**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

IN RE:

CRS REPROCESSING, LLC                                         CHAPTER 11

     DEBTOR-IN-POSSESSION                               CASE NO. 17-32565

**EMERGENCY MOTION OF DEBTOR AND DEBTOR-IN-POSSESSION FOR INTERIM AND FINAL ORDERS AUTHORIZING DEBTOR TO: (A) OBTAIN SECURED SUPERPRIORITY POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364(C)(1), 364(C)(2) AND 364(D)(1); (B) UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. §§ 105, 361, 362 AND 363; (C) GRANT ADEQUATE PROTECTION TO PRE-PETITION SECURED LENDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362 AND 363; AND (D) SCHEDULE FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B), 4001(C) AND 9014; (E) AND GRANTING RELATED RELIEF**

CRS Reprocessing, LLC ( the "Company" or the "Debtor"), as debtor and debtor-in-possession in this chapter 11 bankruptcy case, pursuant to, *inter alia*, sections 105, 361, 362, 363, and 364(c) and (d) of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 ("Bankruptcy Code")[1] and Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), respectfully requests entry of both interim and final orders authorizing the Debtor to use the lender's cash collateral and obtain secured post-petition superpriority financing (the "DIP Facility") on an interim and final basis pursuant to the terms of that certain Debtor-in-Possession Loan and Security Agreement (the "DIP Loan Agreement") to be entered into by and between the Debtor and Triangle Capital Corporation ("Triangle" or the "Lender") (the "Motion"). The DIP Loan Agreement is attached hereto as Exhibit A and incorporated here by reference. The Debtor requests expedited relief because it currently has insufficient means to fund this bankruptcy, and without this bankruptcy, the value and benefit of

---

[1] Unless otherwise indicated, all "Section" references are to the Bankruptcy Code, all "Rule" references are to the Bankruptcy Rules and all "Local Rule" references are to the Local Rules.

the Debtor's business is in danger of being lost. Attached hereto as Exhibit B is the proposed interim order granting the relief requested herein (the "Interim Order"). A final order granting the relief requested herein (the "Final Order") shall be tendered in advance of the final hearing of the Motion. In support of the Motion, the Debtor respectfully states as follows:

## RELIEF REQUESTED AND OVERVIEW OF DIP FACILITY

By and through this Motion, the Debtor seeks entry of interim and final orders that authorize the Debtor to use cash collateral and obtain secured post-petition financing by execution of the DIP Loan Agreement and to perform such other acts as may be necessary or appropriate in connection therewith. Pursuant to Bankruptcy Rule 4001, the Debtor states that the full terms of the proposed DIP Facility are set forth in the DIP Loan Agreement and tendered order but are summarized below:[2]

| | |
|---|---|
| **CREDIT FACILITY:** | A senior secured, debtor-in-possession revolving loan facility in the principal amount of $4,000,000.00 on an interim basis pending entry of a Final DIP Order (as defined below) (the "DIP Facility"). |
| **USE OF PROCEEDS:** | Operating expenses and capital expenditures of the Company, in accordance with a budget to be prepared by the Company and approved by the Lender (the "Budget"), a draft of which is attached as Schedule 1 hereto. |
| **MATURITY:** | January 31, 2018, or, if earlier, the earliest of (i) confirmation by the Bankruptcy Court of a plan of reorganization for the Company, (ii) consummation of a sale of all or substantially all assets of the Company under Bankruptcy Code § 363, or (iii) appointment of a Chapter 7 or Chapter 11 trustee; provided that such date may be extended from time to time by written agreement of the Company and the Lender (the date of such maturity, the "Maturity Date"). |
| **INTEREST:** | 8% per annum on the principal amount outstanding from time to time, calculated on an actual/360 basis, payable in arrears on the last day of each month and on the Maturity Date. While an Event of Default exists, principal shall accrue interest at a rate that is 2% in excess of the above rate. |
| **AVAILABILITY:** | In any calendar week, the Company may borrow under the DIP Facility an aggregate amount not exceeding the lesser of (i) 115% of the sum of the amounts, if any, shown on the Budget line entitled "Cumulative Cash |

---

[2] In the event of any discrepancy between this summary, the DIP Loan Agreement and any order entered as a result, the terms of the order shall control.

