**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

IN RE:

CRS REPROCESSING, LLC                                                                 CHAPTER 11

    DEBTOR-IN-POSSESSION                                                     CASE NO. 17-32565

**DECLARATION OF SCOTT T. MASSIE IN SUPPORT OF FIRST DAY MOTIONS**

Declarant, Scott T. Massie, pursuant to 28 USC § 1746, states the following:

1. I am the Chief Executive Officer of CRS Reprocessing, LLC ("CRS Reprocessing" or the "Debtor"), a Delaware limited liability company. CRS Reprocessing is a global partner in fluid reprocessing management, offering people, technology and services to efficiently handle industrial fluids for a variety of industries. It has operations in the United States, Europe and Asia. I have been the Chief Executive Officer of CRS Reprocessing since August 1, 2009. Before that, I served as Chief Executive Officer of EPV Solar, which is also in the renewable energy market, from 2007 to 2009 and as Executive Vice President at EMCORE Corporation from 2003 to 2006. As such, I have detailed knowledge and experience with the CRS Reprocessing's business and financial affairs.

2. I am authorized to submit this declaration in support of the Debtor's First Day Motions (defined below) (the "Declaration"). Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of the relevant documents, or my opinion based on my experience, knowledge and information concerning CRS Reprocessing's operations and financial affairs. If I were called upon to testify, I would testify competently to the facts set forth in the Declaration.

3. Capitalized terms used but not defined herein shall have the meanings given to them in the First Day Motions (defined below), as applicable.

### A. BACKGROUND

4. On August 9, 2017 (the "Petition Date"), CRS Reprocessing filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Code").

5. The Debtor intends to continue to operate as a debtor-in-possession pursuant to sections 1107 and 1108 of the Code.

#### 1. The Debtor's Business

6. CRS Reprocessing's corporate headquarters are located at 9780 Ormsby Station Road, Suite 2500, Louisville, Kentucky 40223 (the "Corporate Headquarters. It has been at this location for approximately one year. CRS Reprocessing leases the Corporate Headquarters from Fenley Portfolio Trust I, LLC pursuant to the terms of a lease agreement that expires on April 30, 2023.

7. CRS Reprocessing and its affiliated entities are leaders in the fluid reprocessing market including proprietary recycling processes.[1] CRS Reprocessing's primary line of business is to convert industrial fluids into a reusable product while simultaneously reducing waste disposal. Its on-site business model – the equipment is installed at the customer's facility - reduces the risk of material spillage or emission by limiting the transportation of such materials. CRS Reprocessing utilizes proprietary separation processes for slurry, coolants and lubricants that are mechanical in nature and do not use any harsh chemicals that could potentially endanger the environment.

---

[1] CRS Reprocessing has ten (10) subsidiaries in which it holds a 99% or greater ownership interest. Of these ten subsidiaries, seven are foreign entities. Four of these subsidiaries also have one or more subsidiaries and collectively such subsidiaries number five, all of which are foreign entities. Thus, CRS Reprocessing has a direct or indirect ownership interest in fifteen entities (the "CRS Affiliates").

8. In addition to the industrial fluids market, CRS Reprocessing also provides operates in the following markets: solar/semiconductor, metals and oil and gas services, among others.

9. The solar/semiconductor market involves slurry reprocessing and CRS Reprocessing's process for recovering spent slurries is a proprietary method incorporating dilutents and mechanical processes, devoid of chemicals, to facilitate the separation of recoverable grit and carrier.

10. With respect to the metals market, CRS Reprocessing offers on-site services that increase the quality and recovery of coolants for hot and cold metal rolling operations and emulsified fluids for aluminum wheel production. With over three decades of experience developing advanced reprocessing solutions, CRS Reprocessing has created innovative distillation, centrifugation and proprietary filtration offerings to optimize the treatment process for a variety of metals including aluminum, stainless steel, and other rolled and wheeled metals.

11. As to the oil and gas market, CRS is an ISO-certified provider for industrial fluid management.[2] Its expertise includes the creation of process-controls software, providing unmatched automation and consistency essential for well pad production efficiency.

