# UNITED STATES BANKRUPTCY COURT
# WESTERN DISTRICT OF KENTUCKY

| | : | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| CRS Reprocessing, LLC, | : | Case No. 17-32565 (ACS) |
| | : | |
| Debtor. | : | |
| | : | |

## OBJECTION OF TERM LOAN AGENT TO DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING DEBTOR TO OBTAIN POSTPETITION FINANCING

THL Corporate Finance, Inc., as the prepetition administrative agent and collateral agent (the "Term Loan Agent") under the Term Loan Agreement (as defined below) hereby objects to the *Emergency Motion of Debtor and Debtor-in-Possession for Interim and Final Orders Authorizing Debtor to: (A) Obtain Secured Superpriority Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2) and 364(d)(1); (B) Utilize Cash Collateral Pursuant to 11 U.S.C. §§ 105, 361, 362 and 363; (C) Grant Adequate Protection to Pre-Petition Secured Lender Pursuant to 11 U.S.C. §§ 105, 361, 362 and 363; and (D) Schedule Final Hearing Pursuant to Bankruptcy Rules 4001(b), 4001(c) and 9014; (E) And Granting Related Relief*, dated August 9, 2017 [ECF No. 3] (the "DIP Motion"),[1] and in support thereof respectfully represent as follows:

## PRELIMINARY STATEMENT

1. The Debtor seeks extraordinary relief by asking this Court for the authority to grant a priming lien, on a non-consensual basis, to its controlling shareholder when a priming lien is not permissible or necessary. The Debtor has entered into a debtor-in-possession financing

---

[1] All capitalized terms used herein and not otherwise defined shall have the meanings set forth in the DIP Motion.

facility (the "DIP Loan") with Triangle Capital Corporation ("Triangle"). Triangle, as explained more fully below, is an insider of the Debtor; through a wholly-owned subsidiary, Triangle holds more than 70% of the Debtor's equity. (ECF No. 1-1). Triangle also holds a prepetition claim in the principal amount of approximately $1,802,769, which is allegedly secured by a first priority lien on only certain very limited collateral: prepetition accounts receivable and possibly proceeds of such collateral. (*See* Declaration of Scott T. Massie ("Massie Declaration"), at ¶¶ 28-29). By contrast, the Term Loan Lenders have first priority liens on all other assets and *post-petition* accounts receivable and proceeds thereof as a result of the impairment of Triangle's prepetition lien by operation of section 552(a) of the Bankruptcy Code (collectively, the "Term Loan Collateral"), securing a claim in the principal amount of approximately $31 million. (Massie Declaration, at ¶¶ 32-33).

2.      The DIP Motion is the first step in a brazen and transparent scheme by Triangle to acquire the Debtor's assets using section 363 of the Bankruptcy Code. The first step of this scheme requires the grant of a priming lien on the Term Loan Collateral in exchange for the $4 million DIP Loan to fund operating expenses, a sale process, and professional fees (including professional fees of the DIP Lender). The second step contemplates the sale of the Debtor's assets in exchange for a $7.1 million credit bid and $3 million in cash. Thus, the DIP Loan is designed to create "credit bid" currency on the Term Loan Collateral, which currency does not exist today because Triangle only claims a lien on the prepetition accounts receivable and possibly the proceeds thereof. The proposed DIP Loan and proposed sale process are fundamentally flawed, contrary to applicable law, breaches of prepetition contracts between the parties, and, consequently, will be vigorously opposed by the Term Loan Agent. The DIP Motion cannot be approved for at least the following four reasons.

3. First, the DIP Motion violates the clear and unambiguous terms of an enforceable intercreditor agreement between Triangle, the Term Loan Agent, and the Debtor pursuant to which Triangle expressly agreed that it "will not take, or enter into any agreement to take, a Lien on any assets of any Grantor other than the Revolving Credit Collateral." (Intercreditor Agreement (as defined herein), attached as Exhibit 1, at § 3.2(a)(1)).  In other words, Triangle agreed (and the Debtor acknowledged) that it would not take a lien on the Term Loan Collateral. Triangle should not be permitted to circumvent its binding agreement.  The Debtor (despite being a party to the intercreditor agreement) fails to even mention the agreement or how the priming lien on the Term Loan Collateral could be granted in blatant breach of the unambiguous prohibition.

