**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

IN RE:

CRS REPROCESSING, LLC                                                                    CHAPTER 11

    DEBTOR-IN-POSSESSION                                                      CASE NO. 17-32565

**DEBTOR'S APPLICATION FOR ENTRY OF AN ORDER AUTHORIZING THE RETENTION OF LINCOLN PARTNERS ADVISORS LLC AS INVESTMENT BANKER TO THE DEBTORS PURSUANT TO 11 U.S.C. §§ 327(a) AND 328(a), *NUNC PRO TUNC* TO THE PETITION DATE**

    CRS Reprocessing, LLC ("CRS Reprocessing" or the "Debtor"), as debtor and debtor-in-possession in this chapter 11 bankruptcy case, hereby applies to the Court (the "Application") for entry of an order, authorizing the retention of Lincoln Partners Advisors LLC ("Lincoln") as investment banker to the Debtor, pursuant to sections 327(a) and 328(a) of title 11 of the United States Code (the "Bankruptcy Code"), *nunc pro tunc* to the Petition Date (as defined below). In support of this Application, the Debtor relies on the Declaration of Brent C. Williams in Support of Debtor's Application for Entry of an Order Authorizing the Retention of Lincoln Partners Advisors LLC As Investment Banker to the Debtor Pursuant to 11 U.S.C. §§ 327(a) and 328(a), *Nunc Pro Tunc* to the Petition Date, attached to this Application as Exhibit B (the "Williams Declaration"). In further support of the Application, the Debtor respectfully represents as follows:

**JURISDICTION AND VENUE**

    1.    This Court has jurisdiction over this case and this Application pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

    2.    Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested in this Application are sections 327(a) and 328(a) of the Bankruptcy Code and Rules 2014(a) and 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

4. On August 9, 2017 (the "Petition Date"), the Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

5. The Debtor continues to be in possession of its properties and to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As of the date hereof, no trustee, examiner, or official committee of unsecured creditors has been appointed in the Debtor's chapter 11 case.

6. Additional factual background regarding the Debtor, including its business operations, capital and debt structure, and the events leading to the filing of this chapter 11 case, is set forth in more detail in the Declaration of Scott T. Massie in Support of First Day Motions (Doc. No. 8), filed on the Petition Date and later amended (Doc. No. 38) (the "First Day Declaration").

## LINCOLN'S PREPETITION INVOLVEMENT

7. In light of the Debtor's need to consider various strategic alternatives, the Debtor engaged Lincoln on July 17, 2017, as its investment banker to evaluate its go-forward strategic alternatives, including the potential sale of its assets and those of certain of its subsidiaries, either together or in part, to financial or strategic acquirors. Lincoln immediately spent considerable time analyzing the Debtor's business and held discussions with management. By late July 2017, however, the Debtor's liquidity forecast had been severely impacted due to the inability of its

lenders to agree to a refinancing, thereby dramatically shortening the liquidity runway for the sale process.

8. At approximately the same time, Lincoln was informed that the Stalking Horse Purchaser (defined below) was contemplating an acquisition of substantially all of the Debtor's assets that would be conducted via a chapter 11 process and, to effectuate such a transaction, was also interested in providing debtor in possession financing to allow the Debtor to adequately market and sell its assets through the chapter 11 process. In order to ascertain whether there were any other parties that would be interested in providing debtor in possession financing in conjunction with a potential acquisition, Lincoln immediately initiated discussions with 10 other parties that could potentially move swiftly enough and have the investment flexibility to provide a competing junior debtor in possession financing proposal to that submitted by the Stalking Horse Purchaser. Given the likely subordinated position of the DIP collateral, none of these other parties wanted to execute a non-disclosure agreement and move forward in the process. While Lincoln conducted numerous conference calls and discussions with potential parties to ascertain their interest, no party emerged as a viable alternative funding source for the DIP Facility and other integrated transactions proposed by the Stalking Horse Bidder within the time available to the Debtors given their acute liquidity issues.

9. During this time, Lincoln with the Debtor's other advisors have been discussing a potential acquisition of the Debtor through a chapter 11 sale process by Triangle Capital Corporation ("Triangle"), that would contemplate consideration comprised of cash, assumed debt and liabilities, and the credit bid of the outstanding amount owing under the Triangle Credit Facility.[1]  Given the time constraints relating to the Debtor's fragile liquidity position, Lincoln

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

3

also focused its efforts on assisting the Debtor's CEO, management, and counsel in negotiating the Stalking Horse Agreement in connection with the commencement of this chapter 11 case.