Shortfall excluding DIP Borrowing" with respect to such calendar week, all prior calendar weeks, and the immediately following calendar week, or (ii) the aggregate principal amount, if any, remaining under the DIP Facility; provided that upon written request the Company may borrow additional amounts in the Lender's sole discretion.  Subject to the foregoing, principal amounts may be borrowed, repaid, and reborrowed at any time prior to the Maturity Date.

**DEBT SERVICE / ADEQUATE PROTECTION PAYMENTS:**

Debt service, consisting of interest accruing on the DIP Facility, shall be paid when due.

**USE OF CASH COLLATERAL:**

In consideration of the Company's use of cash collateral or conversion of other pre-petition collateral into cash collateral, the Lender, in its capacity as pre-petition lender to the Company, shall be granted a post-petition replacement lien on the same assets (now owned or hereafter acquired by the Company, whether through the use of cash collateral or otherwise) to which its liens attached pre-petition, to the same extent and with the same validity and priority as exists on the petition date, and shall be granted the liens and priority status described below to further secure the use of the cash collateral.

**COLLATERAL AND SUPER PRIORITY ADMINISTRATIVE EXPENSE:**

Obligations of the Company under the DIP Facility shall be secured at all times by a first priority, perfected priming lien upon all real, personal, tangible, and intangible property of the Company's bankruptcy estate. Subject to the Carve Out (as defined below) and avoidance actions pursuant to §§ 502(d), 544, 545, 546, 547, 548, and 550 of the Bankruptcy Code, the DIP Facility shall constitute super priority expenses of the Company in the Chapter 11 case, with administrative priority and senior secured status under §§ 364(c) and 364(d) of the Bankruptcy Code.  The claims, liens and security interests granted to the Lender on all of the Company's assets, and the priorities accorded to the DIP Facility, shall have the super priority and senior secured status afforded by §§ 364(c) and 364(d) of the Bankruptcy Code, senior to all claims and interests other than the Carve Out and avoidance actions, and shall have priority over any and all other costs and expenses of the kind specified in, or ordered pursuant to, §§ 105, 326, 328, 330, 331, 363, 364, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 or any other provision of the Bankruptcy Code and shall at all times be senior to the rights of the Company, its estate, and any successor trustee or estate representative in the Chapter 11 case, or in any subsequent Chapter 7 or other proceeding or case under the Bankruptcy Code.  The interim DIP financing order and Final DIP Order shall be sufficient and conclusive evidence of the creation, attachment, validity, perfection and priority of the Lender's security interest in and liens on the Company's assets, without the necessity of the Lender filing, recording, or serving any financing statements or other documents which otherwise may be required under federal or state law in any jurisdiction or the taking of any action to validate or perfect the security interests and liens granted to the Lender.

**CARVE OUT:**

The security interests and the super priority administrative expense status

3

described herein, including without limitation in the paragraph above captioned "Collateral and Super Priority Administrative Expense," shall be subject only to a carve out for (i) allowed professional fees of and disbursements to professionals retained pursuant to orders of the Bankruptcy Court in accordance with the Budget; and (ii) amounts payable in connection with the Chapter 11 case pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of Court, each as set forth in the Interim DIP Financing Order (collectively, the "Carve Out").

**NO SURCHARGE:**   Except for the Carve Out, no costs or expenses of administration shall be imposed against the Lender or its collateral under §§ 105, 506(c), or 552 of the Bankruptcy Code, or otherwise, and the Company shall waive for itself and on behalf of its bankruptcy estate any and all rights under §§ 105, 506(c), or 552 of the Bankruptcy Code, or otherwise, to assert or impose or seek to assert or impose any such costs or expenses of administration against the Lender or its collateral.

**FINAL DIP ORDER:**   No later than the earlier of (i) the expiration of any interim DIP financing order and (ii) 45 days after the entry of such interim DIP financing order, a Final DIP Order shall have been entered by the Bankruptcy Court and shall be in full force and effect and shall not have been (x) vacated, stayed, or reversed or (y) amended or modified except as agreed to in writing by the Lender in its sole discretion. "Final DIP Order" means an order entered by the Bankruptcy Court on at least fourteen (14) days' notice as required by Bankruptcy Rule 4001, in form and substance satisfactory to Lender in its sole discretion approving the DIP Facility and the DIP Revolving Loan Documents (as defined in the DIP Facility).