12. As demonstrated by the numerous lines of business described above, CRS Reprocessing has taken an innovative approach as markets shift and change, allowing it to maintain existing business platforms while tapping into other emerging and expanding market segments. Thus, some businesses lines are more profitable than others and certain lines are more exploratory in nature. The services that CRS Reprocessing provides to its customers through

---

[2] An ISO certification certifies that a management system, manufacturing process, service or documentation procedure has all the requirements for standardization and quality assurance.

3

various of these business lines are necessary to the business operations of its customers and without these services the operations of many customers would be severely limited.

13. In many instances, CRS Reprocessing functions as the customer's kidney for spent fluids and biproducts. For example, if CRS Reprocessing is no longer able to provide services to two cold mill customers which rely on CRS Reprocessing to reprocess 100% of their cold rolling fluid, over 1,000 workers in the United States would be placed on furlough as their sites would be down.

**2.     The CRS Reprocessing Team**

14. I am CRS Reprocessing's Chief Executive Officer, and, in that capacity, my duties include total control and operation of the assets. As of the Petition Date, CRS Reprocessing employed approximately 43 full time and part time employees including engineers, operating and process technicians, and lab technicians, among others. CRS Affiliates employ an additional approximately 60 employees. CRS Reprocessing's employees perform a variety of labor and services at locations throughout the world.

15. As part of its ordinary course of business, CRS Reprocessing provides health, dental, vision and life insurance benefits to certain of its employees. CRS Reprocessing obtains health, dental, vision and life insurance for its employees through United Healthcare, Delta Dental, Anthem and Anthem Life, respectively. Approximately 41 domestic employees and their family members have health or dental insurance through their employment with CRS Reprocessing.

**3.     Events Leading To The Chapter 11 Filing**

16. As of the Petition Date, 70.54% of CRS Reprocessing is owned by Energy Hardware Holdings, Inc., which in turn is wholly owned by Triangle Capital Corporation. Salem

Halifax Capital Partners LP owns a 22.39% interest in CRS Reprocessing and the remaining 7.27% of CRS Reprocessing is owned by various partnerships and individuals.

17. As of the Petition Date, CRS Reprocessing's financing was obtained through four (4) credit facilities with four (4) different lender groups: the Triangle Credit Facility, the THL Credit Facility, the Harvest Credit Facility and the Interim Credit Facility, all as defined below. While the financing instruments are complex, in general, Triangle has a first priority lien on receivables and proceeds with THL having junior liens on the same. THL has a first priority lien on contracts and equipment.

18. CRS Reprocessing has entered into several complicated debt refinancings since 2011. On May 27, 2015, CRS Reprocessing and its four lender groups entered into a significant restructuring and refinancing in which portions of secured debt were converted into equity. CRS Reprocessing has continued to borrow money since May 27, 2015 through certain debt tranches within the THL Credit Facility. Triangle has provided substantially all of the financing through the THL Credit Facility as a participating lender. CRS Reprocessing has not made any principal payments to any of its secured lenders since May 27, 2015. The amendments to the various secured debt facilities have been to extend the maturity dates of each debt facility and to provide for additional borrowings under the THL Credit Facility. Beginning in approximately 2016, it became increasingly difficult for CRS Reprocessing to extend the maturity date of its secured credit facilities, in part, to ongoing disputes among various of its lenders. Currently, CRS must have new money to operate but Triangle and THL are not in agreement regarding what collateral rights a party injecting new money into CRS Reprocessing would get.

19. On June 30, 2017, both the Triangle Credit Facility and the THL Credit Facility matured. CRS Reprocessing made the interest payments on both facilities that were due on June 30, 2017 but did not make the interest payments due on July 31, 2017.

20. In connection with the maturity of the Facilities, negotiations between and among the four lender groups commenced but an agreement was not reached.

21. As of the Petition Date, a global restructuring agreement had not been reached by the lenders and CRS Reprocessing had no more liquidity absent bankruptcy protection.

### 4.     Employment And Vendors

22. CRS Reprocessing withholds from participating employees' paychecks funds for health, dental and life insurance premiums, and remits those payments directly to, the appropriate insurance provider. As of the Petition Date, CRS Reprocessing owed approximately $51,000 on obligations related to these benefits and requests authority to pay these benefits that accrued pre-petition.