4. Second, the Debtor cannot meet its burden to provide "adequate protection" to the Term Loan Agent for the impairment of the Term Loan Lender's interest in the Term Loan Collateral resulting from being subordinated to the proposed DIP Loan as required by Section 364(d) of the Bankruptcy Code.  The Debtor acknowledges is there is no equity cushion because Term Loan Lenders are under-secured.  (*See* DIP Motion at 12 ("all of the Debtor's secured lenders are underwater.")).  Instead, the Debtor contends that "[a]dequate protection is being provided by the value to each of these lenders that is likely to be gained from a well-funded, going concern sale that will bring more than a fire sale liquidation." (*Id.*)   There is, however, no evidence to support the theory that the Term Loan Lenders will actually receive any recovery in excess of the liquidation value of the Term Loan Collateral.  In fact, the DIP Motion supports the *exact opposite* conclusion.  Triangle's proposed APA provides for a purchase price of $3 million in cash, plus credit bid of $7.1 million.  The most that Term Loan Agent could possibly receive under this APA, even assuming the Debtor allocated the entire cash price to the Term Loan

Collateral, is 100% of the cash portion (i.e., $3 million), which is **less than** the $3.6 million that the Debtor represents is the liquidation value of the Term Loan Collateral. (DIP Motion, at 1). Thus, the DIP Motion itself refutes the Debtor's bare assertion that the DIP Loan enhances the value of the Term Loan Collateral to offset the impairment resulting from a $4 million priming DIP Loan. Moreover, the Debtor's statements about a marketing process that has not yet been commenced are far too speculative and uncertain to provide adequate protection to the Term Loan Lenders. "Congress did not contemplate that a creditor could find its priority position eroded and, as compensation for the erosion, be offered an opportunity to recoup dependent upon the success of a business with inherently risky prospects." *See In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 567 (3d Cir. 1993). In the absence of adequate protection, the priming lien cannot be granted as matter of law.

5.    Third, the DIP Motion contemplates that the Debtor will draw on the full $4 million proposed DIP loan during the *interim period* even though the Debtor does not need $4 million to address its immediate needs to avoid immediate and irreparable harm until this Court can schedule a final hearing. In fact, the Debtor's proposed budget anticipates that the DIP Loan will be fully drawn by the week of October 6, 2017, which would leave the Debtor with a cash balance of *$1,054,426*. A cash surplus of this amount is completely unnecessary and makes no business sense – except of course from the perspective of Triangle. Since the Debtor proposes to obtain approval of the sale to Triangle by no later than October 9, 2017, (ECF No. 3, at 4), it is clear that the only motivation for the proposed full draw-down of the DIP Loan is the maximization of Triangle's credit-bidding currency on the Term Loan Collateral. Thus, the requested relief must be denied because it is inconsistent with Bankruptcy Rule 4001(c)(2) and serves only to benefit the Debtor's insider-bidder, Triangle.

6. Finally, the DIP Motion must be denied because the Debtor cannot show that it is unable to obtain financing without the grant of a priming lien as required by 11 U.S.C. § 364(d). Here, the Term Loan Agent has offered to provide alternative DIP financing to fund necessary operating expenses during the interim period *without* a priming lien on the substantially the same terms as the proposed Triangle facility. (*See* Term Sheet, attached as Exhibit 2). The Term Loan Agent's non-priming alternative proposal is a practical and commercial solution to address the Debtor's immediate cash needs until the final hearing. The Debtor, however, has refused to accept the Term Loan Agent's financing proposal and has instead chosen a value destructive litigation path that favors insiders over its unaffiliated creditors. The Debtor's decision-making in this regard raises serious red flags about whether the Debtor and its board of directors can fairly and honestly act as independent fiduciaries in this bankruptcy case and whether it can take action for the benefit of creditors that may be contrary to the whims of its controlling shareholder, Triangle. The Term Loan Agent remains ready, willing and able to fund an amount sufficient to meet payroll, utilities, and possible other operating expenses during the interim period to the extent necessary to avoid immediate and irreparable harm subject to its non-priming alternative financing proposal.

7. For these reasons, and the additional arguments that will be made at the interim hearing, the DIP Motion should be denied.