10. The Debtor has determined, after extensive diligence and in consultation with their advisors and key stakeholders that maximizing the value of the Debtor's estate is best accomplished through the sale, free and clear of liens, claims and other interests, of substantially all of its assets. Undertaking a sale of substantially all of the Debtor's assets represents the best available alternative for the Debtor to meet its immediate and ongoing liquidity needs, while continuing to operate in the ordinary course of business during this process for the benefit of the Debtor's customers, employees, vendors and other stakeholders.

11. The Debtor (in this capacity, the "Seller") has negotiated that certain asset purchase agreement, dated as of August ___, 2017 (together with the schedules and related documents thereto, the "Stalking Horse Agreement"), with Triangle (the "Stalking Horse Purchaser"), and the proposed $4 million secured debtor-in-possession credit facility, pursuant to which the Stalking Horse Purchaser contemplates acquiring the Purchased Assets on the terms and conditions specified therein. The sale transaction contemplated by the Stalking Horse Agreement will be subject to competitive bidding. To this end, Lincoln has and will continue to pursue and cultivate interest in the Debtor's assets pursuant to the proposed sales procedures.

## THE NEED FOR LINCOLN'S SERVICES

12. As described in detail in the Williams Declaration, in July 2017, the Debtor began working with Lincoln as its investment banker in connection with the Debtor's exploration of a range of strategic alternatives. The Debtor submits this Application because of its need to continue to retain a highly qualified investment banker that would be able to assist it in the critical tasks to be undertaken in this chapter 11 case and to guide the Debtor through the

accompanying sale process. The Debtor believes that the retention of Lincoln as investment banker is necessary and appropriate to enable it to evaluate the financial and economic issues raised by the Debtor's chapter 11 case, including in connection with the marketing and sale of the Debtor's assets pursuant to section 363 of the Bankruptcy Code, successful consummation of such a sale, as well as shopping and negotiation of the DIP Financing, thereby enabling the Debtor to fulfill its statutory duties.

13.     Further, Lincoln is familiar with the Debtor's financial and business operations. Lincoln has been employed by the Debtor since July 17, 2017 and has been involved in negotiating and providing advisory services related to the Debtor's DIP Financing, and the draft Stalking Horse Agreement. The ongoing negotiation of the Debtor's DIP Financing, sale process, and bidding procedures has and will require a significant expenditure of time and effort by Lincoln, and without Lincoln's assistance, the Debtor likely would not achieve as favorable a resolution in the negotiations. Moreover, Lincoln continues to solicit higher and better bids and, to that end, Lincoln is leveraging the extensive work performed prior to the Petition Date. The Debtor, thus, believes that Lincoln is uniquely positioned to advise the Debtor in this chapter 11 case in an efficient and timely manner, and the continuity in the provision of Lincoln's investment banking services will promote such efficiency and expediency.

## **LINCOLN'S QUALIFICATIONS**

14.     The Debtor chose Lincoln to act as its investment banker in connection with this chapter 11 case because the Debtor believes that Lincoln is well qualified to successfully and efficiently advise and guide the Debtor through this chapter 11 case. Indeed, Lincoln is an internationally recognized investment banking firm engaged in, among other things, mergers and acquisitions, restructurings, leveraged buyouts, competitive biddings, private placements, and

5

valuations for corporate and other purposes with 18 offices throughout the world. Lincoln has substantial experience with, and knowledge of, companies within the environmental and facilities services industries, extensive knowledge and immediate access to a potential buyer base in the Debtor's industry, and significant sell-side investment banking and restructuring transaction experience.