**SALE MOTION:**   The process for a sale of all or substantially all of the Company's assets in accordance with § 363 of the Bankruptcy Code shall be structured so that the sale is approved by the Bankruptcy Court on or before October 9, 2017. The Lender and the Company agree that the Lender shall act as a "stalking horse" for such sale, and all timing, terms and conditions of the 363 sale motion, the sale process, sale procedures and auction shall be acceptable to the Lender in its sole discretion, as more specifically described in the Asset Purchase Agreement and other acquisition documents.[3]

**EVENTS OF DEFAULT:**   Usual and customary events of default for the Lender or DIP financings, including but not limited to the appointment of a trustee or examiner or the conversion of the case to Chapter 7, it being understood that to the Lender's knowledge no Event of Default under the DIP Facility will exist as of the closing date of the DIP Facility.

**EXPENSES:**   The Company will reimburse the Lender and its affiliates on demand for all reasonable out-of-pocket expenses (including, without limitation, the Lender's travel expenses and reasonable fees, costs, and expenses of counsel

---

[3] A copy of the Asset Purchase Agreement is attached hereto as Exhibit C.

to the Lender), in each case incurred in connection with the DIP Facility and the preparation of legal documentation. All amounts allocated for professional fees in the Budget, including attorneys' fees, shall be paid with the proceeds of the DIP Facility and escrowed with said professional each month, and payment to the professionals shall be made upon application to and allowance by the Bankruptcy Court through the regular procedures or those adopted by the Bankruptcy Court, and such professional fees may, on court approval, be paid from proceeds of the DIP Facility regardless of the timing of their incurrence post-petition; provided that Lender shall not be required to make any application to the Bankruptcy Court with respect to reimbursement of any Lender Expenses unless otherwise set forth in an order issued by the Bankruptcy Court.

## FILING AND JURISDICTION

On August 9, 2017 (the "Petition Date"), the Debtor filed with the Court a voluntary petition for relief under chapter 11 of the Code. The Debtor is operating its business as a debtor and debtor-in-possession pursuant to Code §§ 1107(a) and 1108. No request has been made for the appointment of a trustee or examiner, and no committee has been appointed in this case.

This Court has subject matter jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). The Court can exercise its subject matter jurisdiction pursuant to 28 U.S.C. § 157(b)(1). Venue of this case and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

The Debtor is a global partner in fluid reprocessing management, offering people, technology and services to efficiently handle industrial fluids for a variety of industries.

As of the Petition Date, the Debtor has assets including accounts receivable in the estimated face amount of $1,561,000 million, approximately $319,000 in inventory, and approximately $3,325,000 in fixed assets and other personal property.[4] The Debtor's liabilities

---

[4] The Debtor does not own any real property and leases the location from which it operates its corporate headquarters in Louisville, Kentucky. The values stated here are estimated liquidation values only. The Debtor's management believes that the sale of the company as a going concern could generate materially more value than the sum of the liquidation values.

include secured claims in the principal amount of approximately $43 million and approximately $17 million in unsecured claims, excluding the unsecured deficiency claims held by the Debtor's lenders. Of this $17 million, approximately $700,000 is unsecured non-insider accounts payable.

As of the Petition Date, Debtor's financing was obtained through four (4) credit facilities. A detailed description of each of these facilities may be found in the Declaration of Scott T. Massie in Support of the First Day Motions (the "Massie Declaration"), which is incorporated herein by reference.

Pursuant to the Triangle Credit Facility, Debtor received funds from a revolving line of credit in the face principal amount of $5,000,000.[5]

The Triangle Credit Facility is secured by a first priority security interest in the Debtor's accounts receivable, cash, cash equivalents and deposit accounts (the "Cash Collateral"), among other security, all as set forth in that Security Agreement dated as of June 16, 2011, as amended (the "Triangle Credit Facility Collateral").[6]

The THL Credit Facility is secured by a first priority security interest in Debtor's equipment, fixtures, inventory, goods, instruments, intellectual property, all proceeds and all other assets of Debtor except that THL holds a second priority lien on the Triangle Credit Facility Collateral.