23. The Payroll Servicer processes CRS Reprocessing's payroll by withdrawing on a bi-weekly basis funds from CRS Reprocessing's payroll account at the JPMorgan Chase Bank, N.A. (the "Bank") and using that money to issue checks to employees and 1099 contract laborers and to process obligations due to federal, state, and local taxing authorities.

24. In the ordinary course of business, the majority of the Debtor's employees are to be paid on August 18, 2017, with that payroll to be funded by the Debtor on August 16, 2017, for the period from August 7, 2017 through August 18, 2017. For this period, the Debtor will be liable for approximately $154,000 in gross wages and salaries (all but 7 days of which is prepetition). The Debtor has two employees who are paid in arrears. These employees are to be paid on August 18, 2017, with that payroll to be funded by the Debtor on August 16, 2017, for the period from July 31, 2017 through August 11, 2017 (all but 2 days of which is prepetition).

6

For this period, the Debtor is liable for approximately $5,000 in gross wages and salaries. The Debtor also is obligated to pay federal, state, and local withholding taxes due on employee wages and salaries, the matching portion of the Social Security, Medicare taxes and processing fees of approximately $11,000 for the same periods. The Debtor is also obligated to pay $51,189.65 in health, dental, vision and life insurance premiums due on August 1, 2017 for the calendar month of August. As of the Petition Date, the Debtor was current on all of these obligations except that owed for the time period referred to above. The Debtor is also obligated to pay approximately $10,000.00 in business expenses incurred by employees that have not been reimbursed. These expenses are related to travel expenses incurred by employees on official company business.

25. As of the Petition Date, CRS Reprocessing was not current on payments to all ordinary course vendors.

### 5. Pre-Petition Financing

26. As set forth above, as of the Petition Date, CRS Reprocessing's financing was obtained through four (4) credit facilities.

*Triangle Credit Facility*

27. Pursuant to the Triangle Credit Facility (defined below), CRS Reprocessing received funds from JPMorgan Chase Bank, N.A. ("JPM") under a revolving line of credit in the face principal amount of $5,000,000 of which $1,802,769.00 in the aggregate principal amount remains outstanding. JPM was the original lender under the Triangle Credit Facility and Triangle Capital Corporation ("Triangle") acquired JPM's interest pursuant to a Sale and Assignment Agreement dated as of May 27, 2015. The "Triangle Credit Facility" means that certain Loan Agreement dated as of June 16, 2011 by and among the Debtor, JPM and the guarantor parties thereto, as amended by the letter agreement dated as of August 23, 2011, as amended, restated and modified from time to time and most recently amended by that by the

7

Eleventh Amendment to Borrower Documents dated as of February 7, 2017.

28. The Triangle Credit Facility is secured by a first priority security interest in the Debtor's accounts receivable, cash, cash equivalents and deposit accounts, among other security, all as set forth in that Security Agreement dated as of June 16, 2011, as amended (the "Triangle Credit Facility Collateral").[3]

29. As of the Petition Date, the aggregate principal amount of $1,802,769.00 remains outstanding under the Triangle Credit Facility.

*THL Credit Facility*

30. Also on or about June 16, 2011, CRS Reprocessing and the guarantors party thereto entered into a Credit Agreement with THL Corporate Finance, Inc., as Administrative Agent and Collateral Agent ("THL Agent") for THL Credit, Inc., THL Credit Greenway Fund, LLC and Crystal Financial SPV, LLC (together, "Initial THL Lenders") pursuant to which the Initial THL Lenders made term loans in the face principal amount of $30,000,000 to CRS Reprocessing (the "Initial THL Credit Facility").

31. The Initial THL Credit Facility was amended and restated pursuant to the Amended and Restated Credit Agreement dated as of May 27, 2015 among CRS Reprocessing, the guarantors party thereto, THL Agent for THL Credit, Inc. and THL Credit Greenway Fund, LLC (together, "THL Lenders") which provided for the repayment of a portion of the outstanding obligations, the refinancing of $17,051,259.47, additional term loans in the face amount of $4,000,000 and additional incremental term loans in the face amount of $7,500,000 (the "THL Restated Credit Facility"). The THL Restated Credit Facility has been subsequently

---

[3] JPM filed a UCC financing statement with the Delaware Secretary of State's office on June 16, 2011 to perfect its security interest in the same, which was assigned to Triangle with the filing of a UCC financing statement amendment with the Delaware Secretary of State's office on May 27, 2015. A continuation statement was filed on March 28, 2016.

amended, modified and restated, from time to time, which modifications provided for additional incremental term loans. The THL Restated Credit Facility was most recently amended by that Third Amendment to Amended and Restated Credit Agreement dated as of February 7, 2017 (the THL Restated Credit Facility along with the subsequent amendments is hereafter referred to as the "THL Credit Facility").