**RELEVANT BACKGROUND**

A.  **Term Loan Agreement**

8. The Debtor is party to the Amended and Restated Credit Agreement dated as of May 27, 2015, as may be amended or modified from time to time (the "Term Loan Agreement"), by and among (i) CRS Reprocessing, LLC ("CRS"), as borrower, (ii) certain affiliates of CRS as

guarantors, (iii) the Term Loan Agent, and (iv) the other lender parties thereto (the "Term Loan Lenders"), which agreement provides for senior secured term loans to CRS.  As of the Petition Date, the obligations outstanding under the Term Loan Agreement approximated $31.2 million, exclusive of fees, costs and expenses as provided for in the Term Loan Agreement.

9. The Debtor's obligations under the Term Loan Agreement are guaranteed by various of the Debtor's affiliates and secured pursuant to an Amended and Restated Guarantee, Pledge and Security Agreement, dated as of May 10, 2012, as may be amended or modified from time to time.  The collateral granted to secure the Obligations under the Term Loan Agreement constitutes substantially all of the real and personal property of the Debtor and the other parties to the agreement.

10. The Term Loan Agent also is party to two participation agreements with Triangle with respect to the Term Loan Agreement.  Pursuant to the participation agreements, Triangle owns a participation interest in each of the "Additional Term Loans" and the "Incremental Term Loans" under the Term Loan Agreement.  Triangle has a participation interest of approximately $7.75 million in the Additional Term Loans and $6.2 million in the Incremental Term Loans, the latter of which is a "last out" participation interest.  While Triangle holds a participation interest in the Term Loans, it is not a lender of record, cannot appear in this case as a Term Loan Lender, and cannot direct to the Term Loan Agent to take any action.

**B.    Intercreditor Agreement**

11. The Term Loan Agent is also party to an Amended and Restated Intercreditor Agreement, dated as of May 27, 2015, as may be amended or modified from time to time (the "Intercreditor Agreement") with Triangle and the Debtor.  Pursuant to the Intercreditor Agreement, Triangle's liens on the Revolving Credit Collateral (as defined in the Intercreditor

Agreement) are senior in all respects to the Term Loan Agent's liens on the same collateral  The Revolving Credit Collateral includes, among other things, accounts receivable. Triangle's liens are junior, however, to the Term Loan Primary Collateral (as defined in the Intercreditor Agreement).  The Term Loan Primary Collateral does not include the Revolving Credit Collateral.[2]

C.   **DIP Motion**

12. The Debtor seeks authority to enter into the DIP Loan Agreement with Triangle pursuant to which the Debtor would borrow up to $4 million (the "DIP Loan"), all of which would be available upon entry of the Interim Order.  The Debtor intends to use the DIP Loan to fund a section 363 sale, for which the Debtor allegedly lacks the liquidity to consummate.

13.  The proposed DIP Loan would rank senior in right of payment to the existing debt due under the Term Loan Agreement and would be secured by a lien that would prime the existing liens on the Term Loan Collateral.  The Term Loan Agent and the Term Loan Lenders do not consent to the proposed priming DIP Loan which, if approved, would result in the diminution of the value of their interest in the Term Loan Collateral.

D.   **Stalking Horse APA**

14. The Debtor and Triangle are parties to an Asset Purchase Agreement by and between Triangle, CRS and RDC Consulting, LLC (the "Stalking Horse APA") which provides for Triangle's purchase of substantially all of the Debtor's assets in exchange for (i) $3 million in

---

[2]  As a general rule, section 552(a) provides that property acquired by the debtor after the commencement of the bankruptcy case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.  *See* 11 U.S.C. § 552(a).  Section 552(b) sets forth an exception ot the general where the post-petition property is proceeds of prepetition collateral.  As a result of section 552(a), Triangle does not have a lien on post-petition accounts receivable because that property is not proceeds of Triangle's prepetition collateral because new account receivable are not proceeds of existing accounts receivable.  Instead, the post-petition accounts receivable are subject to the Term Loan Agent's prepetition lien because that asset is proceeds of the Term Loan Agent's lien on the contracts that generated those receivables.

DOC ID - 26527165.5                                    7

cash, (ii) a credit bid in the amount of $7.1 million with respect to the Debtor's outstanding obligations under the DIP Loan and the pre-petition loan with Triangle, and (iii) the assumption of certain vendor liabilities. The Stalking Horse APA is subject to various conditions and milestones, including the ability for Triangle to terminate the agreement if an interim order approving the DIP Loan is not entered within five business days following the interim hearing.