15. In addition to numerous out-of-court restructuring situations, Lincoln and its professionals have been actively involved in major chapter 11 cases and have been retained as financial advisor in many cases, including, among others, *In re EO Liquidating, LLC* (*f/k/a Eastern Outfitters*), Case No. 17-10243 (LSS) (Bankr. D. Del. March 3, 2017); *In re Vestis Retail Group, LLC*, Case No. 16-10971 (LSS) (Bankr. D. Del. May 11, 2016) (Dkt. No. 253); *Hancock Fabrics, Inc.*, Case No. 16-10296 (BLS) (Bankr. D. Del. Mar. 3, 2016 (Dkt. No. 282); *In re Constar Int'l Holdings LLC*, Case No. 13-13281 (CSS) (Bankr, D. Del. Jan. 24, 2014) (Dkt. No. 236); *In re: Comprehensive Clinical Development, Inc.*, No. 13-17273 (JKO) (Bankr. S.D. Fla. Apr. 15, 2013); *In re Humboldt Creamery, LLC*, No. 09-11078 (Bankr. N.D. Cal. June 11, 2009); *In re Omtron USA, LLC*, No. 12-81931 (CRA) (Bankr. M.D.N.C. Feb. 5, 2013); *In re ClearEdge Power Inc.*, No. 14-44191 (Bankr. N.D. Cal. July 23, 2014); *In re Allens, Inc.*, No. 13-73597 (BTB) (Bankr. D. AR Oct. 28, 2014); *In re K-V Discovery Solutions, Inc.*, No. 12-13346 (ALG) (Bankr. D. S.D.N.Y. Aug. 4, 2012); *In re Visteon Corp.*, No. 09-11786 (CSS) (Bankr. D. Del. Sept. 11, 2009); *In re Dura Automotive Sys., Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. Dec. 21, 2006); *In re Hayes Lemmerz Int'l*; No. 09-11655 (MFW) (Bankr. D. Del. May 11, 2009); *In re Global Power Equip. Group, Inc.*, No. 06-11045 (BLS) (Bankr. D. Del. Nov. 17, 2006); *In re Citadel Broad. Corp.*, No. 09-17442 (BRL) (Bankr. S.D.N.Y. Apr. 12, 2010); *In re Philadelphia Newspapers, LLC*, No. 09-11204 (JKF) (Bankr. D. Del. June 6, 2009), *In re Trico*

*Marine Servs., Inc.*, No. 10-12653 (BLS) (Bankr. D. Del. Oct. 1, 2010); and *In re AES Technologies, LLC* (PMG) (Bankr. M.D. Fla. October 31, 2014).

16. Furthermore, Lincoln's environmental and facilities services investment banking practice and its professionals have advised on numerous transactions, including advising many companies within the Debtor's industry and those having similar operations and end markets to the Debtor. Lincoln's advisors have extensive relationships in the private equity and debt capital markets, including commercial banks, non-bank finance companies, private equity firms, private debt funds, hedge funds, and opportunities funds, including those that from time to time provide third party debtor in possession financing. As a result, the Debtor believes that Lincoln is well qualified to perform these investment banker services and represent the Debtor's interests in this chapter 11 case to the fullest.

## SCOPE OF SERVICES

17. The relationship between Lincoln and the Debtor is governed by the Engagement Letter, executed on July 17, 2017. The terms and conditions of the Engagement Letter were negotiated at arm's length and reflect the parties' mutual agreement as to the substantial efforts and resources that will be required in this engagement. Under the Engagement Letter, Lincoln will perform such investment banking services for the Debtor in connection with the sale, DIP Financing, and all related services as are customary and appropriate in transactions of type, including the structure, negotiation strategy, valuation analyses, financial terms, and other financial matters, as the Debtor reasonably requests:[2] Subject to the Court's approval, the Debtor anticipates that Lincoln will perform the following investment banker services, among others,

---

[2] Summaries and other descriptions of the terms of the Engagement Letter set forth in this Application are not intended to replace the terms of the Engagement Letter, and the terms of the Engagement Letter shall govern to the extent of any inconsistency between this Application and the Engagement Letter except the extent modified in the Order. To the extent the Order is intended to modify or qualify the Engagement Letter in certain respects, as

7

(a) <u>With respect to a Sale Transaction</u>:

    (i) identifying potential parties who might be interested in entering into a sale transaction (the "Sale Transaction" as defined in the Engagement Letter);

    (ii) assisting with the preparation of an information memorandum or similar presentations for delivery to potential parties to a Sale Transaction describing the Debtor, the business and/or the assets to be sold (the "Sale Information Memorandum");

    (iii) formulating and recommending a strategy for pursuing a potential Sale Transaction;

    (iv) contacting and eliciting interest from potential parties to a Sale Transaction;

    (v) conveying information desired by potential parties to a Sale Transaction not contained in the Sale Information Memorandum (the "Sale Supplemental Information");

    (vi) reviewing and evaluating potential parties to a Sale Transaction; and

    (vii) reviewing and analyzing proposals regarding a potential Sale Transaction.