On June 30, 2017, both the Triangle Credit Facility and the THL Credit Facility matured. The Debtor made the interest payments on both facilities that were due on June 30, 2017 but did not make the interest payments due on July 31, 2017.

---

[5] All capitalized terms not otherwise defined herein shall have the meanings assigned to them in the Massie Declaration.

[6] JPM filed a UCC financing statement with the Delaware Secretary of State's office on June 16, 2011 to perfect its security interest in the same, which was assigned to Triangle with the filing of a UCC financing statement amendment with the Delaware Secretary of State's office on May 27, 2015. A continuation statement was filed on March 28, 2016.

As of the Petition Date, a global restructuring agreement had not been reached by the lenders as negotiations among the various creditor groups recently broke down.

**B.      Need for Cash Use and DIP Financing under Interim and Final Orders and for Expedited Relief**

The Debtor has an urgent and immediate need to use the Cash Collateral and obtain post-petition financing.  In particular, the Debtor does not have sufficient funds to pay the expenses necessary to administer this bankruptcy case.

Without the DIP Facility and use of the Cash Collateral, the Debtor may not be able to continue paying wages (including its next payroll, which must be funded on Wednesday, August 16, 2017) or § 363 sale expenses and will be unable to pay professionals as approved by orders of this Court, pay quarterly U.S. Trustee fees, or provide for other expenses attendant to the bankruptcy process generally and chapter 11 proceedings specifically.

The Debtor cannot borrow funds other than the DIP Facility due to its financial condition. Prior to the Petition Date, the Debtor's proposed investment banker, Lincoln Partners Advisors LLC ("Lincoln") solicited 10 entities to provide DIP financing to the Debtor as detailed in the Declaration of Brent C. Williams (the "Lincoln Declaration") which is attached hereto as Exhibit D.  The Debtor's counsel also invited THL to make it an offer for DIP financing which THL did shortly before the bankruptcy filing.  The terms of the proposed THL DIP financing were not as favorable as those offered by Triangle or the late arrival of the offer left too little time to reach or document an agreement regarding it and, as such, that proposal was rejected.

Without the Court's approval of the cash use and DIP Facility at the outset of the case, the Debtor will suffer irreparable harm due to its inability to fund its bankruptcy, the value of the

Debtor's business will be lost, the Debtor's customers will likely suffer significant disruption or harm[7], and the Debtor's unsecured trade vendors will have no chance to be paid.

The DIP financing is needed to preserve the value of the Debtor's estate so that the Debtor's assets may be sold pursuant to Section 363 of the Code.[8]

## RELIEF REQUESTED

The Lender is consenting to the Debtor's post-petition use of its Cash Collateral as set forth in the DIP Loan Agreement.  As to the post-petition DIP Financing, section 364(c)(1) and (2) and section 364(d)(1) of the Code are the basis for a superpriority administrative expense claim, a senior lien on unencumbered property, and a senior priming lien on property of the estate in favor of a post-petition lender if a debtor is unable to obtain unsecured credit as an administrative claim under section 503(b)(1), after notice and a hearing.

### A.    Section 364(c)'s Requirements For Post-Petition Credit Are Satisfied

In order to obtain a court's authorization for post-petition credit pursuant to section 364(c), a debtor has the burden of establishing that: (1) it was unable to obtain unsecured credit; (2) the proposed credit transaction is necessary to preserve assets of the estate; and (3) the terms of the proposed credit agreement are fair, reasonable, and adequate in light of the circumstances of the debtor and the proposed lender. *See, e.g., In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).

### 1.    The Debtor is Unable to Obtain Unsecured Credit

In considering whether to approve proposed financing, a court must first examine the debtor's efforts to obtain financing on an unsecured basis. *See, e.g.*, *In re Ames Dep't Stores,*

---

[7] The Debtor's waste fluid systems function like a kidney to each of those customers – i.e. the customers cannot operate without that service.