32. The THL Credit Facility is secured by a first priority security interest in CRS Reprocessing's equipment, fixtures, inventory, goods, instruments, intellectual property, all proceeds and all of its other assets of except that THL has a second priority lien on the Triangle Credit Facility Collateral. THL was granted a security interest in Debtor's assets pursuant to the U.S. Security Agreement dated as of June 16, 2011 and the Pledge Agreement dated as of June 16, 2011.[4]

33. As of the Petition Date, the aggregate principal amount of approximately $31,243,726.00 remains outstanding under the THL Credit Facility.

*Harvest Credit Facility*

34. On November 25, 2009, CRS Reprocessing and the guarantors party thereto entered into that certain Loan Agreement pursuant to which Triangle Mezzanine Fund, LLLP made a loan to CRS Reprocessing in the aggregate amount of $16,000,000 in senior subordinated debt (the "Original Loan Agreement").

35. Pursuant to a First Amendment to Loan Agreement dated as of November 20, 2010, the lenders made an additional loan to CRS Reprocessing in the aggregate principal amount of up to $15,000,000 in junior subordinated debt ("First Amendment"). Pursuant to that certain Amended and Restated Loan Agreement dated as of June 16, 2011, among CRS

---

[4] THL filed a UCC financing statement with the Delaware Secretary of State's office on June 16, 2011 to perfect its security interest in the same which financing statement was continued on May 9, 2016.

Reprocessing, the lenders and the agent for the lenders, the agent and the lenders amended and waived certain provisions of the Original Loan Agreement and First Amendment (the "2011 Loan Agreement").

36. The 2011 Loan Agreement was amended and restated pursuant to that certain Second Amended and Restated Loan Agreement dated as of October 31, 2012 among CRS Reprocessing, the guarantors party thereto, the departing lenders, the new lenders and the agent (the "2012 Loan Agreement") in which the lenders made additional loans in an aggregate amount not to exceed $5,000,000.

37. The 2012 Loan Agreement was amended and restated pursuant to the Third Amended and Restated Loan Agreement dated as of May 27, 2015 (the "Third Loan Agreement") among the CRS Reprocessing, the guarantors party thereto, the departing lenders, and Harvest Capital Credit Corporation, as replacement agent and successor lender ("Harvest"), which provided for the indebtedness owed to the departing lenders to be contributed and converted into equity in the CRS Reprocessing and provided for a partial repayment of the loans made under previous loan agreements.

38. The Third Loan Agreement has been subsequently amended , with the most recent amendment by that certain Third Amendment to Third Amended and Restated Loan Agreement dated as of February 7, 2017 (the Third Loan Agreement along with the subsequent amendments is hereafter referred to as the "Harvest Credit Facility").

39. As of the Petition Date, the aggregate principal amount of approximately $7,136,823.53 remains outstanding under the Harvest Credit Facility.

*The Interim Credit Facility*

40. CRS Reprocessing also has financing evidenced by that certain Second Amended

and Restated Senior Secured Subordinated Note dated as of February 10, 2015 (as modified by that certain First Modification to Second Amended and Restated Senior Secured Subordinated Note dated as of April 29, 2016, as further modified by that certain Second Modification to Second Amended and Restated Senior Secured Subordinated Note dated as of October 31, 2016, collectively, the "Subordinated Note" or the "Interim Credit Facility"), made by CRS Reprocessing in favor of Triangle Capital Corporation ("Triangle") and Salem Halifax Capital Partners, Limited Partnership ("Salem"), in the original maximum principal amount of $3,500,000.00.