## OBJECTION

### I. The Intercreditor Agreement Expressly Prohibits the Priming DIP

15.     The plain language of the Intercreditor Agreement prohibits the relief sought in the DIP Motion.  More specifically, the Intercreditor Agreement unambiguously provides that Triangle "will not take, or enter into any agreement to take, a Lien on any assets of any Grantor other than the Revolving Credit Collateral." Intercreditor Agreement § 3.2(a)(1). Triangle also agreed that it would not take any action "adverse to the priority status of the Liens on the Term Loan Primary Collateral…" Intercreditor Agreement § 3.2(c)(2).  As a party to the Intercreditor Agreement, the Debtor is also bound by these terms and cannot act in concert with its controlling shareholder to tortuously interfere with this express prohibition.  The DIP Motion blatantly disregards these prohibitions, however, as it grants priming liens on Term Loan Primary Collateral (*i.e.*, assets other than the Revolving Credit Collateral). The Intercreditor Agreement is enforceable in bankruptcy by its own terms as a subordination agreement under section 510(a). *See* 11 U.S.C. § 510(a) ("[a] subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law."); Intercreditor Agreement § 2.1(a); 7.4(d).

16.     The Intercreditor Agreement is governed by New York law.  *See* Intercreditor Agreement § 8.9.  Under New York law, where a contract, like the Intercreditor Agreement, is

clear, the parties' intent "must be gleaned from the several provisions of the contract," and "[courts] are required to adjudicate [the parties'] rights according to the unambiguous terms of the contract and therefore must give the words and phrases employed their plain meaning." *Laba v. Carey*, 277 N.E.2d 641, 644-45 (N.Y. 1971). Courts applying New York law "have long adhered to the sound rule in the construction of contracts, that where the language is clear, unequivocal and unambiguous, the contract is to be interpreted by its own language[.]" *R/S Assocs. v. N.Y. Job Dev. Auth.*, 771 N.E.2d 240, 242 (N.Y. 2002). That is particularly so where "sophisticated businessmen reduced their negotiations to a clear, complete writing." *W.W.W. Assocs., Inc. v. Gianconteri*, 566 N.E.2d 639, 642 (N.Y. 1990). Bankruptcy courts have routinely enforced intercreditor agreements under section 510(a). *See, e.g., In re Boston Generating, LLC*, 440 B.R. 302, 318-19 (Bankr. S.D.N.Y. 2010); *In re Erickson Retirement Cmtys., LLC*, 425 B.R. 309, 314 (Bankr. N.D. Tex. 2010); *In re Ion Media Networks, Inc.*, 419 B.R. 585, 595 (Bankr. S.D.N.Y. 2009). Here, the language of the Intercreditor Agreement plainly prohibits priming liens on the Term Loan Primary Collateral and DIP Motion should be denied as a result.[3]

## II. The Debtor Has Failed to Meet the Standards of Section 364(d)(1) of the Bankruptcy Code and Fed. R. Bankr. P. 4001(c)(2)

17. In order for a debtor to demonstrate to the court the propriety of the grant of a priming lien to a lender under 11 U.S.C. § 364(d), it must show that it is unable to obtain credit without granting the priming lien and that the interests of the lien holders to be subordinated will be adequately protected. In particular, § 364(d) provides:

---

[3] As a result of the Debtor's tortious interference with the terms of the Intercreditor Agreement, its actions have exposed the estate to administrative expense liability for the Term Loan Lenders' damages. *See In re Eagle-Pitcher Indus., Inc.*, 447 F.3d 461, 464-66 (6th Cir. 2006) (post-petition tort claims treated as administrative expenses under section 503); *Lama Holding Co. v. Smith Barney Inc*., 88 N.Y.2d 413, 424 (Ct. App. N.Y. 1996) ("Tortious interference with contract requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom") (citations omitted).

> (d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –
>
> (A) the trustee is unable to obtain such credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d). Further, Rule 4001(c)(2), which governs the procedures for obtaining authorization for interim financing, provides, in pertinent part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14-day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c)(2).