(b) <u>With respect to a Restructuring Transaction</u>:

    (i) assisting the Debtor in developing a restructuring plan, which can be a Plan (the "Restructuring Transaction");

    (ii) assisting the Debtor in structuring any securities to be issued pursuant to the restructuring plan;

    (iii) assisting the Debtor in negotiating the restructuring plan with lenders, creditors and other interested parties;

    (iv) assisting the Debtor in developing a plan of reorganization, if the Debtor files a voluntary case under the Bankruptcy Code,

    (v) participating in hearings before the relevant bankruptcy court, if applicable, with respect to matters upon which Lincoln has provided

---

may be necessary in connection with Lincoln's retention in this chapter 11 case, the Order shall control in the event any inconsistencies between the Application, the Engagement Letter, and the Order.

8

    advice, including, as relevant, coordinating with the Debtor's legal counsel with respect to testimony in connection therewith.

(c)  <u>With respect to a Financing Transaction</u>:

  (i)  Advising the Company regarding an appropriate capital structure for the Company, including the potential pricing and terms for any new senior debt, junior capital and/or equity securities;

  (ii)  Identifying financing sources who might be interested in participating in a Financing Transaction;

  (iii)  Assisting with the preparation of an information memorandum for delivery to financing sources describing the Company (the "Financing Information Memorandum" and, collectively with the Sale Information Memorandum, the "Information Memorandum");

  (iv)  Formulating and recommending a strategy for pursuing a potential Financing Transaction;

  (v)  Contacting and eliciting interest from various financing sources, including senior lenders, junior capital providers and/or equity investors, as appropriate;

  (vi)  Conveying information desired by financing sources not contained in the Financing Information Memorandum (the "Financing Supplemental Information,") and collectively with the Sale Supplemental Information, the "Supplemental Information"); and

  (vii)  Reviewing and analyzing all proposals, both preliminary and firm, received from financing sources relating to a Financing Transaction.

(d)  Such other services to which Debtor and Lincoln mutually agree.

18.  It is necessary that the Debtor employed Lincoln to render the foregoing professional services. The Debtor believes that the services will not duplicate the services that other professionals will be providing the Debtor in these cases. Specifically, Lincoln will carry out unique functions and will use reasonable efforts to coordinate with the Debtor and other professionals retained in these cases to avoid the unnecessary duplication of services.

## PROFESSIONAL COMPENSATION

19. As set forth with greater specificity in the Engagement Letter, the Debtor and Lincoln have agreed to the following terms of compensation (collectively, the "Transaction Fee"):

(a) <u>Initial Advisory Fee</u>. An initial non-refundable cash advisory fee (the "Initial Advisory Fee") of $25,000 payable in cash upon the execution of the Engagement Letter.

(b) <u>Monthly Advisory Fee</u>. A monthly non-refundable cash advisory fee (the "Monthly Advisory Fee") of $25,000, for the first two months. Commencing in the third month, the Monthly Advisory Fee shall be increased to $40,000. This fee is payable in cash on the first day of each month of the term hereof.

(c) <u>Sale Transaction Fee</u>. In connection with a Sale Transaction, a transaction fee (a "Sale Transaction Fee") equal to 4.0% of the Enterprise Value (defined below), if a Sale Transaction is consummated during the term hereof or the period specified in paragraph 9 of the Engagement Letter. However, if a Sale Transaction is effectuated by Triangle Capital Corporation (or its affiliates), Lincoln Advisors would be entitled only to the Minimum Transaction Fee (defined below). The minimum Sale Transaction Fee or Restructuring Transaction Fee shall be $600,000 ("Minimum Transaction Fee"). The Minimum Transaction Fee shall be, in addition to the Initial Advisory Fee and Monthly Advisory Fee, earned, due and payable in cash at the time of the closing of the Sale Transaction or Restructuring Transaction, as applicable. A Sale Transaction Fee shall be in addition to the Initial Advisory Fee and Monthly Advisory Fee (subject to the provisions of paragraph 7(g) of the Engagement Letter), and shall be earned, due and payable in cash at the time of the closing of the Sale Transaction.