[8] The Debtor anticipates filing a bid procedures motion within the next week or so.

*Inc.*, 115 B.R. 34, 37-40 (Bankr. S.D.N.Y. 1990) (debtor demonstrated the unavailability of unsecured financing where debtor approached several lending institutions); *In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992) (stating that debtor does not need to contact "infinite number" of lenders in order to demonstrate unavailability of unsecured financing); *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where there are few lenders likely to be able and/or willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing"), *aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989). While a debtor is not required to show that it sought credit from every possible source, a debtor must demonstrate that it made a reasonable effort to seek credit from other sources available under Bankruptcy Code sections 364(a) and (b). *Id.*

Here, as detailed above and in the Lincoln Declaration, the Debtor has been unable to obtain unsecured DIP financing despite its efforts to do so.

The Debtor has negotiated the terms of the proposed DIP Facility with Triangle. While the Debtor invited other of its lenders to make it a DIP financing proposal, the Debtor did not receive any other proposals except that from THL on the eve of its bankruptcy filing.

**2.     Approval of the DIP Facility Will Preserve the Primary Asset of the Estate**

The DIP Facility is absolutely necessary to preserve the value of the Debtor's estate, and without it, the Debtor's business is subject to irreparable harm.

When considering a proposed post-petition financing arrangement, a court must focus upon whether the terms of the proposal prejudice the rights of creditors or grant the lender excessive control. *In re Defender Dep't Stores*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992).

However, a court must allow a debtor to exercise reasonable business judgment. *See, e.g., In re Ames Dep't Stores, Inc.*, 115 B.R. at 38.

In this case, the DIP Loan Agreement is the result of a reasonable exercise of the Debtor's business judgment. The Debtor has several developing or profitable lines of business that are anticipated to be the subject of a section 363 sale.  However, the Debtor currently lacks the liquidity needed to fund this proceeding and consummate a sale. The Debtor therefore needs to borrow funds to ensure that it makes constructive use of the bankruptcy process.  The Debtor exercised sound business judgment by seeking advice from its legal and financial advisors in making the determination that the DIP Facility is fair and reasonable and in the best interest of Debtor's estate under its current circumstances.  Accordingly, Debtor should be granted authority under Section 364(c) to enter into the DIP Facility and borrow funds from the DIP Lender on the basis described herein and in the DIP Facility, on a senior secured superpriority basis with a priming lien also to be given to the Lender.

**3.    The Terms of the DIP Loan Agreement are Fair, Reasonable, and Adequate Under the Circumstances**

Section 364 is a vehicle for a debtor to continue operating under the supervision of a bankruptcy court since debtors would face significant difficulties obtaining credit in a bankruptcy.

Here, the terms of the DIP Loan Agreement are fair and equitable to the Debtor under its highly distressed circumstances.  First, the interest rate is in line with that for loans of this type.  Second, portions of the collateral that secure the DIP Facility is collateral on which the Lender already has a prepetition lien.  Third, the Lender is undersecured as to its prepetition debt, so there is no equity that could result in a benefit to other creditors.  Finally, the funds will be used to satisfy normal and essential expenses and fees of the bankruptcy meaning that all parties in

10

interest can benefit from the involvement and oversight of the Bankruptcy Court and a sale that might realize going concern value that would otherwise be lost.

**B.**      <u>The Requirements For A Priming Lien Under Section 364(d)(1) Are Also Satisfied</u>

Section 364(d) provides:

> (d)      The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate this is subject to a lien only if-
>
> > (1)      the trustee [or debtor-in-possession] is unable to obtain such credit otherwise; and
> >
> > (2)      there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

Hence, absent consent, in order to obtain what is commonly referred to as a "priming lien," a debtor must establish that (i) there was no other alternative to the DIP facility, and (ii) the interests of the senior lien holders being "primed" will be adequately protected in the face of the proposed loan. *In re First South Sav. Ass'n.*, 820 F.2d 700 (5th Cir. 1987); *In re W&W Protection Agency, Inc.*, 200 B.R. 615, 623 (Bankr. S.D. Ohio 1996). *In re Levitt & Sons, LLC*, 384 B.R. 630, 640-41 (Bankr. S.D. Fla. 2008).