41.   Pursuant to (a) that certain Participation Agreement dated as of October 31, 2014 (the "Argosy Participation Agreement") by and among Argosy Capital Group III, L.P. ("Argosy"), Salem and Triangle Mezzanine Fund, LLLP ("TMF"); (b) that certain Participation Agreement dated as of October 31, 2014 by and among Cordam Group, LLC ("Cordam"), Salem and TMF; (c) that certain Participation Agreement dated as of October 31, 2014 by and among Fran Donato ("Donato"), Salem and TMF; and (d) that certain Participation Agreement dated as of October 31, 2014 by and among Frank Seidman ("Seidman", and together with Argosy, Cordam and Donato, the "Participants", and each individually a "Participant"), Salem and TMF, each of Salem and TMF granted to each Participant a participation interest in the Subordinated Note.

42.   The Interim Credit Facility is secured by a second priority security interest in the Debtor's accounts receivable, cash, cash equivalents and deposit accounts, among other security, all as set forth in that Security Agreement dated as of October 15, 2014, as amended (the "Interim Credit Facility Collateral").[5]

---

[5] Triangle filed a UCC financing statement with the Delaware Secretary of State's office on October 16, 2014 to perfect its security interest in the same.

11

43. As of the Petition Date, 2017, the aggregate principal amount of approximately $3,000,000.00 remains outstanding on the Subordinated Note.

## B. **THE FIRST DAY MOTIONS**

44. CRS Reprocessing filed its Chapter 11 petition on August 9, 2017

45. On August 9, 2017, the Debtor filed, among others, the following motions:

(a) Emergency Motion Emergency Motion Of Debtor And Debtor-In-Possession For Interim And Final Orders Authorizing Debtor To: (A) Obtain Secured Superpriority Post-Petition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364(C)(1), 364(C)(2) And 364(D)(1); (B) Utilize Cash Collateral Pursuant To 11 U.S.C. §§ 105, 361, 362 And 363; (C) Grant Adequate Protection To Pre-Petition Secured Lender Pursuant To 11 U.S.C. §§ 105, 361, 362 And 363; And (D) Schedule Final Hearing Pursuant To Bankruptcy Rules 4001(B), 4001(C) And 9014; (E) And Granting Related Relief (the "DIP Motion") (D.I. 3);

(b) Emergency Motion For Order Authorizing Payment Of Pre-Petition Accrued Employee Wages, Salaries, 1099 Income, Taxes, And Benefits (D.I. 5);

(c) Emergency Motion For Order Determining Adequate Assurance Of Payment For Future Utility Services (D.I. 6); and

(d) Expedited Application For Interim And Final Approval Of Debtor's Application For Order Authorizing The Employment And Retention Of Stoll Keenon Ogden PLLC As Counsel For The Debtor *Nunc Pro Tunc* As Of August 9, 2017 (D.I. 4) (collectively, the "First Day Motions").

1. **Support for the Emergency Motion Emergency Motion Of Debtor And Debtor-In-Possession For Interim And Final Orders Authorizing Debtor To: (A) Obtain Secured Superpriority Post-Petition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364(C)(1), 364(C)(2) And 364(D)(1); (B) Utilize Cash Collateral Pursuant To 11 U.S.C. §§ 105, 361, 362 And 363; (C) Grant Adequate Protection To Pre-Petition Secured Lender Pursuant To 11 U.S.C. §§ 105, 361, 362 And 363; And (D) Schedule Final Hearing Pursuant To Bankruptcy Rules 4001(B), 4001(C) And 9014; (E) And <u>Granting Related Relief (the "DIP Motion") ("DIP Financing Motion") (D.I. 3)</u>**

46. CRS Reprocessing cannot operate through the period of even an expedited sale without additional funds from a DIP credit facility and use of its cash collateral in the form of existing cash and receivables proceeds. CRS Reprocessing must have this cash in order to pay wages, utilities, other operating expenses and sale and chapter 11 expenses, as set forth in the 13 week budget projection attached to the tendered order approving the DIP financing and use of cash collateral.