18. The rigorous statutory safeguards on non-consensual priming set forth in § 364(d) and Fed. R. Bankr. P. 4001(c) emphasize that such relief is extraordinary and should only be allowed as an absolute last resort. *See In re YL W. 87th Holdings I LLC,* 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010). ("[G]ranting post-petition financing on a priming basis is extraordinary and is allowed only as a last resort.") (citations omitted). To satisfy its burden under § 364(d)(1) and Fed. R. Bankr. P. 4001, the debtor must demonstrate that (i) the secured lenders are adequately protected by the priming liens under § 364(d)(2); (ii) no other credit is available; and (iii) the requested financing is necessary to prevent immediate and irreparable harm to the estate. Here, the Debtor fails to meet its burden on all three counts.

19. The Debtor cannot meet its burden of proof especially in light of the heightened scrutiny under which the proposed DIP Loan with the Debtor's majority shareholder (a statutory insider) must be viewed. *In re Winstar Commc'ns., Inc.*, 554 F.3d 382, 412 (3d Cir. 2009) ("A

claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts.") (citations omitted); *In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010) ("'heightened scrutiny' standard . . . closely examines transactions involving insiders"); *In re NuGelt, Inc.*, 142 B.R. 661, 667 (Bankr. D. Del. 1992) ("[I]nsider transactions are subject to greater scrutiny than 'arms length' transactions[.]") (citations omitted).

### A. The Debtor Has Failed to Provide Adequate Protection

20. Section 364(d) of the Bankruptcy Code provides that a bankruptcy court may not authorize a lien senior to the Term Loan Agent's liens unless the Debtor demonstrates that the Term Loan Agent's and Term Loan Lenders' interests in their collateral are adequately protected. 11 U.S.C. § 364(d)(1)(B). In furtherance of this protection, § 363(e) provides that, "on request of an entity that has an interest in property used ... or proposed to be used ... by the [debtor in possession], the court ... shall prohibit or condition such use ... as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

21. In other words, the Bankruptcy Code permits a debtor's continued operation and use of the estate's property in the ordinary course of business, but not at the expense of passing the risk of loss or dissipation in the collateral's value onto its secured creditors. *See* 11 U.S.C. § 363(e); *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204 (1983). The debtor bears the burden of demonstrating adequate protection. *See In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (*en banc*) (the "debtor has the burden to establish that the holder of the lien to be subordinated has adequate protection") (citations omitted); *In re DB Capital Holdings, LLC*, 454 B.R. 804, 822-23 (Bankr. D. Colo. 2011) (same).

22. Adequate protection is intended to protect an existing secured creditor against any erosion of collateral value resulting from a priming lien. As Congress explained, the purpose of

the adequate protection requirement is to ensure that secured creditors are not "deprived of the benefit of their bargain." *See* H.R. Rep. No. 95-595, at 339; S. Rep. No. 95-989, at 53 (1977). Adequate protection, regardless of its form, "should as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights.... the proposal should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing." *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (*en banc*) (internal quotations omitted).

23. The concept of adequate protection also reflects the mandate of the Fifth Amendment of the United States Constitution that "[n]o person shall be ... deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. Const. Amend. V; *see, e.g., Wright v. Union Central Life Ins. Co.*, 311 U.S. 273, 278 (1940) ("Safeguards were provided to protect the rights of secured creditors, throughout the proceedings, to the extent of the value of the property.") (internal citations omitted); *In re SCOPAC*, 624 F.3d 274, 278 n.1 (5th Cir. 2010), *opinion modified on denial of reh'g*, 649 F.3d 320 (5th Cir. 2011) (adequate protection must be sufficient to protect the creditor against diminution in the value of his collateral during the bankruptcy); *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985) ("The concept of adequate protection was designed to insure that the secured creditor receives the value for which he bargained."); *see also George Ruggiere Chrysler-Plymouth*, 727 F.2d 1017, 1019-1020 (11th Cir. 1984) (because security interests are "property rights" protected by Fifth Amendment from public taking without just compensation, bankruptcy court cannot allow secured interest to be threatened by improper use of collateral) (internal citation omitted).