For the foregoing purposes the "Enterprise Value" shall mean the enterprise value of the Debtor based on the aggregate consideration directly or indirectly paid or payable to the Debtor and all shareholders, partners and members, as well as holders of options, warrants, convertible securities, phantom equity and similar rights (collectively, "Equity Owners") or creditors in connection with or as a result of the Transaction (including retained assets and equity), as determined in the Engagement Letter.

(d) <u>Restructuring Transaction Fee</u>. A transaction fee (a "Restructuring Transaction Fee") equal to 1.5% of the total Indebtedness restructured (defined below) if a Restructuring Transaction is consummated during the term hereof or the period specified in paragraph 9 of the Engagement Letter. A Restructuring Transaction Fee shall be, in addition to the Initial Advisory Fee and Monthly Advisory Fee, earned, due and payable in cash at the time of the closing of a Restructuring Transaction. A Restructuring Transaction Fee shall be in addition to the Initial Advisory Fee and Monthly Advisory Fee (subject to the provisions of paragraph 7(g) of the Engagement Letter) and shall be earned, due and payable in cash at the time of the closing of a Restructuring Transaction.

(e)     Financing Fee: A transaction fee (a "Financing Transaction Fee") equal to (i) 3.0% of the committed amount of secured debt (including debtor-in-possession financing); plus (ii) 4.0% on any committed amount of unsecured debt; plus (iii) 5.0% on any preferred stock, or common stock raised (in each case in clauses (i)-(iii) above, whether or not funded at the closing of the Financing Transaction), if a Financing Transaction is consummated during the term hereof or the period specified in paragraph 9

However, if debtor-in-possession financing is provided by Triangle Capital Corporation (or its affiliates), Lincoln Advisors shall not be entitled to a Financing Fee for the portion of the debtor-in-possession financing provided by Triangle Capital Corporation (or its affiliates). A Financing Transaction Fee shall be, in addition to the Initial Advisory Fee, Monthly Advisory Fee, and Restructuring/Sale Transaction Fee, earned, due and payable in cash at the time of the closing of a Financing Transaction.

20.     In addition, pursuant to the Engagement Letter, the Debtor will reimburse Lincoln, upon request from time to time, for all reasonable out-of-pocket expenses incurred by Lincoln during the term of the Engagement in connection with the matters contemplated by the Engagement Letter, including without limitation, transportation, lodging, meals, communications, color copying, color printing, document services and legal counsel (including, but not limited to, the defense against any fee objections in a proceeding) and other professional advisor fees and expenses. To the extent that Lincoln Advisors' personnel assist in, or provide testimony in trial or depositions for any action, suit, or proceeding relating to a Transaction or Lincoln's Engagement following the consummation of a Transaction or termination of Lincoln's Engagement, the Company shall pay Lincoln a per person, per diem charge of $2,000, together with a reimbursement of all out-of-pocket expenses and disbursements, including reasonable attorneys' fees and disbursements, for the services of such persons.

21.     The Debtor believes that the compensation structure described in the Engagement Letter is reasonable and that it is comparable to those generally charged by investment banking and financial advisory firms of similar stature to Lincoln for comparable engagements.

22. The hours worked, the results achieved, and the ultimate benefit to the Debtor of the work performed by Lincoln in connection with the engagement may vary and this has been taken into account in setting the above fees.

23. In addition, given the numerous issues which Lincoln may be required to address in the performance of its services under the Engagement Letter, Lincoln's commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for Lincoln's services for engagements of this nature in an out-of-court context, the Debtor believes that the fee arrangements set forth in the Engagement Letter, including the Transaction Fee, are reasonable under the standards set forth in section 328(a) of the Bankruptcy Code.