Debtor meets the first criteria: there are no alternate funding sources that have offered terms as or more favorable than those being offered to it by the Lender.

As to the second prong of § 364(d), "the determination of adequate protection involves a careful balancing of all relevant factors including the value of the collateral, the likelihood it will depreciate over time, the debtor's prospects for a successful reorganization, the debtor's performance under the plan, the balance of hardships between the parties, and whether the creditor's property interest is being unduly jeopardized." *In re Brown*, 1998 U.S. Dist. LEXIS

16436, *14 (E.D. Pa. Oct. 15, 1998).  For example, in *In re Protective Prods. of Am.*, the Court

found that the non-consenting lenders were adequately protected:

> The evidence proffered without objection at the Interim Hearing demonstrates that
> the expenses provided for in the Budget and this Interim Order are the reasonable,
> necessary costs and expenses of preserving the value of the Debtors' assets
> pending the Sale.  Absent the interim borrowing of funds under the DIP Credit
> Agreement authorized by this Interim Order and the use of Cash Collateral, the
> value of the Debtors' assets and businesses would be severely threatened and
> would decline significantly.  Therefore, the Debtors' estates will suffer immediate
> and irreparable harm absent interim approval of the DIP Credit Facility and
> authorization to use Cash Collateral.  In view of the foregoing, and based on the
> evidence proffered without objection at the Interim Hearing, the Court finds and
> concludes that the interests of all entities holding liens in any property comprising
> the DIP Collateral (as such term is hereinafter defined), who have not otherwise
> consented to the relief granted herein, are adequately protected as required by
> Section 364(d) of the Bankruptcy Code.

2010 Bankr. LEXIS 5939, *11-12 (Bankr. S.D. Fla. 2010).

Here, the all of the Debtor's secured lenders are underwater.  Adequate protection is

being provided by the value to each of these lenders that is likely to be gained from a well-

funded, going concern sale that will bring more than a fire sale liquidation.

The Debtor estimates that the liquidation of the collateral on which THL claims a first

priority lien is approximately $3.6 million.  It likewise estimates that the value of the collateral

on which Triangle holds a validly perfected, first priority lien – the accounts receivable – is

$1,561,000 million. If, however, the Debtor maintains adequate liquidity for both working

capital and to fund its on-going projects post-petition, Lincoln will be able to run a robust

marketing process to strategic and financial buyers, located both domestically and

internationally. Lincoln has already identified over 175 potential buyers which may be interested

in acquiring the Debtor as a going-concern. Given the Debtor's diversified business model

providing critical services to a variety of markets and end users, Lincoln believes that a robust

process can be effectuated that will yield recoverable proceeds much greater than the implied value under the Debtor's orderly liquidation analysis.

The lenders are better served by a well-funded sale that requires priming their pre-petition liens than by a liquidation. The DIP Facility is better for other interest holders as well – jobs for the Debtor's 43 employees will be preserved.  It also avoids the irreparable injury that will result to the Debtor's customers if it is forced to cease operations and liquidate.  The Debtor functions as the customer's kidney for spent fluids and biproducts. For example, if the Debtor is no longer able to provide services to two cold mill customers which rely on the Debtor to reprocess 100% of their cold rolling fluid, over 1,000 workers in the United States would be placed on furlough as their sites would be down.

<u>CONCLUSION</u>

For all of the foregoing reasons, the Debtor respectfully requests that the Court (i) grant the Motion on an interim basis; (ii) enter the Interim Order authorizing the Debtor to use the Lender's cash collateral and enter into the DIP Loan Agreement; and (iii) schedule a final hearing on the Motion.

August 9, 2017                             Respectfully submitted,


                                           /s/ Lea Pauley Goff
                                           Lea Pauley Goff
                                           Emily L. Pagorski
                                           STOLL KEENON OGDEN PLLC
                                           500 West Jefferson Street
                                           Suite 2000
                                           Louisville, Kentucky  40202
                                           Tel. No. (502) 333-6000
                                           Fax No. (502) 333-6099

                                           *Proposed Counsel for the Debtor,*
                                           *CRS Reprocessing, LLC*

1501748.1