47. The proposed DIP facility, offered by Triangle, would infuse up to $4 million at 8% interest, into CRS Reprocessing to get through the sale process. The terms of the facility are as set forth in the tendered order attached to the DIP Financing Motion but may be summarized by Triangle's receipt of first priority replacement liens in the collateral on which it had a first lien pre-petition, first priority liens on new equipment purchased with the DIP loan proceeds and a first priority lien on all other assets of CRS Reprocessing (i.e. a lien priming) under 11 U.S.C. § 363(d)(1).While the Debtor would prefer a credit facility that had better terms, it has no other sources of funds. Lincoln Partners Advisors LLC unsuccessfully solicited addition loan offers. CRS Reprocessing requested that THL make an offer for DIP financing, but only received its offer the day before its bankruptcy filing.

2. **Support for the Debtor's Emergency Motion For Order Authorizing Payment Of Pre-Petition Accrued Employee Wages, Salaries, 1099 Income, <u>Withheld Taxes, And Benefits ("Prepetition Wage Motion") (D.I. 5)</u>**

48. As with most operating businesses, CRS Reprocessing's ability to pay its

13

employees is critical to its operations. Because of the timing of the Petition, the employees are owed wages for a handful of days pre-petition, and the pre-petition amounts owed to them are de minimis compared to other amounts owed by CRS Reprocessing. The amount owed each is less than the $12,850 limit on a priority wage claim under § 507(a)(4). CRS Reprocessing's ability to keep prepetition benefits for its employees is similarly critical to their families and to CRS Reprocessing's operations.

### 3. Support for the Debtor's Emergency Motion For Order Determining Adequate Assurance Of Payment For Future Utility Services ("Utility Motion") (D.I. 6)

49. The Debtor currently utilizes gas, water, electric, telephone, and other utility services provided by several utility companies (collectively, the "Utility Companies"). A list of all, or substantially all, of the Utility Companies that were providing utility services to the Debtor as of the Petition Date, along with the amount of any deposit being held by that Utility Company, is attached as Exhibit 1 to the Debtor's Utility Motion. The relief requested by that motion is intended to apply to all Utility Companies, whether or not listed on that Exhibit 1.

50. The services provided by the Utility Companies are essential to the business of the Debtor. Any interruption in utility services would prove devastating to the Debtor and its estate. In fact, the temporary or permanent discontinuation of utility services to the Debtor could injure employees and irreparably disrupt the Debtor's business operations and, as a result, fundamentally undermine its efforts at reorganization.

51. The Debtor submits that its history of prompt payment to the Utility Companies constitutes adequate assurance to each of the Utility Companies of payment for all future services. Thus, it is unnecessary, and would be an improvident use of Debtor's available cash, for Debtor to make cash security deposits with each of the Utility Companies post-petition.

**4.      Support for the Expedited Application For Interim And Final Approval Of Debtor's Application For Order Authorizing The Employment And Retention Of Stoll Keenon Ogden PLLC As Counsel For The Debtor *Nunc Pro Tunc* As Of August 9, 201 ("Counsel Employment Motion") (D.I. 4)**

52.      The services of SKO are necessary in order to enable the Debtor to faithfully execute its duties as a debtor in possession.  The professional services which SKO is to render include the general representation of Debtor in this case and the performance of all legal services for Debtor which may be necessary herein, excepting those to be performed by special counsel which the Debtor will seek to employ, if necessary, as set forth in the Stoll Keenon Ogden PLLC Declaration at D.I. 4.

53.      CRS Reprocessing seeks to employ SKO on an emergency interim basis under 11 U.S.C. §§ 327 and 328 because an expedited sale under 11 U.S.C. § 363 is anticipated, will require significant work in the initial weeks of the chapter 11 and proposed counsel needs to be confident of its employment during that period.  The Debtor will suffer irreparable injury in the event of delays in its sale process.  Orders of this nature have been entered in other cases including:  *In re Financial Holdings, Inc.*, Case No. 15-51187 (Bankr. E.D. Ky., June 19, 2015); and *In re AppleIllinois*, Case No. 13-20723 (Bankr. E.D. Ky., April 24, 2013).

### C.      CONCLUSION

The Declarant has read the Debtor's First Day Motions and believes that the facts stated in them are accurate, and believes the relief requested therein is essential for the reorganization of the Debtor.

By: /s/ *Scott T. Massie*

Scott T. Massie
Chief Executive Officer,
CRS Reprocessing, LLC

1485409