24. Indeed, the Fifth Circuit Court of Appeals has stated that "[g]iven the fact that

superpriority financing displaces liens on which creditors have relied in extending credit, a court that is asked to authorize such financing must be particularly cautious when assessing whether the creditors so displaced are adequately protected." *In re First S. Sav. Ass'n*, 820 F.2d 700, 710 (5th Cir. 1987). The rigorous statutory safeguards on non-consensual priming set forth in § 364(d) emphasize that such relief is extraordinary and should only be allowed as an absolute last resort. *In re LTAP US, LLLP,* No. 10-14125, 2011 WL 671761, at *3 (Bankr. D. Del. Feb. 18, 2011) ("Priming is extraordinary relief requiring a strong showing that the loan to be subordinated is adequately protected."); *In re YL W. 87th Holdings I LLC,* 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("[G]ranting post-petition financing on a priming basis is extraordinary and is allowed only as a last resort.")(citations omitted). As such, "ensuring that a creditor receives the value for which it bargained before the debtor had filed for bankruptcy is the principle's raison d'être." *In re Fontainebleau Las Vegas Holdings, LLC*, 434 B.R. 716, 749 (S.D. Fla. 2010).

25. The Bankruptcy Code does not define adequate protection, but section 361(e) of the Code provides three nonexclusive means of providing adequate protection: (i) periodic cash payments to the extent of any decrease in collateral value; (ii) an additional or replacement lien to the extent of any decrease in collateral value; or (iii) any other relief that will result in the secured lender's receiving the "indubitable equivalent" of its interest in the collateral.

26. The Debtor fails to provide any credible adequate protection to the Term Loan Lenders. It does not offer any periodic cash payments, replacement liens on unencumbered assets, nor can it credibly argue the Term Loan Lenders are protected by an equity cushion on the Term Loan Collateral. Indeed, the adequate protection offered by the Debtor, who dedicates less than a page in the DIP Motion to the subject, is anything but adequate. The Debtor offers ***no specifics whatsoever*** on what adequate protection it will provide (besides its generalized need for

liquidity). This is entirely insufficient for the Debtor to meet its burden.

27. To compound the inequity, the Debtor proposes to grant replacement liens on unencumbered assets and a superpriority claim to Triangle as adequate protection for Triangle's interest as a result of Triangle's consent to prime itself. (*See* proposed Interim DIP Order, at ¶ 13).

28. The Debtor attempts to justify the priming DIP Loan by arguing that it is necessary to avoid an immediate shut-down of the Debtor's operations and to maintain operations while it pursues a going concern sale. It is well-settled, however, that the use of DIP financing to maintain a company as a going concern, or even to enhance its value, does not constitute in and of itself adequate protection of a secured creditor's interest in collateral when that interest is being primed. For example, in *Fontainebleau*, the district court held that the bankruptcy court erred in allowing the lienholders to be primed in order to preserve the value of the debtor for the benefit of all creditors. 434 B.R. at 749-752. While "[t]hat goal was worthy and important … the Debtors did not try to establish, and the bankruptcy court did not find, that the decrease in the value of the [lienholders'] interests therein caused by the priming lien was compensated, replaced, or substituted in any way; to be blunt, the [lienholders] were not adequately protected." *In re Fontainebleau*, 434 B.R. at 754. Put differently, to demonstrate that a lender is adequately protected, the debtor must offer consideration to offset the diminution of its interest in its collateral as a result of the priming. *See In re Swedeland*, 16 F.3d at 564-65; *In re Fontainebleau*, 434 B.R. at 754 ("The proceedings below failed to account for what a priming lien does.").

29. The district court in *Fontainebleau* also found that the lienholders to be primed were not adequately protected despite testimony from the Debtor's chief restructuring officer that:

> if the Debtors did not obtain the DIP financing, they would "pretty much shut down." … that the DIP financing was "a necessity" … "I don't believe we have any other option but to walk away from this asset. We have no money, and we have nowhere else to turn, I believe."

434 B.R. at 750.  Moreover, an examiner appointed in the case testified that the proposed DIP financing should be approved because "it benefits the estate because ... there is no other way I can bring money into the estate." *Id.* at 751.  Notwithstanding the negative implications for the debtor if its DIP financing were not to be approved, the district court refused to grant the proposed DIP lender priming lien, reasoning that:

> [t]his evidence establishes that the DIP financing was necessary to preserve, and possibly even enhance, the value of the Debtors' assets and to bring the sale to a conclusion. In this regard the record supports the bankruptcy court's findings. But these findings do not support the bankruptcy court's conclusion that the [lienholders] were adequately protected. To the contrary, these findings are somewhat beside the point. Because the [lienholders] were due to be "primed," the inquiry ought to have focused on compensating the [lienholders] for the loss of value of their interests in the Project caused by the priming lien.