## THE INDEMNIFICATION AND CONTRIBUTION TERMS

24. As set forth more fully in Exhibit 1 to the Engagement Letter, if the Application is granted the Debtor will indemnify and hold harmless (the "Indemnification Provision") Lincoln and its affiliates and their respective officers, directors, members, employees, agents, representatives, affiliates, or any person controlling Lincoln or any of its affiliates (collectively, the "Indemnified Parties"), to the full extent lawful, from and against any losses, claims, damages, expenses and liabilities (collectively, "Losses") related to or arising out of (i) Lincoln's engagement contemplated by the Engagement Letter, or (ii) any untrue statement or alleged untrue statement of a material fact or the omission or alleged omission to state therein a material fact necessary in order to make the statements therein not misleading in light of the circumstances under which they were made, or (iii) otherwise related to the engagement or any transaction or conduct in connection therewith, except that this clause (iii) shall not apply with respect to any losses that are finally judicially determined to have resulted primarily from the

12

gross negligence, bad faith or willful misconduct of such indemnified party; *provided*, *however*, that the Debtor's obligations as set forth in the Engagement Letter and as described in this Paragraph shall be subject to the provisions of the proposed Order during the pendency of these cases.

25. The Indemnification Provision was fully negotiated between the Debtor and Lincoln. The Debtor and Lincoln believe that the Indemnification Provision is customary and reasonable for investment banking and financial advisory engagements both out of court and in chapter 11 cases. *See*, *e.g.*, *Noranda Aluminum, Inc., et al.*, No. 16-10083 (Bankr. E.D. Mo. March 18, 2016); *In re Arch Coal, Inc., et al.*, No. 16-40120 (Bankr. E.D. Mo. Feb. 9, 2016); *In re Eagle Bulk Shipping Inc.*, No. 14-12303 (SHL) (Bankr. S.D.N.Y. Sept. 19, 2014); *In re MPM Silicones, LLC*, No. 14-22503 (RDD) (Bankr. S.D.N.Y. Apr. 28, 2014); *In re Sbarro LLC*, No. 14-10557 (MG) (Bankr. S.D.N.Y. Apr. 7, 2014); *In re AMR Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y. Mar. 2, 2012); *In re Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. July 26, 2012); *In re General Maritime Corp.*, No. 11-15285 (MG) (Bankr. S.D.N.Y. Dec. 15, 2011); *In re Sbarro, Inc.*, No. 1111527 (SCC) (Bankr. S.D.N.Y. May 4, 2011); *In re Great Atlantic & Pacific Tea Co.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 13, 2011). Accordingly, the Debtor respectfully submits that the terms of the Indemnification Provision is reasonable and customary and should be approved in this chapter 11 case.

## RELIEF REQUESTED

26. The Debtor respectfully requests entry of an order as proposed in Exhibit A (the "Order") (i) authorizing the Debtor to retain and employ Lincoln as investment banker to the Debtor, (ii) approving the terms and conditions contained in that certain letter agreement, dated as of July 16, 2017, (the "Engagement Letter") under which Lincoln will be retained and

13

compensated by the Debtor's estate, and (iii) granting related relief. A copy of the Engagement Letter is attached as Exhibit C hereto.[3]

## BASIS FOR RELIEF REQUESTED

**The Debtor Should Be Permitted to Retain and Employ Lincoln on the Terms of the Engagement Letter Pursuant to Sections 327 and 328 of the Bankruptcy Code.**

27. The Debtor seeks approval of the retention of Lincoln pursuant to sections 327(a) and 328(a) of the Bankruptcy Code. Section 327(a) of the Bankruptcy Code provides that a debtor in possession "may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estates, and that are disinterested persons, to represent or assist" the debtor in possession in carrying out its duties. 11 U.S.C. § 327(a).

29. In addition, section 328(a) of the Bankruptcy Code provides, in relevant part, that a debtor "with the court's approval, may employ or authorize the employment of a professional person under section 327 . . . on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis." 11 U.S.C. § 328(a). Accordingly, section 328 permits the compensation of professionals, including investment bankers, on more flexible terms that reflect the nature of their services and market conditions. As the United States Court of Appeals for the Fifth Circuit recognized in *Donaldson Lufkin & Jenrette Sec. Corp. v. Nat'l Gypsum (In re Nat'l Gypsum Co.)*:

> Prior to 1978 the most able professionals were often unwilling to work for bankruptcy estates where their compensation would be subject to the uncertainties of what a judge thought the work was worth after it had been done. That uncertainty continues under the present § 330 of the Bankruptcy Code, which provides that the court award to professional consultants "reasonable compensation" based on relevant factors of time and comparable costs, etc. Under

---

[3] Any statements contained herein concerning the terms and conditions of the Engagement Letter are qualified entirely by reference to the Engagement Letter.