*In re Fontainebleau*, 434 B.R. at 751-52 (internal citations omitted).

30. The Term Loan Agent anticipates similar testimony at the interim hearing.  The Debtor's witnesses undoubtedly will testify that "if we cannot get this financing today, we will be forced to shut down immediately, because we are unable to make payroll tomorrow."  As discussed in the following section, this supposition is not even accurate, as the Term Loan Agent has offered a more favorable financing package to the Debtor. But even aside from that, the mere fact that the Debtor would use the financing to maintain its operations is not sufficient grounds to find that the Term Loan Lenders are adequately protected.

31. The Debtor would disagree, arguing that the priming DIP Loan is necessary to conduct a 363 sale that will create incremental value—value that allegedly could not be achieved through a liquidation and that will offset the diminution in the value of the Term Loan Collateral. The Debtor's theory and estimation of these values, however, is based on conjecture, and plainly cannot serve as the basis for a finding of adequate protection.  And, even if the Debtor is correct that the DIP Loan will create incremental value, there is no evidence that any of this value will

inure to the benefit of the Term Loan Lenders, as opposed to Triangle. Indeed, since Triangle will hold a first lien on substantially all of the collateral and intends to serve as the stalking horse bidder in the sale, Triangle's interests are actively opposed to obtaining additional bids – any such additional bids would only force Triangle to lose its debt and equity investment in the Debtor or bid more money to retain it. In this regard, it is telling that despite the filing of a number of first-day motions and comments about how this case must proceed to a quick sale, no applications to retain independent auctioneers or brokers were filed.

32. The Third Circuit Court of Appeals in *Swedeland* has found that adequate protection cannot be premised on a speculative increase in collateral value based on a debtor's ability to continue its operations post-petition. In *Swedeland*, the debtor owned a partially developed real estate project which was encumbered by a lien in favor of the secured lender. The lower court authorized a priming DIP loan where the evidence showed, among other things, that the new loan proceeds would be used to fund continued construction of a real estate project, which was projected to increase the value of the underlying collateral for the secured lender's benefit. The Third Circuit reversed and found that "continued construction based on projections and improvements to the property does not alone constitute adequate protection." *Swedeland*, 16 F.3d at 566. The Third Circuit also found that, as is the case here, the debtor offered no new consideration to the existing secured creditor to offset its diminution of its interest in collateral resulting from the priming DIP loan. *See id.* at 567 ("Congress did not contemplate that a creditor could find its priority position eroded and, as compensation for the erosion, be offered an opportunity to recoup dependent upon the success of a business with inherently risky prospects.").

33. Other courts similarly have refused to deprive a secured creditor of the benefit of its bargain when, as here, the proposed adequate protection is based on sheer speculation. *See*

*Bankwest, N.A. v. Todd*, 49 B.R. 633, 638 (D.S.D. 1985) ("[I]t is plainly not enough in any case for a debtor to merely make predictions, write them down, and offer them as exhibits showing adequate protection."); *In re Pacific Lifestyle Homes, Inc.*, 2009 WL 688908, *12 (Bankr. W.D. Wash. Mar. 16, 2009) (declining to find adequate protection where debtor offered "little, if anything, of additional value" other than "hopes and projections of future profitability"); *In re Stoney Creek Techs., LLC*, 364 B.R. 882, 890-93 (Bankr. E.D. Pa. 2007) (declining to find adequate protection, even assuming a substantial equity cushion, because, among other things, the debtor's projections were speculative); *In re Mosello*, 195 B.R. 277, 290, 292 (Bankr. S.D.N.Y. 1996) (declining to find adequate protection where debtor's scheme was "beset by uncertainty and risk, and the ultimate outcome [was] a matter of speculation based upon assumptions which cannot be quantified or verified by objective evidence" and stating that a "[a] finding of adequate protection should be premised on facts, or on projections grounded on a firm evidentiary basis"); *In re St. Petersburg Hotel Assocs., Ltd.*, 44 B.R. 944, 946 (Bankr. M.D. Fla. 1984) (declining to find adequate protection and noting "an examination of the assumptions relied upon by the debtor ... reveals that the assumptions are mere expectations, many of which are highly speculative and unrealistic").