> present § 328 the professional may avoid that uncertainty by obtaining court approval of compensation agreed to with the trustee (or debtor or committee).

123 F.3d 861, 862 (5th Cir. 1997) (internal citations and emphasis omitted).

30. Bankruptcy Rule 2014 further requires that an application for retention of a professional person include:

> [S]pecific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee

*See* FED. R. BANKR. P. 2014(a).

31. As discussed below and in the Williams Declaration, Lincoln satisfies the disinterestedness standard in section 327(a) of the Bankruptcy Code. Additionally, given the numerous issues that Lincoln may be required to address in the performance of its services for the Debtor pursuant to the Engagement Letter, Lincoln's commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for Lincoln's services for engagements of this nature, the Debtor believes that the terms and conditions of the Engagement Letter are fair, reasonable, and market-based under the standards set forth in section 328(a) of the Bankruptcy Code.

32. Indeed, the Debtor believes that the Fee Structure appropriately reflects: (a) the nature and scope of services to be provided by Lincoln; (b) Lincoln's substantial experience with respect to investment banking services; and (c) the fee structures typically utilized by Lincoln and other leading investment banks that do not bill their clients on an hourly basis.

33. As set forth below, and notwithstanding approval of the Engagement Letter under section 328 of the Bankruptcy Code, Lincoln intends to apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with this chapter 11 case, subject to the Court's approval and in compliance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and any other applicable procedures and orders of the Court, with certain limited modifications.

34. Lincoln has requested, pursuant to section 328(a) of the Bankruptcy Code, payment of its fees on a fixed-rate and/or fixed-percentage basis. Additionally, it is not the general practice of investment banking firms to keep detailed time records similar to those customarily kept by attorneys. As discussed below, however, Lincoln's professionals, when formally retained in chapter 11 cases, and when required by Local Bankruptcy Rules, keep summary time records describing their daily activities and the identity of persons who performed such tasks, and, in this chapter 11 case will maintain such time records in one-hour increments. Apart from the time recording practices described above, however, Lincoln's professionals do not maintain their time records on a "project category" basis. As such, the Debtor requests modification of the requirements under any applicable local rules or procedures and orders of the Court.

## **LINCOLN'S DISINTERESTEDNESS**

35. Lincoln has informed the Debtor that as of this date, except as set forth in the Williams Declaration, Lincoln is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code and as required by section 327(a) of the Bankruptcy Code, and referenced by section 328(c) of the Bankruptcy Code, as it (a) holds no interest materially adverse to the Debtor, its creditors, and shareholders for the matters for which Lincoln is to be

16

employed; (b) has no connection to the Debtor, its creditors, shareholders, or related parties herein except as disclosed in the Williams Declaration; (c) none of Lincoln's past or current engagements would or does appear to create an interest materially adverse to the interests of the Debtor, creditors, or equity security holders in this case; (d) is not a creditor, equity security holder or an insider of the Debtor; and (e) is not or was not within two years before the Petition Date a director, officer, or employee of the Debtor. As such, the Debtor believes that Lincoln is disinterested and holds no materially adverse interest as to the matters upon which it is to be retained. To the extent Lincoln discovers any facts bearing on the matters described in this Application during the period of Lincoln's retention, it will supplement the information contained in the Williams Declaration.

36. Since July 17, 2017, Lincoln has been providing extensive services to the Debtor and prior to the Petition Date has received the following payments: a payment of $25,000 received on or about July 18, 2017 as the Initial Advisory Fee; From July 17, 2017 through the Petition Date (and subsequent to the Petition Date), Lincoln has been providing extensive services to the Debtor.

37. The Debtor has been advised that Lincoln has agreed not to share with any other person or firm the compensation to be paid for professional services rendered in connection with this chapter 11 case in accordance with section 504(a) of the Bankruptcy Code.

[*remainder of page intentionally left blank*]

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the Debtor respectfully requests that the Court enter the Proposed Order, substantially in the form attached hereto as Exhibit A, granting the relief requested herein and such other and further relief as the Court deems just and proper.

Dated: August 16, 2017

Respectfully submitted,

CRS REPROCESSING, LLC
Debtor and Debtor in Possession

_____
Scott T. Massie
Chief Executive Officer