34. In sum, the mere fact that the Debtor needs the DIP financing to maintain its operations does not justify granting the DIP Motion when the Term Loan Lenders effectively would bear the risk and expense of the Debtor's postpetition financing. While the Bankruptcy Code permits a debtor's continued operation and use of the estate's property in the ordinary course of business, it does not permit passing the risk of loss or dissipation in collateral's value onto its secured creditors.

B. **Availability of Alternative Source of Credit**

35. Post-petition financing "on a priming basis is extraordinary and is allowed only as a last resort," after a rigorous showing that alternative financing is unavailable and secured creditors are adequately protected. *In re YL W. 87th Holdings I LLC*, 423 B.R. at 441 (citations omitted); *In re Seth Co.,* 281 B.R. 150, 153 (Bankr. D. Conn. 2002) ("ability to prime . . . is extraordinary"). The DIP Motion must be denied because the Debtor cannot establish that no alternative source of credit is available on less onerous terms (*i.e.*, without the need for a priming lien) as required by § 364(d)(1)(A) of the Bankruptcy Code.

36. Indeed, as the Debtor acknowledges in the DIP Motion, the Debtor and its advisors have had extensive negotiations with the Term Loan Agent for a non-priming DIP facility. Those discussions have continued post-petition. In other words, there was, and is, a viable alternative to Triangle's DIP Loan—one that would not entail a non-consensual priming of the Term Loan lenders. The Term Loan Agent is standing by ready, willing, and able to provide a DIP facility to the Debtor. That fact alone requires denial of the DIP Motion. *See In re Harborwalk, LP*, 2010 WL 346298, at *2 (Bankr. S.D. Tex. Jan. 29, 2010) (denying request for priming DIP loan based on non-compliance with 11 U.S.C. § 364(d)(1)(A) where debtors' immediate capital needs could be met by existing lenders without granting non-consensual priming lien).

37. The Debtor allegedly rejected the Term Loan Agent's proposal because of the "late arrival of the offer" and terms that were not as favorable as Triangle's facility. *See* DIP Motion at 7. This is simply not the case, as evidenced by the Term Loan Agent's proposed DIP term sheet attached as Exhibit 2 hereto. Indeed, the DIP facility proposed by the Term Loan Agent provided terms *more* favorable to the Debtor and its creditors (e.g., no priming liens) and was offered to the Debtor and its advisors with plenty of time to consummate before the commencement of this case.

### C. Lack of Immediate and Irreparable Harm to the Estate

38. The Debtor's extraordinary request for authority to enter into the priming DIP Loan can only be granted if it is necessary to avoid immediate and irreparable harm to the estate. Fed. R. Bankr. P. 4001(c)(2).

39. Here, the Debtor cannot show that the interim priming DIP Loan is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." There is no immediate and irreparable harm to the Debtor's estate if this Court denies the DIP Motion, because the Term Loan Agent is prepared—and has already advised the Debtor as much—to modify the terms of its proposed interim DIP financing facility and provide interim financing that matches the economic terms of Triangle's DIP Loan. As a result, because the Debtor and the proposed DIP Loan cannot and do not meet the standard set forth in Fed. R. Bankr. P. 4001(c)(2), the DIP Motion should be denied.

**WHEREFORE**, the Term Loan Agent requests that the Court enter an order: (i) denying the Motion and (ii) granting them such other relief as is just and proper.

Dated:  August 14, 2017

By: */s/ Ellen Arvin Kennedy, Esq.*

Ellen Arvin Kennedy
DINSMORE & SHOHL LLP
250 West Main Street, Suite 1400
Lexington, KY 40507
Phone:  859.425.1020
Email:  ellen.kennedy@dinsmore.com

– and –

David M. Hillman (*pro hac vice pending*)
Parker J. Milender (*pro hac vice pending*)
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, New York 10022
Phone: 212.756.2000
Facsimile:  212.593.5955
Email:  david.hillman@srz.com
Email:  parker.milender@srz.com

*Counsel for THL Corporate Finance, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served this the 14th day of August 2017, electronically in accordance with the method established under this Court's CM/ECF Administrative Procedures upon all parties in the electronic filing system in this case. Copies were also served on the Debtor's 20 largest unsecured creditors, via electronic mail where available, or where electronic mail information is unknown, by U.S. first-class mail, postage pre-paid.

*/s/ Ellen Arvin Kennedy*
**ATTORNEY FOR THL CORPORATE FINANCE, INC.**