**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF KENTUCKY**

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| CRS Reprocessing, LLC, | : | Case No. 17-32565 (ACS) |
|  | : |  |
| Debtor. | : |  |

**FINAL ORDER GRANTING EMERGENCY MOTION OF DEBTOR AND
DEBTOR-IN-POSSESSION FOR INTERIM AND FINAL ORDERS
AUTHORIZING DEBTOR TO: (A) OBTAIN SECURED SUPERPRIORITY
POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105,361,362,363,
364(c)(1), 364(c)(2), AND 364(d)(1); (B) UTILIZE CASH COLLATERAL PURSUANT
TO 11 U.S.C. §§ 105, 361, 362 AND 363; (C) GRANT ADEQUATE PROTECTION
TO PRE-PETITION SECURED LENDER PURSUANT TO 11 U.S.C. §§ 105,
361, 362 AND 363; AND (D) SCHEDULE FINAL HEARING PURSUANT TO
RULES 4001(b), 4001(c) AND 9014; AND (E) GRANTING RELATED RELIEF**

This matter came on for hearing on September 12, 2017 (the "Final Hearing") on the

*Emergency Motion of Debtor and Debtor-in-Possession for Interim and Final Orders Authorizing*

*Debtor to: (A) Obtain Secured Superpriority Post-Petition Financing Pursuant to 11 U.S.C. §§*

*105, 361, 362, 363, 364(c)(1), 364(c)(2) and 364(d)(1); (B) Utilize Cash Collateral Pursuant to 11*

*U.S.C. §§ 105, 361, 362 and 363; (C) Grant Adequate Protection to Pre-Petition Secured Lender*

*Pursuant to 11 U.S.C. §§ 105, 361, 362 and 363; and (D) Schedule Final Hearing Pursuant to*

*Bankruptcy Rules 4001(b), 4001(c) and 9014; (E) And Granting Related Relief,* dated August 9,

2017 [ECF No. 3, as amended ECF No. 80, and as further amended by that filing made by Debtor

on September 11, 2017] up through and including ] (collectively, the "Motion") seeking a Final

Order, pursuant to Sections 105, 361, 362, 363, and 364(c) of the United States Bankruptcy Code,

11 U.S.C. §§ 101-1532 ("Bankruptcy Code")[1] and Rules 2002, 4001, 6004, and 9014 of the

Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") for post-petition financing from

---

[1] Unless otherwise indicated, all "Section" references are to the Bankruptcy Code, all "Rule" references are to the
Bankruptcy Rules and all "Local Rule" references are to the Local Rules.

Triangle Capital Corporation ("Triangle" or the "DIP Lender") secured by a priming lien under Section 364(d) of the Bankruptcy Code; and, after the hearing on September 12, 2017 and conducting further negotiations with Triangle, the Debtor now seeks entry of this Final Order; and upon the record of the Debtor's bankruptcy case (the "Case") and this Court having held the Final Hearing, and having considered all the pleadings filed with this Court and the record of the Final Hearing and after due deliberation and consideration, and good and sufficient cause appearing therefor, and it appearing to be in the best interests of the Debtor's estate and creditors:

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW FOR PURPOSES OF ENTERING THIS FINAL ORDER:**

A.     **Petition Date.** On August 9, 2017 ("Petition Date"), the Debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code in this Court. The Debtor continues to operate its business and manage its property as a debtor-in-possession pursuant to Sections 1107(a) and 1108. As of the date hereof, no trustee or examiner has been appointed.

B.     **Jurisdiction and Venue.** This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).   The statutory predicates for the relief sought herein are Sections 105, 361, 362, 363, and 364 and Rule 4001(b) and (c). Venue of the Debtor's Case and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     **Notice.** Sufficient, proper, and adequate notice of the Motion, the relief requested, and of the Final Hearing under the urgent circumstances present has been provided by the Debtor pursuant to Rules 2002, 4001(b), (c), and (d), and 9014, and Section 102(1), as required by Sections 363(b), 364(c), and 364(d) on the following parties: (i) the office of the United States Trustee for Region 8; (ii) Debtor's pre-petition secured lender and proposed post-petition lender, Triangle Capital Corporation and its counsel; (iii) the Debtor's other pre-petition secured lenders

2

and their counsel, if known; (iv) the additional creditors identified on the Debtor's list of twenty (20) largest unsecured creditors; (v) other known claimants having liens or security interests in property of Debtor; (vi) all of Debtor's depository banks; (vii) any parties who provide Debtor with utility services; (viii) all equity holders; (ix) the Internal Revenue Service; (x) the United States Attorney for the district; and (xi) the United States Department of Justice (together, "<u>Notice Parties</u>") (except that notice of this tendered Order has been given to parties receiving ECF notice in this case) and no further notice of the Motion or this Order is necessary or required.

D.    **<u>Need for Post-Petition Financing</u>.** An immediate and critical need exists for the Debtor to maintain post-petition financing, including cash collateral, in order to continue the operation of its business. Without such funds, the Debtor will not be able to meet its payroll and other direct operating expenses or obtain goods and services needed to carry on its business during this sensitive period in a manner that will avoid irreparable harm to the Debtor's estate.

E.    **<u>No Credit Available on More Favorable Terms</u>.** Given its current financial condition, financing arrangements, and capital structure, the Debtor has been unable to obtain financing from sources other than from the DIP Lender on terms more favorable than those under the First Amendment to Debtor-in-Possession Loan and Security Agreement (together with all exhibits, attachments and annexes, the "<u>DIP Credit Agreement</u>") attached hereto as <u>Exhibit A</u>. The Debtor is unable to obtain the required funds in the form of unsecured credit or unsecured debt allowable under Section 503(b)(1) as an administrative expense pursuant to Section 364(a) or (b), unsecured debt having the priority afforded by Section 364(c)(1), or debt secured only as described in Section 364(c)(2). The DIP Lender is willing to advance monies to the Debtor only upon the terms and subject to the conditions contained in this Order and the DIP Credit Agreement.

F.    **<u>Budget</u>.** The Debtor has prepared and delivered the budget (attached hereto as

3

Exhibit B) to the DIP Lender (the "Budget"). The Budget has been thoroughly reviewed by the Debtor and its management.  The Debtor represents that the Budget is reasonable and should allow the Debtor to operate its business and its Case. The DIP Lender is relying upon the Debtor's compliance with the Budget in accordance with the Order in determining to enter into the DIP Credit Agreement and the post-petition financing arrangements provided for herein, including use of cash collateral.

       G.      **Business Judgment and Good Faith Pursuant to Section 364(e).** Based on the record of the Interim Hearing and the record of the Final Hearing, the terms of the DIP Credit Agreement and this Order are fair, just, and reasonable under the circumstances, ordinary and appropriate for secured financing to debtors-in-possession, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and constitute reasonably equivalent value and fair consideration. The DIP Credit Agreement and this Order have been negotiated in good faith and in an arm's length, open, and honest fashion in accordance with the Bankruptcy Code among the Debtor and the DIP Lender, with all parties represented by counsel, and any credit extended, loans made, and other financial accommodations extended to the Debtor by the DIP Lender, including, but not limited to, (i) all loans made to the Debtor pursuant to the DIP Credit Agreement, (ii) all advances, indebtedness, or obligations, contingent or absolute, which may now or from time to time hereafter be owing by the Debtor to the DIP Lender including, without limitation, interest, expenses, and attorneys' fees as set forth in the DIP Credit Agreement, and (iii) all obligations incurred (as set forth in the DIP Financing Documents) (collectively, "DIP Obligations"), shall be deemed to have been extended, issued, or made, as the case may be, in "good faith" as that term is used in Section 364(e) and in express reliance upon the protections afforded by Section 364(e) in the event that this Order or any provision hereof is vacated, reversed,

4

or modified, on appeal or otherwise. Accordingly, the DIP Lender is entitled to the protection of

Section 364(e).

BASED UPON THE FOREGOING, AND UPON THE RECORD MADE BEFORE
THIS COURT AT THE FINAL HEARING, AND GOOD AND SUFFICIENT CAUSE
APPEARING THEREFOR, **THEREFORE, IT IS HEREBY ORDERED AND ADJUDGED
THAT:**

1.     **Motion Granted.**  The Motion is granted on a final basis as provided herein and in

accordance with Rule 4001(b)(2) and (c)(2) to the extent provided in this Order.  To the extent any

objections were made to the relief sought in the Motion and the entry of this Order (and not

withdrawn or otherwise resolved prior to the entry of this Order) such objections are hereby

overruled.

2.     **Authorization to Obtain Debtor-In-Possession Financing.**

(a)     The Debtor is authorized to enter into the DIP Credit Agreement and all agreements

contemplated therein or in this Order (collectively, the "DIP Financing Documents") and is

authorized to borrow up to the aggregate amount of $4,000,000 (the "Final DIP Loan") pursuant to

the DIP Financing Documents and this Order. The provisions of the DIP Financing Documents are

hereby approved in all respects.

(b)     The Debtor is authorized and directed to perform all acts, and execute and comply

with the terms of all instruments and documents, as the DIP Lender may reasonably require as

evidence of and for the protection of the obligations arising under the DIP Financing Documents

and/or this Order (collectively,  the "Final DIP Loan Obligations") and the DIP Collateral (as

defined below) or which may be otherwise deemed necessary by the DIP Lender to effectuate the

terms and conditions of this Order and the DIP Financing Documents.

(c)     **Approval of the Budget and Restriction on Use of Proceeds.** The Debtor is

hereby authorized to borrow the Final DIP Loan pursuant to the terms and provisions of the DIP

5

Financing Documents and this Order and to use such proceeds solely in accordance with the Budget, as amended. The DIP Lender shall have no obligation to make any loan unless all of the conditions precedent to the making of such extension of credit under the DIP Financing Documents have been satisfied in full or waived by the DIP Lender in its sole discretion. No Final DIP Loan proceeds shall be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Lender or any affiliate of the DIP Lender (in any capacity), or any of their respective officers, directors, members, investors, employees or agents.

3.    **DIP Liens.**  All Final DIP Loan Obligations shall be secured by the following liens (effective upon entry of this Order without any further action required) on the  DIP Collateral (as defined below) with the priorities set forth below:

(a)      pursuant to section 364(c)(2), a perfected first-priority lien on the DIP Collateral (as defined below), but subject to the Carve-Out; and

(b)      pursuant to section 364(d) of the Bankruptcy Code, a perfected first priority, priming lien on the DIP Collateral (the "Priming DIP Liens"), but subject to the Carve-Out.  The Priming DIP Liens shall not be subject to being treated *pari passu* with, or subordinated to, any other liens or security interests on the DIP Collateral, subject in each case only to permitted exceptions (i) to be expressly agreed upon in writing by the DIP Lender, or (ii) imposed by applicable non-bankruptcy law, in existence as of the Petition Date and otherwise unavoidable (collectively, the "Permitted Liens").

(c)      As used in this Order, "DIP Collateral"[2] means all of the following, whether presently existing or hereafter created or acquired, and wherever located, in each case whether

---

[2] Unless otherwise defined in the DIP Credit Agreement, all terms in paragraph 3(d) have the meanings given to them in the New York Uniform Commercial Code, as amended or supplemented from time to time.

existing, created or acquired prior to the Petition Date or on or after the Petition Date (1) all Accounts; (2) all payment rights under contracts directly relating to the creation or collection of Accounts; (3) all rights under any existing or future policy of insurance relating to Accounts; (4) all letters of credit, guarantees, supporting obligations and other obligations securing or supporting any Accounts, and all claims under such securing or supporting obligations; (5) other than (x) any Term Loan Collateral Account (as defined in that certain Amended and Restated Intercreditor Agreement, dated as of May 27, 2015, by and among, inter alia, the Debtor, THL Corporate Finance, Inc. ("THL Agent") and Triangle Capital Corporation, as amended, restated or otherwise modified from time to time), the contents thereof and proceeds therefrom and (y) the Chase Collateral Account (as defined in the Credit Card Order, which is defined below), the contents thereof and proceeds therefrom, all cash and cash equivalents, Deposit Accounts, and lockboxes of any Credit Party; (6) all credit card receivables; (7) [reserved]; (8) all other collateral of any nature as may be provided as security for the Obligations in any Interim DIP Order, any Final DIP Order or otherwise; (9) all books and records directly related to any of the foregoing; and (10) any and all proceeds and products of any of the foregoing (including, without limitation, proceeds of insurance described in (3) above but excluding proceeds of business interruption insurance so long as those proceeds are not compensation for a loss with respect to the DIP Collateral, chattel paper, investment property, instruments and letter of credit rights relating to any of the foregoing), all whether now existing or hereafter created, whether purchased or otherwise acquired by such Credit Party.  Notwithstanding anything to the contrary in this Order, this Order shall be subject to the terms of the Agreed Order with Respect to Borrowing and Security Under Credit Card Program, Letter of Credit and Reimbursement of Fees [DE 55] (the "Credit Card Order").

      4.    **DIP Lender's Superpriority Claim.** Pursuant to Section 364(c)(1), the Final DIP

Loan Obligations shall constitute an allowed claim ("Superpriority DIP Claim") against the Debtor, with priority over any and all administrative expenses, diminution claims, adequate protection claims and all other claims against the Debtor (except claims payable through the Carve-Out), now existing or hereafter arising, of any kind whatsoever, including all administrative expenses of the kind specified in sections 364, 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113, or 1114, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, and which Superpriority DIP Claim shall be payable from and have recourse to all pre- and post-petition property of the Debtor and all proceeds thereof.  The Superpriority DIP Claim and the DIP Liens shall continue if the Debtor's chapter 11 Case is converted to a case under chapter 7 of the Bankruptcy Code, and shall maintain their priority as provided in this Order until all Final DIP Loan Obligations have been indefeasibly paid, in full, in cash, or otherwise satisfied with the consent of the DIP Lender (the "DIP Payout"). Until the DIP Pay-Out, the Debtor shall not permit to exist any administrative expense claim against the Debtor of any kind or nature whatsoever, including any administrative expenses specified in or arising under Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113, and 1114, excepting claims payable under the Carve-Out, that has a priority that is equal to or superior to the priority of the Superpriority DIP Claim.

5. **Termination Date.**  The Debtor's right to borrow under the DIP Credit Agreement shall expire and all Final DIP Loan Obligations shall be due and payable in cash on the Termination Date (as defined below) without further order or relief from the Court. The term "Termination Date" shall mean the earlier to occur of (i) entry of an order approving financing from any lender other than the DIP Lender; (ii) the Maturity Date (as defined below); (iii) the

acceleration of any Final DIP Loan Obligations in accordance with this Order or the DIP Financing Documents; (iv) this Order ceasing to be in full force and effect for any reason; (v) entry of an Order of (a) confirmation of any plan of reorganization, or (b) consummation of a sale of substantially all of Debtor's assets pursuant to Section 363; (vi) appointment of a Chapter 7 or Chapter 11 trustee in the Case; and (vii) the occurrence of an Event of Default as defined below.

6.    **Adequate Protection.**

(a)    Triangle Capital Corporation in its capacity as lender ("Revolving Lender") under the Loan Agreement dated as of June 16, 2011 by and among the Borrower, the guarantors party thereto and Revolving Lender (as successor in interest to JP Morgan Chase Bank, N.A.), as amended, restated, supplemented or otherwise modified from time to time (the "Revolving Credit Agreement"), is entitled to receive adequate protection to the extent of any diminution in value of its interests in the collateral (including the use of cash collateral pursuant to Section 363(a)) granted by the Debtor to secure its obligations under the Revolving Credit Agreement (the "Revolving Credit Pre-Petition Collateral") pursuant to the Revolving Credit Agreement and related documents under Sections 361, 362, 363 and 364 of the Bankruptcy Code resulting from the Debtor's use, sale or lease of the Revolving Credit Pre-Petition Collateral and the DIP Liens (as defined below) granted on the Revolving Credit Pre-Petition Collateral.

(b)    Triangle Capital Corporation in its capacity as collateral agent ("Interim Note Collateral Agent") under the Second Amended and Restated Senior Secured Subordinated Note dated as of February 10, 2015, made by the Borrower in favor of Triangle Capital Corporation, Salem Halifax Capital Partners, Limited Partnership, and the other lenders from time to time party thereto (collectively, the "Interim Noteholders") as amended, restated, supplemented or otherwise modified from time to time (the "Interim Note"), is entitled to receive adequate protection to the

9

extent of any diminution in value of its interests in the collateral (including the use of cash collateral pursuant to Section 363(a)) granted by the Debtor to secure its obligations under the Interim Note (the "Interim Note Pre-Petition Collateral") pursuant to the Interim Note and related documents under Sections 361, 362, 363 and 364 of the Bankruptcy Code resulting from the Debtor's use, sale or lease of the Interim Note Pre-Petition Collateral and the DIP Liens (as defined below) granted on the Interim Note Pre-Petition Collateral.

(c)      As adequate protection, Revolving Lender is granted, pursuant to Sections 361, 363(e) and 364(d)(1), (i) Adequate Protection Liens (as defined below) and (ii) the Section 507(b) Claim (as defined below), and the Interim Note Collateral Agent is authorized to receive, pursuant to Sections 361, 363(e) and 364(d)(1), adequate protection payments as follows (collectively, the "Adequate Protection Obligations"):

(i)      Revolving Lender is hereby granted (effective and perfected by operation of law and without the necessity of the execution by the Debtor of mortgages, security agreements, pledge agreements, financing statements, or other agreements to the fullest extent as otherwise provided herein) replacement and additional security interests in and liens upon the DIP Collateral and all otherwise unencumbered assets and properties of the Debtor ("Adequate Protection Liens"). The Adequate Protection Liens shall be subject and subordinate only to (i) the DIP Liens, (ii) the Permitted Liens; and (iii) the Carve-Out (as defined below).

(ii)      If the Adequate Protection Liens are insufficient to provide adequate protection, then Revolving Lender shall be granted a superpriority claim as provided for in Section 507(b) ("Section 507(b) Claim") in an amount equal to the aggregate diminution in value of its interest in the Revolving Credit Pre-Petition Collateral and the Interim Note Pre-Petition Collateral. The priority of the Section 507(b) Claim shall be junior to the Superpriority DIP Claim,

10

and subject to the Carve-Out.

       (iii)   As adequate protection, Interim Note Collateral Agent shall receive, pursuant to Sections 361, 363(e) and 364(d)(1) and pursuant to the terms of the DIP Credit Agreement, cash interest payments at the non-default rate of interest set forth in the Interim Note. The Debtor is authorized to pay the Interim Noteholders cash interest on the Interim Note at the non-default rate of interest set forth in the Interim Note as provided in the Budget.

       7.    **Automatic Stay Modification.**  The automatic stay imposed under Section 362(a) is hereby modified to the extent necessary to effectuate all of the terms and provisions of this Order, including, without limitation, (i) to permit the DIP Lender, Revolving Lender and Interim Note Collateral Agent (together, the "Lenders") to enforce any and all remedies available to them hereunder and under the DIP Financing Documents; provided, however, that the automatic stay shall not be deemed vacated and modified with respect to the exercise by the DIP Lender of any rights or remedies with respect to the DIP Collateral following an Event of Default unless and until DIP Lender has given the Debtor, counsel for any Official Unsecured Creditors' Committee and the U.S. Trustee ten (10) days' prior notice of DIP Lender's intention to exercise such remedies, with notice filed with this Court concurrently, (ii) to permit the Debtor to implement the terms of the DIP Financing Documents and this Order, and (iii) to permit the Debtor to create, and the DIP Lender to perfect, any and all liens, mortgages, and security interests granted to it hereunder. In any hearing regarding the Lenders' exercise of any rights or remedies set forth in this Order or in the DIP Financing Documents, the only issues that may be raised by any party in opposition thereto shall be whether an Event of Default has occurred and is continuing and whether the DIP Lender is in compliance with this Order and the DIP Financing Documents. The Debtor hereby waives its right to seek relief, including under Section 105, to the extent such relief would in any

way impair, restrict or delay the exercise of the rights and remedies of the Lenders set forth in this Order or in the DIP Financing Documents.

8. **Maturity Date.** The Final DIP Loan Obligations shall be due and payable, in full, in cash, without notice or demand, November 6, 2017 (the "Maturity Date"). Notwithstanding the occurrence of an Event of Default or the Maturity Date or anything herein, all of the rights, remedies, benefits, and protections provided to the Lenders, the Debtor and its professionals under this Order and the DIP Financing Documents shall survive the Maturity Date.

9. **Carve-Out.** Before and upon the occurrence and during the continuation of an Event of Default, the DIP Liens, security interests, and superpriority administrative expense claims granted hereunder shall be subject to and subordinate only to (a) amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the clerk of the Court (collectively, "UST/Clerk Fees"); and (b) (i) allowed fees and expenses, accrued and unpaid as of the Termination Date, payable to Debtor's counsel and advisors capped in the amounts set forth in the Budget subject to Bankruptcy Court approval ("Professional Expense Cap," and together with the UST/Clerk Fees, the "Carve-Out"); provided, however, that the Professional Expense Cap shall be reduced on a dollar-for-dollar basis, by (i) any postpetition payments actually made to such professionals under Sections 330 or 331 or any other provision of the Bankruptcy Code or order of the Bankruptcy Court, and (ii) the amount of any unused pre-petition retainers held by such professionals at the commencement of the Case, which unused pre-petition retainers shall be applied against any award of compensation and reimbursement of expenses entered in this Case. An amount sufficient to fund the Professional Expense Cap accrued and unpaid prior to the Termination Date (subject to the foregoing reductions) shall be advanced by the DIP Lender to the Debtor pursuant to this Order and the DIP Credit Agreement only when and to the extent such fees and expenses are finally

approved and allowed by Bankruptcy Court order, but will be advanced even if such final approval and allowance occurs after the Termination Date. For the avoidance of doubt, until such time as the DIP Obligations are paid in full, in cash, under no circumstances shall the fees and expenses payable to all professionals retained pursuant to Court order in this Case exceed the Professional Expense Cap. The Carve-Out shall be free and clear of all liens, claims and encumbrances granted hereunder and shall be subject only to the allowed claims of the professionals for such fees and expenses as may be awarded by the Court under Sections 327 or 328; provided, however, as to services rendered and expenses incurred from and after entry of this Order, the Carve-Out cannot be used for the payment or reimbursement of any fees or disbursements of the Debtor or any other party-in-interest incurred in connection with the investigation or assertion of, or joinder in, any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter, when the purpose of such assertion of, or joinder in, any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter is to seek any order, judgment, determination, or similar relief: (1) invalidating, setting aside, avoiding, subordinating, in whole or in part, the Final DIP Loan Obligations, the DIP Collateral, the obligations under the Revolving Credit Agreement or the Revolving Credit Collateral, or any other lien, security interest, right, or claim of any kind of the DIP Lender, Revolving Lender or an affiliate of any of the foregoing parties; or (2) preventing, hindering, or delaying, whether directly or indirectly, the assertion by the Revolving Lender or the DIP Lender or enforcement of their respective liens or realization upon any of their respective collateral; or (3) challenging the DIP Liens or the Final DIP Loan Obligations; or (4) seeking an affirmative recovery from the DIP Lender, Revolving Lender or an affiliate of any of the foregoing parties, or (5) any act that has the effect of materially or adversely modifying or compromising the rights and remedies of the DIP

13

Lender, Revolving Lender or an affiliate of any of the foregoing parties.   In no event shall any of the Carve-Out be used to pay any fees or expenses of any person retained in a chapter 7 case under Sections 326, 327, or 328 or any other Chapter 7 administrative claim.

10.    **No Marshaling.** In no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral.

11.    **No Additional Filings Required For Perfection.**

(a)    All DIP Liens and any adequate protection liens pursuant to this Order are, valid, enforceable, and perfected, effective as of the Petition Date, and (notwithstanding any provisions of any agreement, lease, instrument, document, the Uniform Commercial Code, or any other relevant law or regulation of any jurisdiction) no further notice, filing, or other act shall be required to effect such perfection, and all DIP Liens on any deposit accounts or securities accounts shall pursuant to this Order be, and they hereby are, deemed to confer "control" for purposes of Sections 8-106, 9-104, and 9-106 of the Uniform Commercial Code in the various states in which the Debtor does business as in effect as of the date hereof in favor of the DIP Lender.   A certified copy of this Order may, in the discretion of the DIP Lender, be filed with or recorded in any filing or recording office and all filing offices are hereby authorized and directed to accept such certified copy of this Order for filing and recording.   Any provision of any lease or other license, contract, or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees, taxes, or obligations to any governmental entity, for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or other post-petition collateral related thereto, shall be deemed to have no force and effect with respect to the transactions granting DIP Liens or Adequate Protection Liens.   Notwithstanding any provision to the contrary in any lease, contract, or other document, the DIP Lender shall not be required to

14

enter into any access agreements or similar agreements with any lessor to gain access to real property leased by the Debtor for the purpose of accessing and taking control of any DIP Collateral.  If the DIP Lender shall, in its sole discretion, elect for any reason to file, record, or serve any such financing statements, mortgages, deeds of trust, lease holds, notices of lien or other documents with respect to such liens and security interests, the Debtor shall execute the same upon request and the filing, recording or service thereof (as the case may be) shall be deemed to have been made at the time and on the date required to implement the priority of such liens and security interests as provided in this Order.

12.    **Preservation of Rights Granted Under this Order.**

(a)    No claim or lien having a priority superior to or *pari passu* with those granted to the DIP Lender or Revolving Lender by this Order shall be granted or allowed until the DIP Pay-Out, except such claims payable through the Carve-Out.

(b)    The Debtor shall not seek, and it shall constitute an Event of Default under the DIP Financing Documents if the Debtor seeks, or if there is entered, (i) any modifications or extensions of this Order without the prior written consent of the DIP Lender or Revolving Lender, (ii) [reserved], (iii) an order appointing a Chapter 11 trustee in the Case, (iv) any plan of reorganization that does not provide for the DIP Pay Out or is not consented to by the Lenders, or (v) any motion involving any sale of the Debtor's assets that does not provide for the DIP Pay-Out or is not consented to by the Lenders. If an order dismissing the Case under Section 1112 or otherwise is at any time entered, such order shall provide that (x) the Section 507(b) Claim, the DIP Liens, the Superpriority DIP Claim, the Carve-Out, and the Adequate Protection Liens shall continue in full force and effect and shall maintain their priorities as provided in this Order until the DIP Pay-Out shall have been paid and indefeasibly satisfied, in full, in cash, and (y) subject to

15

the provisions of Section 350, the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security interests or replacement security interests referred to in clause (x) above.

(c)    If any or all of the provisions of this Order are hereafter reversed, modified, vacated, or stayed, such reversal, stay, modification, or vacation shall not affect (i) the validity of any Final DIP Loan prior to the actual receipt of written notice by the DIP Lender of the effective date of such reversal, stay, modification, or vacation or (ii) the validity or enforceability of any security interest, lien, Carve-Out, or priority authorized or created hereby or pursuant to the DIP Financing Documents with respect to any Final DIP Obligations or Adequate Protection Obligations.

13.    **Remedies upon Occurrence of Event of Default**. In the event of any of the following: (a) the failure of the Debtor to perform in any material respect any of its obligations pursuant to this Order; (b) the occurrence and continuation of any "Event of Default" as defined under the DIP Financing Documents; (c) the Termination Date; (d) the Case is either dismissed or converted to a case under chapter 7 of the Bankruptcy Code; (e) a trustee or examiner with expanded powers is appointed in the Case; or (f) the termination or nonrenewal of any DIP Financing Document, or if terminated sooner by an order of this Court, (each an "Event of Default" and collectively, "Events of Default"); then (unless such Event of Default is specifically waived in writing by the DIP Lender as provided for in the DIP Financing Documents, which waiver shall not be implied from any other action, inaction, or acquiescence by the DIP Lender) the automatic stay provisions of Section 362 are vacated and modified to the extent necessary to permit the DIP Lender to take any or all of the following actions: (i) terminate or reduce any lending under the DIP Financing Documents whereupon any lending shall immediately be

16

terminated or reduced, (ii) declare all or a portion of the Final DIP Loan Obligations then outstanding to be due and payable, whereupon all or such portion of the aggregate principal of such loans, all accrued and unpaid interest thereon, all fees, and all other amounts payable under the DIP Financing Documents shall become immediately due and payable, without presentment, demand, protest, or further notice of any kind, all of which are hereby expressly waived by the Debtor, and (iii) exercise any and all of its other rights and remedies hereunder, under the DIP Financing Documents, applicable law, or otherwise.  Except as set forth above, nothing contained in this Order or otherwise shall be construed to obligate the DIP Lender in any way to lend or advance any additional funds to the Debtor, or provide other financial accommodations to the Debtor upon or after the occurrence of an Event of Default.

14.    **Limitation of Liability**. Nothing in this Order or the DIP Financing Documents shall in any way be construed or interpreted to impose, or allow the imposition upon the DIP Lender of, any liability for any claims arising from the pre-petition or post-petition activities by the Debtor in the operation of its business or in connection with its restructuring efforts.

15.    **No Third Party Rights**. Except as explicitly provided for herein, this Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

16.    **Binding Effect Upon Successors and Assigns**. The provisions of this Order shall be binding upon and inure to the benefit of the Lenders, the Debtor and their respective successors and assigns or any estate representative, including any trustee appointed in chapter 11 or chapter 7.

17.    **Immediate Effect**. This order shall be effective upon entry on the docket by the Bankruptcy Court and the ten day-stay imposed by Rule 6004(h), to the extent applicable, is hereby waived.

17

18.    **Good Faith**.    Based on the evidence presented at the Final Hearing and the representations made by the Debtor, and in accordance with section 364(e) of the Bankruptcy Code, with respect to amounts advanced pursuant to this Order, in the event any or all of the provisions of this Order are hereafter reversed or modified by a subsequent order of this or any other Court, the DIP Lender has acted in good faith and is entitled to the protections provided in section 364(e) of the Bankruptcy Code and, provided that this Order is not stayed pending appeal, no such reversal or modification shall affect the validity and enforceability of any advances made under the DIP Credit Agreement or the liens or priority authorized or created hereby. Notwithstanding any such modification, amendment or vacatur, any claim granted to the DIP Lender hereunder arising prior to the effective date of such modification, amendment, or vacatur shall be governed in all respects by the original provisions of this Order and the DIP Lender shall be entitled to all of the rights, remedies, privileges and benefits, including the liens and priorities granted herein, with respect to any such claim.    Because the loans made pursuant to the DIP Credit Agreement are made in reliance on this Order, the obligations owed the DIP Lender prior to the effective date of any reversal or modification of this Order cannot, as a result of any subsequent order in the Case or otherwise, be subordinated, lose their lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status of the liens and claims granted to the DIP Lender under this Order and/or the DIP Financing Documents, provided that this Order was not stayed at the time such liens or claims arose.

19.    **Credit Bid**. The DIP Lender, Revolving Lender and Interim Note Collateral Agent reserve their respective right to credit bid in connection with any sale of the Debtor's assets by auction, plan or otherwise, and such parties shall retain this right notwithstanding any treatment under a proposed plan of reorganization.

20.    **Controlling Effect.** Except where expressly indicated in this Order to the contrary, in the event there is any inconsistency between the provisions of this Order and the DIP Financing Documents, the provisions of this Order shall govern.

21.    **Jurisdiction.** The Court shall retain exclusive jurisdiction to interpret and enforce this Order and the DIP Financing Documents.

22.    **Service of this Order.** Within three (3) Business Days after the entry of this Order, the Debtor shall serve a copy on the Notice Parties.

23.    **Reservation of Rights**.  Notwithstanding anything to the contrary in this Order, no provision of this Order or the DIP Financing Documents, shall impair or otherwise affect (a) any rights under any intercreditor agreement, including but not limited to the Amended and Restated Intercreditor Agreement, dated as of May 27, 2015, as may be amended or modified from time to time (the "Intercreditor Agreement"), among the Debtor, Triangle, and THL Corporate Finance, Inc.; or (b) any claims or causes of action of the Lenders or their affiliates against any third party; (c) any rights of the Lenders, in any capacity, to challenge any (x) proposed sale of the DIP Collateral to THL Corporate Finance, Inc. or any of its affiliates or (y) financing from THL Corporate Finance, Inc. or any other party.

24.    **Cash Collateral and Additional Adequate Protection**.  The Debtors are hereby authorized to use "cash collateral" as defined in section 363(a) of the Bankruptcy Code, subject to the Budget, the Carve-Out, the Credit Card Order, and the Adequate Protection Liens.

25. **Order Supersedes Interim Order.** This Final Order supersedes and replaces the Interim Order *nunc pro tunc* as of the earlier of (a) September 15, 2017 (i.e., the expiration of the Interim Order); and (b) the entry of this Final Order.

**IT IS SO ORDERED.**

Alan C. Stout
United States Bankruptcy Judge

Dated: September 13, 2017

###

Respectfully submitted:

/s/ Emily L. Pagorski
Lea Pauley Goff
Emily L. Pagorski
STOLL KEENON OGDEN PLLC
500 West Jefferson Street
Suite 2000
Louisville, Kentucky 40202
Tel. No. (502) 333-6000
Fax No. (502) 333-6099

*Proposed Counsel for the Debtor,*
*CRS Reprocessing, LLC*

Copies to:

Debtor's Limited Mailing Matrix

20

**Exhibit A**

**DIP Credit Agreement**

*Smith Anderson Draft 9.11.2017*

# FIRST AMENDMENT
# TO
# DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

This First Amendment to Debtor-In-Possession Loan and Security Agreement (together with all annexes and exhibits hereto, this "Amendment") is entered into as of September [__], 2017, by and among CRS REPROCESSING, LLC, a Delaware limited liability company ("CRS" and together with each Person that becomes a borrower from time to time in accordance with Section 6.12 of the Loan Agreement referred to below, collectively "Borrower" and each, individually, a "Borrower"), the Guarantors party hereto, and TRIANGLE CAPITAL CORPORATION, a Maryland corporation ("Lender").

## RECITALS

WHEREAS, a voluntary petition for relief under Title 11, United States Code (the "Bankruptcy Code") was filed by CRS with the United States Bankruptcy Court for the Western District of Kentucky (the "Bankruptcy Court") on August 9, 2017 (the "Petition Date") commencing a case under Chapter 11 of the Bankruptcy Code (the "Bankruptcy Case"), and CRS is continuing to operate its business and manage its properties as debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, pursuant to that certain Debtor-In-Possession Loan and Security Agreement dated as of August 30, 2017 by and among CRS, the Guarantors party thereto and Lender (the "Loan Agreement"), Lender has made available the DIP Revolving Facility (as defined in the Loan Agreement) to CRS and certain Domestic Subsidiaries of CRS, subject to the terms and conditions set forth therein; and

WHEREAS, the Credit Parties and Lender desire to amend the Loan Agreement in accordance with the terms of this Amendment.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and of the promises and agreements set forth herein, and for other good and valuable consideration, the mutuality, receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    **Capitalized Terms**.  Unless otherwise defined herein, all capitalized terms shall have the meanings given them in the Loan Agreement, and the meanings assigned to all capitalized terms shall be equally applicable to both the singular and plural forms of the terms defined.

2.    **Amendments to the Loan Agreement**.  The Loan Agreement is hereby amended as follows:

(a)    The Loan Agreement is amended to delete the stricken text (indicated textually in the same manner as the following example: ~~stricken text~~) and to add the bold and double-underlined text (indicated textually in the same manner as the following example:  **bold and double-underlined text**) as set forth on the pages of the Loan Agreement attached as Annex I hereto.

1

(b)      Exhibit A to the Loan Agreement is hereby amended and restated in its entirety as set forth in Exhibit A attached hereto.

3.      **Reaffirmation**.  The Credit Parties hereby reaffirm their respective obligations under any and all of the DIP Revolving Loan Documents and any and all other agreements, instruments and documents to which any of them is a party and under which Lender has any rights or obligations and which is or may be related in any way to the agreements, instruments and documents mentioned in or affected by this Amendment, the Loan Agreement or any of the other DIP Revolving Loan Documents as amended by this Amendment.

4.      **Conditions Precedent**.  The obligation of Lender to enter into this Amendment is subject to the condition precedent that Lender shall have received, in form and substance satisfactory to Lender, or shall have waived, the following:

(a)      a Final DIP Order entered by the Bankruptcy Court providing that Lender is a good faith lender within the meaning of Section 364(e) of the Bankruptcy Code and such Final DIP Order shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended and such other motions, orders and other pleadings or related documents to be filed or submitted to the Bankruptcy Court in connection with the DIP Revolving Facility and the transactions contemplated thereby as Lender may reasonably deem necessary or appropriate;

(b)      this Amendment, executed by Borrower and each Guarantor;

(c)      signed resolutions certified by the Secretary or equivalent officer of each Credit Party authorizing the execution and delivery of this Amendment and copies of Organizational Documents of each Credit Party;

(d)      the representations and warranties contained in Section 5 of the Loan Agreement shall be true and correct in all material respects on and as of the First Amendment Effective Date (except to the extent that such representation and warranty relates to an earlier date in which case such representation or warranty shall be true and correct in all material respects as of such date);

(e)      no Event of Default shall have occurred and be continuing or would exist after giving effect to this Amendment;

(f)      there shall be no order or injunction or pending litigation in which there is a reasonable likelihood of a decision which could have a Material Adverse Effect, and no pending litigation seeking to enjoin or prevent the DIP Revolving Facility or a sale of all or substantially all of Borrower's assets in accordance with § 363 of the Bankruptcy Code; and

(g)      all necessary governmental, regulatory, and other third-party approvals and consents with respect to the DIP Revolving Facility, and such other documents, and completion of such other matters as Lender may reasonably deem necessary or appropriate.

5.      **Miscellaneous**.

(a)      Entire Agreement.  This Amendment and the agreements, instruments and other documents referred to herein, constitute the entire agreement of the parties with respect to, and supersede all prior understandings of the parties with respect to, the subject matter hereof.  No change, modification, addition, or termination of this Amendment shall be enforceable unless in writing and signed by the party against whom enforcement is sought.

(b)     <u>Choice of Law and Venue; Jury Trial Waiver</u>.  Section 11 of the Loan Agreement (Choice of Law and Venue; Jury Trial Waiver) is hereby incorporated into this Amendment *mutatis mutandis*.

(c)     <u>Counterparts</u>.  This Amendment may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same agreement.  Delivery of an executed counterpart of this Amendment by telecopier or electronic mail shall be equally as effective as delivery of an original executed counterpart of this Amendment.  Any party delivering an executed counterpart of this Amendment by telecopier or electronic mail also shall deliver an original executed counterpart of this Amendment but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Amendment.

(d)     <u>Headings</u>.  The headings used in this Amendment have been included solely for ease of reference and shall not be considered in the interpretation or construction of this Amendment.

(e)     <u>Severability</u>.  Each provision of this Amendment shall be severable from every other provision of this Amendment for the purpose of determining the legal enforceability of any specific provision.

(f)     <u>Binding Effect</u>.  This Amendment shall bind and inure to the benefit of the respective successors and permitted assigns of each of the parties, including any trustee that may be appointed in the Bankruptcy Case or a subsequent Chapter 7 case; <u>provided</u>, <u>however</u>, that neither this Amendment, the Loan Agreement, any other DIP Revolving Loan Document, nor any rights hereunder or thereunder may be assigned by any Credit Party without Lender's prior written consent, which consent may be granted or withheld in Lender's sole discretion.

(g)     <u>No Waiver or Course of Dealing</u>.  The execution and delivery of this Amendment by Lender does not waive any right that Lender might have under any of the DIP Revolving Loan Documents except for the specific modifications and amendments contained in this Amendment.  Neither this Amendment, nor earlier amendments or modifications of any of the DIP Revolving Loan Documents, creates any course of dealing among Lender, the Credit Parties or any other Person, and none of the foregoing nor any other Person should infer that Lender will enter into any other or future amendment or modification of any of the DIP Revolving Loan Documents in the future, whether similar of dissimilar to this Amendment.

[Signature Pages Follow]

3

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

**LENDER:**

**TRIANGLE CAPITAL CORPORATION**, a Maryland corporation


By:    _____
Name:  _____
Its:   _____


**BORROWER:**

**CRS REPROCESSING, LLC**, a Delaware limited liability company


By:    _____
Name:  _____
Its:   _____

[Signature Page to First Amendment to DIP Loan and Security Agreement]

**GUARANTORS:**

**CRS SOLIDS SOLUTIONS, LLC,** a Delaware limited
liability company


By: _____
Name: _____
Its: _____


**RDC CONSULTING, LLC**, a Delaware limited
liability company


By: _____
Name: _____
Its: _____


**CRS ÚJRAFELDOLGOZÁS MAGYARORSZÁG KFT.**, a
Hungarian Korlátolt Felelősségű Társaság


By: _____
Name: _____
Its: _____


[Signature Page to First Amendment to DIP Loan and Security Agreement]

**ANNEX 1**

Debtor-In-Possession Loan and Security Agreement,

as amended through the First Amendment Effective Date

[attached]

*Execution Version*

DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

dated as of August 30, 2017

by and among

CRS REPROCESSING, LLC,

as Borrower,

the Guarantors party hereto,

and

TRIANGLE CAPITAL CORPORATION

as Lender

This DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT (together with the Schedule and all exhibits hereto, this "Agreement") is entered into as of August 30, 2017, by and among CRS REPROCESSING, LLC, a Delaware limited liability company ("CRS" and together with each Person joined hereto as a borrower from time to time in accordance with Section 6.12, collectively "Borrower" and each, individually, a "Borrower"), the Guarantors party hereto, and TRIANGLE CAPITAL CORPORATION, a Maryland corporation ("Lender").

### RECITALS

WHEREAS, a voluntary petition for relief under Title 11, United States Code (the "Bankruptcy Code") was filed by CRS with the United States Bankruptcy Court for the Western District of Kentucky (the "Bankruptcy Court") on August 9, 2017 (the "Petition Date") commencing a case under Chapter 11 of the Bankruptcy Code (the "Bankruptcy Case"), and CRS is continuing to operate its business and manage its properties as debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, CRS has requested that Lender make available the DIP Revolving Facility (as defined hereinafter) to CRS and certain Domestic Subsidiaries of CRS, subject to the terms and conditions set forth herein;

WHEREAS, certain Subsidiaries of CRS are parties hereto as Guarantors and the potential obligations of each Guarantor are not disproportionate to the benefits to be derived by such Guarantor from the making of extensions of credit to CRS under the Agreement or to each such Guarantor's net worth;

WHEREAS, Lender is willing, on the terms and conditions hereinafter set forth, to make the DIP Revolving Facility available to CRS; and

WHEREAS, Lender is willing, on the terms and conditions hereinafter set forth, to make the DIP Revolving Facility available to certain Domestic Subsidiaries of CRS.

### AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and intending to be legally bound hereby, the parties hereto agree as follows:

1. **DEFINITIONS AND CONSTRUCTION**.

1.1. **Definitions.** As used in this Agreement, the following terms shall have the following definitions:

"Accounts" has the meaning given to such term in the Code, including all accounts receivable, credit card receivables and all rights to payment for goods sold or leased, or for services rendered.

"Advance" or "Advances" means a cash advance or cash advances under the DIP Revolving Facility.

"Affiliate" shall mean, as applied to any Person, any other Person directly or indirectly controlling, or controlled by, or under common control with, that Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with") as applied to any Person, means the possession, directly or indirectly, of the power (i) to vote 5% or more of the securities having ordinary voting power for the election of

DOC ID - 26567501.3

directors of such Person, or (ii) to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

"Agreement" has the meaning given that term in the Preamble hereof.

"Availability" means, at any time during a calendar week, 115% of the sum of the amounts, if any, shown on the Budget line entitled "Cumulative Cash Shortfall excluding DIP Borrowing" with respect to such calendar week, all prior calendar weeks, and the immediately following calendar week.

"Availability Block" means an aggregate amount equal to $80,000, which amount shall be reduced from time to time on a dollar-for-dollar basis by the amount of the fees and expenses of Borrower's counsel retained pursuant to sections 327 and 328 of the Bankruptcy Code that are finally approved and allowed by the Bankruptcy Court.

"Avoidance Actions" means causes of action of any Credit Party's estate under §§ 502(d), 544, 545, 546, 547, 548, and 550 of the Bankruptcy Code.

"Bankruptcy Case" has the meaning given that term in the Recitals hereof.

"Bankruptcy Code" has the meaning given that term in the Recitals hereof.

"Bankruptcy Court" has the meaning given that term in the Recitals hereof.

"Borrower" has the meaning given that term in the Preamble hereof.

"Budget" means the budget set forth on Exhibit A attached hereto and submitted by Borrower to, and approved by, the Bankruptcy Court in connection with its approval of any Interim DIP Order or any Final DIP Order, together with amendments thereto agreed upon in writing between Lender and Borrower pursuant to Section 12.5 and approved by the Bankruptcy Court.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banks in the State of North Carolina are authorized or required to close.

"Capital Expenditure" means any expenditure for any purchase or other acquisition of any asset which is required to be classified as a fixed or capital asset on a balance sheet prepared in accordance with GAAP.

"Capital Lease" of a Person means any lease of property by such Person as lessee which is required to be classified as a capital lease on a balance sheet of such Person prepared in accordance with GAAP.

"Capital Lease Obligations" of any Person means all obligations (including sales tax obligations) of such Person under Capital Leases.

"Carve Out" means (a) allowed professional fees of and disbursements to professionals retained pursuant to orders of the Bankruptcy Court paid in accordance with the Budget and (b) amounts payable in connection with the Bankruptcy Case pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Court, each as set forth in any Interim DIP Order.

"Closing Date" means the date of this Agreement.

"Code" means the New York Uniform Commercial Code.

DOC ID - 26567501.3

2

"Collateral" means the property described on Exhibit B attached hereto.

"Contingent Obligation" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of that Person with respect to (a) any indebtedness, lease, dividend, letter of credit or other obligation of another; (b) any obligations with respect to undrawn letters of credit, corporate credit cards, or merchant services issued or provided for the account of that Person; and (c) all obligations arising under any Hedging Agreement; provided, however, that the term "Contingent Obligation" shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determined amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by Lender in good faith; provided, however, that such amount shall not in any event exceed the maximum amount of the obligations under the guarantee or other support arrangement.

"Copyrights" means any and all copyright rights, copyright applications, copyright registrations and like protections in each work or authorship and derivative work thereof.

"Credit Parties" shall mean the Borrower and, each Guarantor, and upon execution and delivery of the documents required pursuant to Section 6.13, CRS China.

"Credit Party's Books" means all of any Credit Party's books and records including: ledgers; records concerning such Credit Party's assets or liabilities, the Collateral, business operations or financial condition; and all computer programs, or tape files, and the equipment, containing such information.

"CRS China" means CRS (Dongying) Reprocessing, Ltd., a Chinese wholly foreign owned enterprise.

"Daily Balance" means the amount of the Obligations owed at the end of a given day.

"DIP Disbursement Account" has the meaning given that term in Section 3.1(c).

"DIP Revolving Facility" means the facility under which Borrower may request Lender to issue Advances, as specified in Section 2.1(a).

"DIP Revolving Line" means $1,900,000, as such amount may be increased pursuant to Section 2.2(f).

"DIP Revolving Loan Documents" means, collectively, this Agreement, any Interim DIP Order, any Final DIP Order and any other order of the Bankruptcy Court and any other instrument, document or agreement required to be delivered pursuant to this Agreement or any order of the Bankruptcy Court or delivered in connection with this Agreement, including any documents or instruments executed or delivered by any Person from time to time as guarantees or security for the Obligations, in each case, as amended, modified, waived, substituted, replaced or extended from time to time.

"DIP Revolving Commitment TerminationMaturity Date" means the earliest of (a) September 15,November 6, 2017, (b) confirmation by the Bankruptcy Court of a Plan of Reorganization, (c) consummation of a sale of all or substantially all assets of Borrower under Bankruptcy Code § 363, or (d) appointment of a Chapter 7 or Chapter 11 trustee in the Bankruptcy Case.

"DIP Revolving Maturity Date" means the DIP Revolving Commitment Termination Date; provided, that such date shall be automatically extended to November 6, 2017 solely in the event that (a)

DOC ID - 26567501.3

3

on or prior to the DIP Revolving Commitment Termination Date, the Credit Parties obtain entry of an order of the Bankruptcy Court approving post petition financing from a Person other than Lender to facilitate the sale of substantially all of the assets of the Borrower consistent with the Sale Milestones (as used herein, any such financing, an "Alternative Financing"), (b) such Alternative Financing is either unsecured or secured by liens that are junior, subordinate and subject to, in all respects, (i) the Liens arising under the DIP Revolving Loan Documents, (ii) the adequate protection liens of the Lender arising under any Interim DIP Order or any Final DIP Order, (iii) the Superpriority Claims of the Lender arising under any Interim DIP Order or any Final DIP Order and (iv) any other Senior Liens and Claims (as defined in any Interim DIP Order or any Final DIP Order) of Lender, and (c) such Alternative Financing cannot be "credit bid" in connection with any sale of the Collateral unless and until all liens and claims described in clause (b) above are indefeasibly paid in full in cash.

"Distributions" by a Person means (a) dividends or other distributions or return of capital on any now or hereafter outstanding capital stock of such Person; (b) the redemption, repurchase, defeasance or acquisition of such capital stock of or warrants, rights or other options to purchase such capital stock; and (c) any loans or advances (other than salaries or reimbursement of employee expenses, in each case, in the ordinary course of business), to any stockholder(s), partner(s) or member(s) of such Person.

"Domestic Credit Party" shall mean a Credit Party organized under the laws of the United States, any state thereof or the District of Columbia.

"Equipment" means all present and future machinery, equipment, tenant improvements, furniture, fixtures, vehicles, tools, parts and attachments in which any Credit Party has any interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder.

"Event of Default" has the meaning assigned in Article 8.

"Final DIP Order" means any order entered by the Bankruptcy Court on at least fourteen (14) days' notice as required by Bankruptcy Rule 4001, in form and substance satisfactory to Lender in its sole discretion, approving the DIP Revolving Facility and the DIP Revolving Loan Documents.

"First Amendment Effective Date" means September [___], 2017.

"Foreign Credit Party" shall mean a Credit Party that is not a Domestic Credit Party.

"GAAP" means generally accepted accounting principles as in effect within the United States from time to time, consistently applied.

"Hedging Agreement" means any rate protection agreement (including swaps, caps, and collars), foreign currency exchange agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging agreement.

"Indebtedness" means, with respect to any Person, without duplication, such Person's (a) obligations for borrowed money, (b) obligations representing the deferred purchase price of property or services (other than accounts payable arising in the ordinary course of such Person's business payable on terms customary in the trade and not outstanding more than ninety (90) days past the date of invoice), (c) obligations, whether or not assumed, secured by Liens or payable out of the proceeds or production from property now or hereafter owned or acquired by such Person, (d) obligations which are evidenced by notes, acceptances, or other instruments, (e) obligations of such Person to purchase securities or other

property arising out of or in connection with the sale of the same or substantially similar securities or property, (f) Capital Lease Obligations and obligations created or arising under any conditional sale or other title retention agreement, (g) Contingent Obligations in respect of Indebtedness, (h) net obligations under or relating to Hedging Agreements equal to the Termination Value as of the date of determination, (i) Off-Balance Sheet Liabilities, (j) obligations in respect of Sale and Leaseback Transactions, (k) the aggregate undrawn face amount of all letters of credit, bankers' acceptances, surety and appeal bonds, and similar obligations issued for the account and/or upon the application of such Person together with all unreimbursed drawings with respect thereto, and (l) any other obligation for borrowed money or other financial accommodation which in accordance with GAAP would be shown as a liability on the balance sheet of such Person.

"Intellectual Property Collateral" means all of each Credit Party's right, title, and interest in and to the following: Copyrights, Trademarks and Patents; all trade secrets, all design rights, claims for damages by way of past, present and future infringement of any of the rights included above, all licenses or other rights to use any of the Copyrights, Patents or Trademarks, and all license fees and royalties arising from such use to the extent permitted by such license or rights; all amendments, renewals and extensions of any of the Copyrights, Trademarks or Patents; and all proceeds and products of the foregoing, including all payments under insurance or any indemnity or warranty payable in respect of any of the foregoing.

"Interim DIP Order" means any order entered by the Bankruptcy Court with respect to the DIP Revolving Facility prior to the Final DIP Order, in form and substance satisfactory to Lender in its sole discretion, approving the DIP Revolving Facility and the DIP Revolving Loan Documents.

"Inventory" means all inventory in which any Credit Party has or acquires any interest, including work in process and finished products intended for sale or lease or to be furnished under a contract of service, of every kind and description now or at any time hereafter owned by or in the custody or possession, actual or constructive, of such Credit Party, including such inventory as is temporarily out of its custody or possession or in transit and including any returns upon any accounts or other proceeds, including insurance proceeds, resulting from the sale or disposition of any of the foregoing and any documents of title representing any of the above, and such Credit Party's Books relating to any of the foregoing.

"Investment" means any beneficial ownership of (including stock, partnership interest or other securities) any Person, or any loan, advance or capital contribution to any Person.

"Lender" has the meaning given that term in the Preamble hereof.

"Lender Expenses" means all reasonable out-of-pocket expenses (including Lender's reasonable travel expenses and reasonable fees, costs, and expenses of counsel to Lender), in each case, incurred in connection with the DIP Revolving Facility and the preparation of legal documentation.

"Lien" means any mortgage, lien, deed of trust, charge, pledge, security interest or other encumbrance.

"Material Adverse Effect" means a material adverse effect on (a) the business, condition (financial or otherwise), operations, prospects, performance or property of any Credit Party (other than the filing and continuing pendency of the Bankruptcy Case), or (b) the validity or enforceability of or any rights of Lender under the DIP Revolving Loan Documents.

"Negotiable Collateral" means all letters of credit of which any Credit Party is a beneficiary, notes, drafts, instruments, securities, documents of title, and chattel paper, and such Credit Party's Books relating to any of the foregoing.

"Obligations" means all present and future obligations, indebtedness and liabilities, Lender Expenses and all renewals and extensions of all or any part thereof, of each Credit Party to Lender arising from, by virtue of or pursuant to this Agreement, any other DIP Revolving Loan Document and any and all renewals and extensions thereof or any part thereof, or future amendments thereto, all interest accruing on all or any part thereof, all expenses incurred in connection with the execution of waivers, amendments and consents, and in connection with the enforcement or the collection of all or any part thereof, and reasonable attorneys' fees incurred by Lender in connection with the enforcement or the collection of all or any part of the Obligations during the continuance of an Event of Default, in each case, whether such obligations, indebtedness and liabilities are direct, indirect, fixed, contingent, joint, several or joint and several.

"Off-Balance Sheet Liability" of a Person means (a) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (b) any liability under any Sale and Leaseback Transaction which is not a Capital Lease, (c) any liability under any "synthetic lease" transaction entered into by such Person, or (d) any obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheets of such Person.

"Organizational Documents" shall mean the documents necessary for the formation of an entity, which will include the Articles or Certificate of Incorporation and Regulations or Bylaws if the entity is a corporation, the Articles or Certificate of Organization and Operating Agreement, if any, if the entity is a limited liability company, the Partnership Agreement or Limited Partnership Agreement if the entity is a partnership, and the documents necessary for the formation of an entity under foreign law.

"Patents" means all patents, patent applications and like protections including improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same.

"Permitted Indebtedness" means:

(a)    Indebtedness in favor of Lender arising under this Agreement or any other DIP Revolving Loan Document;

(b)    Indebtedness existing on the Petition Date and disclosed in the Schedule and any extensions, renewals, and refinancings thereof which have been approved by Lender in writing;

(c)    Indebtedness arising from the honoring by a financial institution of a check or similar instrument drawn against insufficient funds in the ordinary course of business, so long as such Indebtedness is extinguished within ten (10) Business Days of incurrence;

(d)    Indebtedness with respect to surety and appeal bonds, performance bonds, bid bonds and similar obligations incurred in the ordinary course of business; and

(e)    Unsecured intercompany Indebtedness resulting from an intercompany Investment permitted by clause (f) of the definition of "Permitted Investment".

"Permitted Investment" means:

(a)    Investments existing on the Petition Date disclosed in the Schedule;

DOC ID - 26567501.3

(b)       Advances in the form of prepayments of expenses to trade creditors made in connection with the purchase or sale of goods or services in the ordinary course of business and either consistent with past practice, provided for in the Budget, or otherwise in accordance with any Interim DIP Order or any Final DIP Order;

(c)       Investments in the ordinary course of business consisting of endorsements for collection or deposit;

(d)       Investments (including debt obligations) received in connection with the bankruptcy or reorganization of customers or suppliers and in settlement of delinquent obligations of, and other disputes with, customers or suppliers arising in the ordinary course of business;

(e)       (i) marketable direct obligations issued or unconditionally guaranteed by the United States of America or any agency or any State thereof maturing within one (1) year from the date of acquisition thereof, and (ii) commercial paper maturing no more than one (1) year from the date of creation thereof and currently having rating of at least A-2 or P-2 from either Standard & Poor's Corporation or Moody's Investors Service; provided, that such Investments are subject to a perfected first priority Lien in favor of Lender at all times, including if necessary pursuant to a control agreement in form and substance satisfactory to Lender, and provided further that such Investments do not exceed in the aggregate the cumulative amount, if any, set forth in the Budget at any given time; and

(f)       Intercompany Investments made by any Credit Party or any Subsidiary of a Credit Party in any other Credit Party.

"Permitted Liens" means the following:

(a)       Any Liens arising under this Agreement or the other DIP Revolving Loan Documents;

(b)       Any Liens existing on the Petition Date that are disclosed in the Schedule;

(c)       Liens for taxes, fees, assessments or other governmental charges or levies, either not delinquent or being contested in good faith by appropriate proceedings; provided, that provision is made to the reasonable satisfaction of Lender for the eventual payment thereof if subsequently found payable;

(d)       Liens imposed by law, such as carriers', warehousemens', and mechanics' liens and other similar Liens, arising in the ordinary course of business which secure payment of obligations not more than sixty (60) days past due or which are being contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books;

(e)       Liens arising in the ordinary course of business out of pledges or deposits under worker's compensation laws, unemployment insurance, old age pensions, or other social security or retirement benefits, or similar legislation;

(f)       utility easements, building restrictions and such other encumbrances or charges against real property as are of a nature generally existing with respect to properties of a similar character and which do not in any material way affect the marketability of the same or interfere with the use thereof in the business of any Credit Party;

(g)    rights of setoff or bankers' liens upon deposits in cash in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of such deposit accounts in the ordinary course of business;

(h)    Liens securing judgments for the payment of money not constituting an Event of Default hereunder;

(i)    leases and subleases entered into by any Credit Party or Subsidiary of a Credit Party, as lessor or sublessor, to the extent (x) payments thereunder are in accordance with the Budget and (y) any such lease or sublease does not materially and adversely affect the use and operation of the applicable property by such Credit Party; and

(j)    Liens incurred in connection with the extension, renewal or refinancing of the indebtedness secured by Liens of the type described in clauses (a) and (b) above, provided, that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien and the principal amount of the indebtedness being extended, renewed or refinanced does not increase.

"Person" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or governmental agency.

"Petition Date" has the meaning given that term in the Recitals hereof.

"Plan of Reorganization" means a plan of reorganization in the Bankruptcy Case.

"Pre-Petition Loan A" means the loans evidenced by (a) that certain Loan Agreement dated as of June 16, 2011 by and among the Borrower, the guarantors party thereto and ~~Triangle Capital Corporation~~Lender (as successor in interest to JP Morgan Chase Bank, N.A.), as amended, restated, supplemented or otherwise modified from time to time and (b) the other Borrower Documents (as defined in the Loan Agreement referred to in clause (a) above).

"Pre-Petition Loan B" means the loans evidenced by the Pre-Petition Loan B Note.

"Pre-Petition Loan B Note" means that certain Second Amended and Restated Senior Secured Subordinated Note dated as of February 10, 2015, made by the Borrower in favor of ~~Triangle Capital Corporation~~Lender, Salem Halifax Capital Partners, Limited Partnership, and the other lenders from time to time party thereto as amended, restated, supplemented or otherwise modified from time to time.

"Pre-Petition Loan C" means the loans evidenced by (a) the Pre-Petition Loan C Credit Agreement and (b) the other Loan Documents (as defined in the Amended and Restated Credit Agreement referred to in clause (a) above).

"Pre-Petition Loan C Agent" means THL Corporate Finance, Inc. in its capacity as Agent under the documents evidencing or governing the Pre-Petition Loan C.

"Pre-Petition Loan C Credit Agreement" means that certain Amended and Restated Credit Agreement, dated as of May 27, 2015, by and among the Borrower, the guarantors from time to time party thereto, the lenders from time to time party thereto, and the Pre-Petition Loan C Agent, as amended, restated, supplemented or otherwise modified from time to time

"Pre-Petition Loan D" means the loan evidenced by (a) that certain that certain Third Amended and Restated Loan Agreement, dated as of May 27, 2015, by and among the Borrower, the lenders from

time to time party thereto, and Harvest Capital Credit Corporation in its capacity as Agent, as amended, restated, supplemented or otherwise modified from time to time and (b) the other Loan Documents (as defined in the Third Amended and Restated Loan Agreement referred to in clause (a) above).

"Responsible Officer" means each of the Chief Executive Officer, the Chief Operating Officer, and the Vice President - Finance and Operations of Borrower.

"Sale and Leaseback Transaction" means (a) any sale or other transfer of property by any Person with the intent to lease such property as lessee, and (b) such lease.

"Sale Milestones" means the milestones with respect to a sale of all or substantially all of Borrower's assets in accordance with § 363 of the Bankruptcy Code set forth on Exhibit C attached hereto.

"Schedule" means the schedules attached hereto and approved by Lender.

"Subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise controlled, by the parent and/or one or more subsidiaries of the parent. References herein to "Subsidiaries" shall, unless the context requires otherwise, be deemed to be references to direct and indirect Subsidiaries of Borrower.

"Superpriority Claims" means any Indebtedness or other claim arising out of credit obtained or Indebtedness incurred by any Credit Party having priority in accordance with the provisions of Section 364(c)(1) of the Bankruptcy Code over any or all administrative expenses of the kind specified in Section 503(b) or 507(b) of the Bankruptcy Code.

"Termination Value" means, in respect of any Hedging Agreement, after taking into account the effect, without duplication, of any legally enforceable netting agreement relating to such Hedging Agreement, (a) for any date on or after the date such Hedging Agreement has been closed out and terminated and a termination value determined in accordance therewith, either such termination value (if payable by any Credit Party or any Subsidiary of a Credit Party) or zero (if already paid or not payable by any Credit Party or any Subsidiary of a Credit Party), and (b) for any date before the date referenced in clause (a), the amount determined as the mark-to-market value for such Hedging Agreement, as determined based on one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Agreement (or, if no such quotation is available at the time of determination, Lender's reasonable determination of such value) (if payable by any Credit Party or any Subsidiary of a Credit Party) or zero (if not payable by any Credit Party or any Subsidiary of a Credit Party).

"Trademarks" means any trademark and servicemark rights, whether registered or not, applications to register and registrations of the same and like protections, and the entire goodwill of the business of Borrower and its Subsidiaries connected with and symbolized by such trademarks.

"Transfer" has the meaning given that term in Section 7.1.

"Unencumbered Foreign Subsidiaries" means CRS ~~(Dongying) Reprocessing, Ltd~~China; CRS (Hohhot) Reprocessing Limited; and CRS Reprocessing (Philippines), Inc.

"Unrestricted Subsidiaries" means Coöperatief CRS Reprocessing U.A., CRS Reprocessing Holding B.V., CRS Reprocessing France SAS, CRS Reprocessing Germany Verwaltungs GmbH, CRS Reprocessing Germany GmbH & Co. KG, CRS Reprocessing Korea Limited YH and Full Charter Industries Limited.

1.2.    Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any right or interest in or to assets and properties of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

1.3.    Accounting Terms.  All accounting terms not specifically defined herein shall be construed in accordance with GAAP, and all calculations made hereunder shall be made in accordance with GAAP.  When used herein, the terms "financial statements" shall include the notes and schedules thereto.

2.    **FACILITY AND TERMS OF PAYMENT**.

2.1.    Advances.  Borrower promises to pay to the order of Lender, in lawful money of the United States of America, the aggregate outstanding principal amount of all Advances made by Lender to Borrower hereunder.  Borrower shall also pay interest on the unpaid principal amount of such Advances at rates in accordance with the terms hereof.

(a)    Availability; Repayment; Advance Request.

(i)    Subject to and upon the terms and conditions of this Agreement, Borrower may request, and if properly requested Lender shall make available to Borrower, at any time during the period from the Closing Date until the DIP Revolving ~~Commitment Termination~~Maturity Date, Advances in an aggregate outstanding amount not to exceed the result of (A) the lesser of (1) the DIP Revolving Line and (2) Availability ~~minus~~ (B) the Availability Block, provided that Borrower may request, and if properly requested Lender may in its sole discretion make available to Borrower, at any time during the period from the Closing Date until the DIP Revolving ~~Commitment Termination~~Maturity Date, Advances in an aggregate principal amount exceeding the amount set forth in the immediately preceding sentence (but not in any case exceeding the DIP Revolving Line).  Subject to the terms and conditions of this Agreement, amounts borrowed pursuant to this Section 2.1(a) may be repaid and reborrowed at any time prior to the DIP Revolving ~~Commitment Termination~~Maturity Date, at which time Lender's commitment to make Advances shall terminate.  Borrower may prepay Advances in any

DOC ID - 26567501.3

10

amount (together with all accrued but unpaid interest thereon) and at any time, without penalty or premium.  All Advances and all other Obligations shall be immediately due and payable on the DIP Revolving Maturity Date.

(ii)    Whenever Borrower desires an Advance, Borrower will deliver to Lender by facsimile transmission no later than 2:00 p.m. North Carolina time, on the Business Day immediately preceding the Business Day on which the Advance is to be made, an Advance Request in substantially the form of Exhibit D attached hereto.  Lender is authorized to make Advances under this Agreement, based upon instructions received from (or believed in good faith to be from) a Responsible Officer or a designee of a Responsible Officer.

(iii)    All Advances made by Lender to Borrower hereunder shall be made solely to the DIP Disbursement Account unless otherwise agreed by Lender in its sole discretion.

(iv)    Notwithstanding anything to the contrary contained in this Agreement, Lender agrees to make a one-time Advance after the DIP Revolving ~~Commitment Termination~~Maturity Date in an amount not to exceed the amount of the Availability Block on the DIP Revolving ~~Commitment Termination~~Maturity Date in respect of the fees and expenses of Borrower's counsel retained pursuant to sections 327 and 328 of the Bankruptcy Code that are accrued and unpaid prior to the DIP Revolving ~~Commitment Termination~~Maturity Date but that are finally approved and allowed by the Bankruptcy Court whether before or after the DIP Revolving ~~Commitment Termination~~Maturity Date.

(b)    Mandatory Repayment.

(i)    If the aggregate amount of the outstanding Advances (excluding Advances constituting interest capitalized pursuant to Section 2.2(c)) exceeds the result of (A) the DIP Revolving Line minus (B) the Availability Block at any time, Borrower shall immediately pay to Lender, in cash, the amount of such excess.

(ii)    If the aggregate amount of the outstanding Advances (excluding Advances constituting interest capitalized pursuant to Section 2.2(c)) exceeds the result of (A) Availability minus (B) the Availability Block at any time and Lender so requests, Borrower shall immediately pay to Lender, in cash, the amount of such excess.

(iii)    If the aggregate amount of cash and cash equivalents in all of the checking, savings and other accounts of the Credit Parties (excluding the aggregate amount of all checks to be drawn against such accounts and the aggregate amount of all outstanding electronic funds transfers that have been initiated against such accounts, in each case, by Persons other than the Credit Parties and their Affiliates) exceeds $100,000 on Friday of any week, Borrower shall immediately pay to Lender, in cash, the amount of such excess.

(iv)    If there are any amounts on deposit in the DIP Disbursement Account on or at any time after the DIP Revolving ~~Commitment Termination~~Maturity Date, Borrower shall immediately pay to Lender, in cash, all such amounts, other than Carve-Out expenses and attorneys' fees accrued through the DIP Revolving ~~Commitment Termination~~Maturity Date.

2.2.    **Interest Rates, Payments, and Calculations.**

(a)    Interest Rates.  Except as set forth in Section 2.2(b), the Advances shall bear interest, on the outstanding Daily Balance thereof, at a rate equal to eight percent (8.0%) per annum.

DOC ID - 26567501.3

11

(b)     Late Fee; Default Rate.  All Obligations shall bear interest (including post-petition interest in any proceeding under the Bankruptcy Code or other applicable bankruptcy law as well as before entry of judgment thereon), from and after the occurrence and during the continuance of an Event of Default, at a rate equal to two (2.0) percentage points above the interest rate applicable immediately prior to the occurrence of the Event of Default.

(c)     Payment-in-Kind.  All interest on Advances shall be paid by capitalizing such interest and adding such capitalized interest to the then outstanding principal amount of the Advances.  Any interest to be so capitalized pursuant to this clause (c) shall be capitalized on the last calendar day of each month and added to the then outstanding principal amount of the Advances and, thereafter, shall bear interest as provided hereunder as if it had originally been part of the outstanding principal of the Advances.

(d)     Payments Generally.  All payments shall be free and clear of any taxes, withholdings, duties, impositions or other charges, to the end that Lender will receive the entire amount of any Obligations payable hereunder, regardless of source of payment.  Amounts received by Lender after 3:00 p.m. on any day shall be deemed to have been made at the open of Lender's business on the immediately succeeding Business Day.

(e)     Computation.  All interest chargeable under the DIP Revolving Loan Documents shall be computed on the basis of a three hundred sixty (360) day year for the actual number of days elapsed.

(f)     Increase in DIP Revolving Line.  Upon entry of a Final DIP Order, Lender may, in its sole discretion and effective upon delivery of notice thereof to Borrower, increase the DIP Revolving Line to an amount not exceeding $4,000,000.

2.3.     No Note.  This Agreement and the DIP Revolving Loan Documents fully evidence and memorialize the Obligations, and no promissory note or any other instrument is required to evidence such Obligations.

2.4.     Term.  This Agreement shall become effective on the Closing Date and, subject to Section 12.7, shall continue in full force and effect for so long as any Obligations remain outstanding or Lender has any obligation to make Advances under this Agreement, provided that Lender's commitment to make Advances, if not previously terminated, shall terminate on the DIP Revolving Commitment Termination Maturity Date.  Notwithstanding the foregoing, Lender shall have the right to terminate its commitment to make Advances under this Agreement immediately and without notice upon the occurrence and during the continuance of an Event of Default.  Notwithstanding termination of Lender's commitment or of this Agreement, Lender's Lien on the Collateral shall remain in effect for so long as any Obligations are outstanding.  Lender shall terminate and release its Lien on the Collateral within three (3) Business Days after Borrower's request following the termination of this Agreement, indefeasible payment, in full, in cash, of the Obligations and termination of Lender's commitment to make Advances.

3.    **CONDITIONS TO ADVANCES.**

3.1.    <u>Conditions Precedent to Initial Advance</u>.  The obligation of Lender to make the initial Advance is subject to the condition precedent that Lender shall have received, in form and substance satisfactory to Lender, or shall have waived, the following:

(a)    the Interim DIP Order entered by the Bankruptcy Court providing that Lender is a good faith lender within the meaning of Section 364(e) of the Bankruptcy Code and the Interim DIP Order shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended and such other motions, orders and other pleadings or related documents to be filed or submitted to the Bankruptcy Court in connection with the DIP Revolving Facility and the transactions contemplated thereby as Lender may reasonably deem necessary or appropriate;

(b)    this Agreement, executed by Borrower and each Guarantor;

(c)    establishment by the Credit Parties of a deposit account to be used exclusively by the Credit Parties for deposit of proceeds of Advances by Lender and disbursements of such proceeds by the Credit Parties, in each case, in accordance with the terms of this Agreement, any Interim DIP Order or any Final DIP Order (such account, the "<u>DIP Disbursement Account</u>");

(d)    UCC Financing Statements naming Borrower and any other Credit Party required by Lender;

(e)    signed resolutions certified by the Secretary or equivalent officer of each Credit Party authorizing the execution and delivery of this Agreement and copies of Organizational Documents of each Credit Party;

(f)    copies of insurance policies complying with the requirements of <u>Section 6.6</u>, including endorsements naming Lender as additional insured or lender's loss payee, as applicable;

(g)    current financial statements and such other information and updated reports from Borrower as Lender may reasonably request; and

(h)    all necessary governmental, regulatory, and other third-party approvals and consents with respect to the DIP Revolving Facility, and such other documents, and completion of such other matters as Lender may reasonably deem necessary or appropriate.

3.2.    <u>Conditions Precedent to all Advances</u>.  The obligation of Lender to make each Advance, including the initial Advance, is further subject to the following conditions:

(a)    timely receipt by Lender of an Advance Request as provided in <u>Section 2.1(a)</u>;

(b)    the representations and warranties contained in <u>Section 5</u> shall be true and correct in all material respects on and as of the date of such Advance Request and on the date of each Advance as though made at and as of each such date (except to the extent that such representation and warranty relates to an earlier date in which case such representation or warranty shall be true and correct in all material respects as of such date), and no Event of Default shall have occurred and be continuing, or would exist after giving effect to such Advance; and

(c)    there shall be no order or injunction or pending litigation in which there is a reasonable likelihood of a decision which could have a Material Adverse Effect, and no pending

DOC ID - 26567501.3

litigation seeking to enjoin or prevent the DIP Revolving Facility or a sale of all or substantially all of Borrower's assets in accordance with § 363 of the Bankruptcy Code.

The making of each Advance shall be deemed to be a representation and warranty by Borrower on the date of such Advance as to the accuracy of the facts referred to in this Section 3.2.

### 4.    CREATION OF SECURITY INTEREST.

4.1.    <u>Grant of Security Interest</u>.  Each Credit Party grants and pledges to Lender:

(a)    Pursuant to Section 364(c)(2) of the Bankruptcy Code, a perfected first-priority lien on the Collateral (but subject to the Carve-Out).

(b)    Pursuant to Section 364(d) of the Bankruptcy Code, a perfected first-priority, priming lien on the Collateral, but subject to the Carve-Out, which lien shall not be subject to being treated *pari passu* with, or subordinated to, any other liens or security interests (whether currently existing or hereafter created).

(c)    These liens are being granted in all presently existing and hereafter acquired or arising Collateral in order to secure prompt repayment of any and all Obligations and in order to secure prompt performance by each Credit Party of its covenants and duties under the DIP Revolving Loan Documents.  Except for the Carve Out, such security interest constitutes a valid, first priority security interest in the presently existing Collateral, and will constitute a valid, first priority security interest in Collateral acquired after the date hereof.

4.2.    <u>Delivery of Additional Documentation Required</u>.  Each Credit Party shall from time to time execute and deliver to Lender, at the request of Lender, all Negotiable Collateral, all financing statements and other documents that Lender may reasonably request, in form reasonably satisfactory to Lender, to perfect and continue the perfection of Lender's security interests in the Collateral and in order to fully consummate all of the transactions contemplated under the DIP Revolving Loan Documents.

4.3.    <u>Right to Inspect</u>.  Lender (through any of its officers, employees, or agents) shall have the right, upon reasonable prior notice, from time to time during any Credit Party's usual business hours, to inspect such Credit Party's Books and to make copies thereof; to check, test, and appraise the Collateral in order to verify such Credit Party's financial condition or the amount, condition of, or any other matter relating to, the Collateral; and to discuss such Credit Party's affairs with such Credit Party's officers, employees, accountants, and advisers.

4.4.    <u>Collateral Perfection and Priority</u>.

(a)    The Obligations shall be secured by automatically perfected security interests and Liens granted pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code and pursuant to any Interim DIP Order.  Notwithstanding the foregoing, Lender may, in its sole discretion, file any Interim DIP Order, any Final DIP Order or any financing statements, deeds of trust, notices of lien or similar instruments or otherwise confirm perfection of its Liens without seeking modification of the automatic stay under Section 362 of the Bankruptcy Code, and all such documents shall be deemed to have been filed or recorded at the time of and on the Petition Date.  Any Interim DIP Order or any Final DIP Order shall be sufficient and conclusive evidence of the creation, attachment, validity, perfection, and priority of Lender's security interest and Lien on the Collateral.

DOC ID - 26567501.3

14

(b)      The Obligations shall be secured at all times by perfected liens upon all real, personal, tangible, and intangible property of Borrower's bankruptcy estate having the priorities set forth in Section 4.1.  Subject to the Carve Out and Avoidance Actions, the DIP Revolving Facility and all Obligations shall constitute superpriority expenses of each Credit Party in the Bankruptcy Case, with administrative priority and senior secured status under §§ 364(c) and 364(d) of the Bankruptcy Code. The claims, Liens and security interests granted to Lender on all of the Collateral, and the priorities accorded to the DIP Revolving Facility, shall have the superpriority and senior secured status afforded by §§ 364(c) and 364(d) of the Bankruptcy Code, senior to all claims and interests other than the Carve Out and Avoidance Actions, and shall have priority over any and all other costs and expenses of the kind specified in, or ordered pursuant to, §§ 105, 326, 328, 330, 331, 363, 364, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 or any other provision of the Bankruptcy Code and shall at all times be senior to the rights of any Credit Party, its estate, and any successor trustee or estate representative in the Bankruptcy Case, or in any subsequent Chapter 7 or other proceeding or case under the Bankruptcy Code.

(c)      Except for the Carve Out, no claim having a priority superior to or *pari passu* with that granted to Lender by any Interim DIP Order or any Final DIP Order shall be granted or approved by any Credit Party or Bankruptcy Court prior to the payment, in full, in cash, of all amounts outstanding under the DIP Revolving Facility and termination of Lender's commitment to make Advances.

(d)      Except for the Carve Out, no costs or expenses of administration shall be imposed against Lender or its Collateral under §§ 105, 506(c), or 552 of the Bankruptcy Code, or otherwise, and Borrower shall waive for itself and on behalf of its bankruptcy estate any and all rights under §§ 105, 506(c), or 552 of the Bankruptcy Code, or otherwise, to assert or impose or seek to assert or impose any such costs or expenses of administration against Lender or its Collateral.

**5.      REPRESENTATIONS AND WARRANTIES.**  Each Credit Party represents and warrants as follows:

5.1.      Due Organization and Qualification; Legal Power.  Each Credit Party and each Subsidiary of any Credit Party is duly organized and validly existing under the laws of its jurisdiction of organization disclosed in the Schedule, and is qualified and licensed to do business in each jurisdiction in which the conduct of its business or its ownership of property requires that it be so qualified, except to the extent that the failure to so qualify could not have a Material Adverse Effect.  Each Credit Party and each Subsidiary of any Credit Party, subject to any required approval of the Bankruptcy Court, has full legal power and authority and possesses all governmental franchises, licenses, permits, authorizations and approvals necessary to enable it to use its legal name and to own, lease or otherwise hold its properties and assets and to carry on its business as now conducted.

5.2.      Due Authorization; No Conflict.  Except as disclosed in the Schedule, the execution, delivery, and performance of the DIP Revolving Loan Documents are within each Credit Party's powers, have been duly authorized, are not in conflict with and do not constitute a breach of any provision contained in such Credit Party's Organizational Documents, do not conflict with, violate or constitute an event of default under any material agreement to which such Credit Party is a party or by which such Credit Party is bound, and do not violate any applicable court orders, judgments, statutes, laws, ordinances or rules.

5.3.      Encumbrances.  Subject to the authority of the Bankruptcy Court, each Credit Party has good and marketable title to its property, free and clear of Liens, except for Permitted Liens and those relating to the Carve Out.

DOC ID - 26567501.3

15

5.4.    <u>Enforceable Obligations</u>.  Each DIP Revolving Loan Document (a) has been duly executed and delivered on behalf of each Credit Party, and (b) subject to the entry by the Bankruptcy Court of any Final DIP Order and except as disclosed in the Schedule, constitutes the legal, valid and binding obligation of each Credit Party, enforceable against each Credit Party in accordance with its terms.

5.5.    <u>Eligible Accounts; Merchantable Inventory</u>.    The Accounts are bona fide existing obligations, and the property and services giving rise to the Accounts have been delivered or rendered to the account debtor or its agent for immediate and unconditional acceptance by the account debtor.  Except as disclosed in the Schedule, no Credit Party has notice or knowledge of any actual or imminent insolvency proceeding of any material account debtor.  All Inventory is in all material respects of good and marketable quality, free from all material defects, except for Inventory for which adequate reserves have been made.

5.6.    <u>Intellectual Property Collateral</u>.    Each Credit Party is the sole owner of its Intellectual Property Collateral, except for non-exclusive licenses granted by any Credit Party to its customers in the ordinary course of business.  Each of the Patents is valid and enforceable, and no part of the Intellectual Property Collateral has been judged invalid or unenforceable, in whole or in part, and no claim has been made that any part of the Intellectual Property Collateral violates the rights of any third party.  Except as disclosed in the Schedule, no Credit Party's rights as a licensee of intellectual property give rise to more than ten percent (10%) of its gross revenue in any given month, including revenue derived from the sale, licensing, rendering or disposition of any product or service. Except as disclosed in the Schedule, no Credit Party is a party to, or bound by, any agreement that restricts the grant by such Credit Party of a security interest in such Credit Party's rights under such agreement.

5.7.    <u>Name; Location of Chief Executive Office</u>.  Except as disclosed in the Schedule, no Credit Party has done business under any name other than that specified on the signature page hereof.  The chief executive office of each Credit Party is located at the address set forth on the Schedule.  Except as disclosed in the Schedule, all of each Credit Party's Inventory and Equipment is located only at the locations disclosed in the Schedule.

5.8.    <u>Litigation</u>.  Except for motions or applications brought by Borrower before the Bankruptcy Court, including those seeking entry of any Interim DIP Order or any Final DIP Order by the Bankruptcy Court, no litigation, investigation or proceeding of or by any governmental authority is pending against any Credit Party or any Subsidiary of any Credit Party.  Except for the commencement of the Bankruptcy Case and the filing and prosecution of claims therein, or as disclosed in the Schedule, no lawsuits, claims, proceedings or investigations are pending or, to the knowledge of any Credit Party, threatened against or affecting such Credit Party or any of its properties, assets, operations or businesses.

5.9.    <u>Regulatory Compliance</u>.  Borrower has met the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA, and no event has occurred resulting from Borrower's failure to comply with ERISA that could reasonably be expected to result in a Material Adverse Effect.  No Credit Party is an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940.  No Credit Party is engaged principally, or as one of the important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulations T and U of the Board of Governors of the Federal Reserve System).  Each Credit Party has complied in all material respects with all of the provisions of the Federal Fair Labor Standards Act.  No Credit Party has violated any statutes, laws, ordinances or rules applicable to it, violation of which could reasonably be expected to have a Material Adverse Effect.

DOC ID - 26567501.3

5.10.   Environmental Condition.  Except as disclosed in the Schedule, none of any Credit Party's properties or assets has ever been used by any Credit Party or, to the best of any Credit Party's knowledge, by previous owners or operators, in the disposal of, or to produce, store, handle, treat, release, or transport, any hazardous waste or hazardous substance other than in accordance with applicable law; to the best of any Credit Party's knowledge, none of any Credit Party's properties or assets has ever been designated or identified in any manner pursuant to any environmental protection statute as a hazardous waste or hazardous substance disposal site, or a candidate for closure pursuant to any environmental protection statute; no lien arising under any environmental protection statute has attached to any revenues or to any real or personal property owned by any Credit Party; and no Credit Party has received a summons, citation, notice, or directive from the Environmental Protection Agency or any other federal, state or other governmental agency concerning any action or omission by such Credit Party resulting in the releasing or otherwise disposing of hazardous waste or hazardous substances into the environment.

5.11.   Taxes.  Each Credit Party has filed or caused to be filed all tax returns required to be filed, and have paid, or have made adequate provision for the payment of, all taxes reflected therein (other than taxes being contested in good faith by appropriate proceedings; provided, that provision is made to the reasonable satisfaction of Lender for the eventual payment thereof if subsequently found payable).

5.12.   Subsidiaries.  No Credit Party owns any stock, partnership interest or other equity securities of any Person except as disclosed in the Schedule.

5.13.   Government Consents.  Each Credit Party has obtained all material consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all governmental authorities that are necessary for the continued operation of such Credit Party's business as currently conducted.  Except as disclosed in the Schedule, the execution, delivery and performance of the DIP Revolving Loan Documents do not require the consent or approval of any governmental authority other than the entry by the Bankruptcy Court of any Interim DIP Order or any the Final DIP Order.

5.14.   Accounts.  Except as disclosed in the Schedule, none of any Domestic Credit Party's deposit, operating or investment accounts are maintained or invested with a Person not subject to a control agreement with Lender.

5.15.   Title to Properties.  Except as disclosed in the Schedule, each Credit Party has good title to, or a valid leasehold interest in, all material property used by it in its business and none of such property is subject to any Lien, except for Permitted Liens.

5.16.   Real Property.  The Schedule sets forth a correct and complete list of all real property leased by each Credit Party.  Except as disclosed in the Schedule, each lease relating to such leased real property is in full force and effect and each Credit Party enjoys peaceful and undisturbed possession thereunder.  Except as disclosed in the Schedule, there is no material default on the part of any Credit Party or any event or condition which (with notice or lapse of time, or both) would constitute a material default under any such lease.  There are no actions, suits or proceedings pending or, to the knowledge of any Credit Party, threatened against any leased real property used in connection with the business of such Credit Party, at law or in equity, in arbitration or before any governmental authority which would in any way affect title to or the right to use such leased real property.  As of the Closing Date, no Credit Party owns any real property.

DOC ID - 26567501.3

17

5.17.    Financial Disclosure; Full Disclosure.    All financial statements delivered by Borrower to Lender fairly present in all material respects each Credit Party's financial condition as of the date thereof and each Credit Party's results of operations for the period then ended.  No representation, warranty or other statement made by any Credit Party in any certificate or written statement furnished to Lender contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained in such certificates or statements not misleading.

## 6.    AFFIRMATIVE COVENANTS.

Each Credit Party shall do or ensure, and cause each of its Subsidiaries to do or ensure, all of the following:

6.1.    Good Standing.    Maintain its existence and good standing in its jurisdiction of incorporation or formation, as applicable, and maintain qualification in each jurisdiction in which it is required under applicable law, except where failure to do so could not reasonably result in a Material Adverse Effect; pay, discharge or otherwise satisfy all obligations and liabilities as required pursuant to the Bankruptcy Code or by order of the Bankruptcy Court; preserve and take all reasonable action to maintain all rights, privileges, licenses, franchises, approvals, agreements, copyrights, trademarks and trade names necessary or desirable in the normal conduct of its business and comply with all applicable statutes, laws, ordinances and rules; keep all property useful and necessary in its business in good working order and condition (ordinary wear and tear excepted); and keep proper books of record and account in which complete and correct entries are made of all dealings and transactions in relation to its business and activities and which permit financial statements to be prepared in substantial conformity with GAAP.

6.2.    Government and Environmental Compliance.    Meet the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA; comply with all statutes, laws, ordinances and government rules and regulations to which it is subject, including all environmental laws and regulations and any applicable remediation requirements, noncompliance with which could reasonably be expected to have a Material Adverse Effect.

6.3.    Financial Statements, Reports, Certificates.    Deliver the following to Lender: (a) as soon as available, but in any event not later than the time required under any Interim DIP Order or any Final DIP Order, such reports and other information as any Credit Party may be required to deliver to Lender thereunder; (b) without duplication of clause (a), as soon as available, but not later than 5:00 p.m. E.T. on Wednesday following the end of each calendar week, a rolling, updated 12-week budget in a form consistent with the Budget and satisfactory to Lender, with a line by line variance report for the immediately preceding calendar week and on a cumulative basis from the Petition Date to the report date showing actual amounts attributable to each line item in the Budget, as the case may be, for such period; (c) as soon as available, but in any event within thirty (30) days after the end of each calendar month, a company-prepared balance sheet, income statement, and cash flow statement covering each Credit Party's operations during such period, prepared in accordance with GAAP, consistently applied, in a form acceptable to Lender and certified by a Responsible Officer; (d) as soon as available, but in any event within one hundred eighty (180) days after the end of Borrower's fiscal year, audited consolidated financial statements of Borrower and each Credit Party prepared in accordance with GAAP, consistently applied, together with an unqualified opinion on such financial statements of an independent certified public accounting firm reasonably acceptable to Lender; (e) copies of all statements, reports and notices sent or made available generally by any Credit Party to its security holders and, if applicable, all reports on Forms 10-K and 10-Q filed with the Securities and Exchange Commission; (f) promptly upon (and in any event with 3 days after) becoming aware thereof, notice (i) of the occurrence of any Event of Default, (ii) of any legal actions pending or threatened against Borrower or any Subsidiary that could result in

damages or costs to any Credit Party of Twenty-Five Thousand Dollars ($25,000) or more, (iii) of any default or event of default under any instrument or other agreement or guarantee or collateral document of any Credit Party which default or event of default has arisen after the Petition Date, other than (x) a default arising solely from commencement of the Bankruptcy Case or (y) defaults involving an obligation of less than Twenty-Five Thousand Dollars ($25,000) individually or in the aggregate, (iv) of any actual, potential, or alleged environmental noncompliance that could reasonably be expected to result in liability, damages or cost to Borrower of Twenty-Five Thousand Dollars ($25,000) or more; or (v) of a Material Adverse Effect; (g) upon approval thereof, but in any event within thirty (30) days after the end of Borrower's fiscal year, Borrower's Board of Directors approved operating budget; and (h) such other budgets, sales projections, operating plans or other financial information as Lender may reasonably request from time to time.

6.4.    <u>Inventory; Returns</u>.  Keep all Inventory in good and marketable condition, free from all material defects except for Inventory for which adequate reserves have been made. Returns and allowances, if any, as between any Credit Party or any Subsidiary of a Credit Party and its account debtors shall be on the same basis and in accordance with the usual customary practices of such Credit Party or Subsidiary of such Credit Party, as they exist on the Closing Date. Borrower shall promptly notify Lender of all returns and recoveries and of all disputes and claims, where the return, recovery, dispute or claim involves more than Twenty-Five Thousand Dollars ($25,000).

6.5.    <u>Taxes</u>.  Make due and timely payment or deposit of all material federal, state, and local taxes, assessments, or contributions required of it by law, and will execute and deliver to Lender, on demand, appropriate certificates attesting to the payment or deposit thereof; make timely payment or deposit of all material tax payments and withholding taxes required of it by applicable laws, including those laws concerning F.I.C.A., F.U.T.A., state disability, and local, state, and federal income taxes, and will, upon request, furnish Lender with proof satisfactory to Lender indicating that such payments or deposits have been made; <u>provided</u>, that no Credit Party and no Subsidiary of any Credit Party need make any payment if the amount or validity of such payment is contested in good faith by appropriate proceedings and is reserved against (to the extent required by GAAP) by such Credit Party of Subsidiary.

6.6.    <u>Insurance</u>.

(a)    Keep the Collateral insured against loss or damage by fire, theft, explosion, sprinklers, and all other hazards and risks, and in such amounts, as ordinarily insured against by other owners in similar businesses conducted in the locations where such Credit Party or Subsidiary's business is conducted on the date hereof; maintain insurance relating to such Credit Party or Subsidiary's business, ownership and use of the Collateral in amounts and of a type that are customary to businesses similar to such Credit Party or Subsidiary.

(b)    All such policies of insurance shall be in such form, with such companies, and in such amounts as are reasonably satisfactory to Lender. All such policies of property insurance shall contain a lender's loss payable endorsement, in a form satisfactory to Lender, showing Lender as an additional loss payee thereof, and all liability insurance policies shall show Lender as an additional insured and shall specify that the insurer must give at least thirty (30) days' notice to Lender before canceling its policy for any reason. Upon Lender's request, each Credit Party shall deliver to Lender certified copies of such policies of insurance and evidence of the payments of all premiums therefor. All proceeds payable under any such policy shall, at the option of Lender, be payable to Lender to be applied on account of the Obligations.

6.7.    Budget.  Comply in all respects with the Budget, except to the extent expressly permitted under the definition of "Availability".

6.8.    Deposit of Proceeds; Use of Proceeds.

(a)    Deposit all proceeds of the DIP Revolving Facility only in the DIP Disbursement Account and use the proceeds of the DIP Revolving Facility solely in accordance with the Budget, and solely upon the terms and conditions set forth in this Agreement, any Interim DIP Order or any Final DIP Order.

(b)    Transfer amounts from the DIP Disbursement Account (i) only to deposit account number 789853421 of the Credit Parties maintained at JPMorgan Chase Bank, N.A. and (ii) only to the extent that amounts transferred to such deposit account on any day are anticipated in good faith to be used prior to the close of business on such day to pay operating expenses and make capital expenditures, in each case, solely in accordance with the Budget.

(c)    ~~Within one Business Day of any transfer of proceeds of the DIP Revolving Facility to the deposit account described in clause (b) above, transfer back to the DIP Disbursement Account all proceeds of the DIP Revolving Facility in excess of $25,000 that are remaining in such deposit account and that were not used prior to the close of business on the immediately preceding day in accordance with clause (b) above, other than Carve Out expenses and attorneys' fees accrued through the DIP Revolving Commitment Termination Date.~~ [Reserved].

(d)    Notwithstanding anything to the contrary contained in this Section 6.8, in no event shall any unused proceeds of the DIP Revolving Facility on deposit in the DIP Disbursement Account on the DIP Revolving ~~Commitment Termination~~Maturity Date be transferred from the DIP Disbursement Account, other than Carve-Out expenses and attorneys' fees accrued through the DIP Revolving ~~Commitment Termination~~Maturity Date.

6.9.    Sale Motion.  Use its best efforts to cause the process for a sale of all or substantially all of Borrower's assets in accordance with § 363 of the Bankruptcy Code to be structured so that the sale is approved by the Bankruptcy Court on or before the date set forth opposite such Sale Milestone on Exhibit C attached hereto.  Lender and Borrower agree that Lender shall act as a "stalking horse" for such sale, and all timing, terms and conditions of the 363 sale motion, the sale process, sale procedures and auction shall be acceptable to Lender in its sole discretion, as more specifically described in an Asset Purchase Agreement between Borrower, its Subsidiaries and Lender and related acquisition documents.

6.10.    Intellectual Property Rights.

(a)    Give Lender prompt written notice of any applications or registrations of intellectual property rights currently filed with the United States Patent and Trademark Office, or equivalent office in a non-U.S. jurisdiction, including the date of such filing and the registration or application numbers, if any. Each Credit Party shall (i) give Lender not less than thirty (30) days prior written notice of the filing of any applications or registrations with the United States Copyright Office, or equivalent office in a non-U.S. jurisdiction, after the Closing Date, including the title of such intellectual property rights to be registered, as such title will appear on such applications or registrations, and the date such applications or registrations will be filed, and (ii) prior to the filing of any such applications or registrations, shall execute such documents as Lender may reasonably request for Lender to maintain its perfection in such intellectual property rights to be registered by such Credit Party and, upon the request of Lender, shall file such documents simultaneously with the filing of any such applications or

DOC ID - 26567501.3

20

registrations. Upon filing any such applications or registrations with the United States Copyright Office, or equivalent office in a non-U.S. jurisdiction, each Credit Party shall promptly provide Lender with (i) a copy of such applications or registrations, without the exhibits, if any, thereto, (ii) evidence of the filing of any documents requested by Lender to be filed for Lender to maintain the perfection and priority of its security interest in such intellectual property rights, and (iii) the date of such filing.

(b)    Lender may audit any Intellectual Property Collateral to confirm compliance with this Section, provided, that such audit may not occur more often than once per year, unless an Event of Default has occurred and is continuing. Lender shall have the right, but not the obligation, to take, at Borrower's sole expense, any actions that any Credit Party is required under this Section to take but which such Credit Party fails to take, after fifteen (15) days' notice to Borrower. Borrower shall reimburse and indemnify Lender for all reasonable costs and reasonable expenses incurred in the reasonable exercise of its rights under this Section.

6.11.    Further Assurances.  Promptly upon request by Lender, (a) correct any material defect or error that may be discovered in any DIP Revolving Loan Document or in the execution, acknowledgment, filing or recordation thereof, and (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as Lender may reasonably require from time to time in order to (i) carry out more effectively the purposes of the DIP Revolving Loan Documents, (ii) to the fullest extent permitted by applicable law, subject any Credit Party's properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any DIP Revolving Loan Document or any Interim DIP Order or any Final DIP Order, (iii) perfect and maintain the validity, effectiveness and priority of any of the Liens intended to be created hereunder and under any Interim DIP Order or any Final DIP Order and (iv) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto Lender the rights granted or now or hereafter intended to be granted to Lender under any DIP Revolving Loan Document, any Interim DIP Order or any Final DIP Order or under any other instrument executed in connection with any DIP Revolving Loan Document to which any Credit Party is or is to become a party.

6.12.    Additional Borrowers.  In the event that any Domestic Subsidiary of CRS files a voluntary petition for relief under the Bankruptcy Code, CRS or such Domestic Subsidiary shall promptly notify Lender of such filing, and at such Domestic Subsidiary's election, such Domestic Subsidiary may become a co-Borrower hereunder; provided that CRS and such Domestic Subsidiary shall take all actions reasonably requested by Lender to cause such Domestic Subsidiary to become a co-Borrower hereunder, including executing a joinder to this Agreement in substantially the form of Exhibit E attached hereto.

6.13.    Post-Closing Obligations.

(a)    Within ten (10) days of the Closing Date, the Domestic Credit Parties shall deliver to Lender account control agreements with respect to the DIP Disbursement Account and all other deposit, operating and investment accounts maintained by Borrower and each Domestic Credit Party, in form and substance reasonably acceptable to Lender, unless waived in writing by Lender.

(b)    On or prior to October [__], 2017, the Credit Parties shall cause CRS China to (i) deliver to Lender a guaranty of the Obligations, such guaranty to be in form and substance satisfactory to Lender in its sole discretion, (ii) execute and deliver to Lender such pledge agreements and take such other actions (including delivering the certificates representing shares of stock or other equity interests to Lender) as shall be necessary to create and perfect valid and enforceable first priority Liens in favor of Lender on any of the issued and outstanding equity interests of CRS China entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) which are in excess of 65% (or

DOC ID - 26567501.3

such greater percentage that (A) could not reasonably be expected to cause the undistributed earnings of CRS China as determined for United States federal income tax purposes to be treated as a deemed dividend to CRS or (B) could not reasonably be expected to cause any material adverse tax consequences) of the total issued and outstanding equity interests of CRS China entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) and (iii) deliver proof of corporate action, incumbency of officers, opinions of counsel and other documents reasonably requested by Lender.

7.    **NEGATIVE COVENANTS.**

No Credit Party will do, or permit any of its Subsidiaries to do, any of the following:

7.1.    <u>Dispositions</u>.  Convey, sell, lease, transfer or otherwise dispose of (collectively, a "<u>Transfer</u>") all or any part of its business or property, other than: (a) Transfers of Inventory in the ordinary course of business; (b) Transfers of non-exclusive licenses and similar arrangements for the use of the property of any Credit Party or Subsidiary in the ordinary course of business; (c) Transfers of worn-out or obsolete Equipment which was not financed by Lender; (d) Transfers among Subsidiaries of the Credit Parties to the extent expressly provided for in the Budget; (e) Transfers among Unrestricted Subsidiaries in an amount not to exceed $100,000200,000 in the aggregate or (f) except as set forth in subsection (e),(f) Transfers from any Credit Party to any Subsidiary in an amount not to exceed $200,000 in the aggregate or (g) any other Transfers among Credit Parties and Subsidiaries with the prior written approval of Lender.

7.2.    <u>Change in Business; Change in Executive Office</u>.  Engage in any business other than the businesses currently engaged in by such Credit Party or Subsidiary and any business substantially similar or related thereto (or incidental thereto); or cease to conduct business substantially similar to the manner conducted by such Credit Party or Subsidiary as of the Closing Date; or relocate its chief executive office or state of incorporation or formation or change its legal name; or without Lender's prior written consent, change the date on which its fiscal year ends.

7.3.    <u>Bankruptcy Case; Sale</u>.  Seek or support any motion or other application for entry of an order dismissing or converting the Bankruptcy Case under Section 1112 of the Bankruptcy Code, or appointing a Chapter 11 trustee or an examiner with expanded powers; and except as provided in <u>Section 6.9</u>, seek or support any motion or other application for entry of an order providing for the sale of substantially all of the assets of Borrower under Section 363 of the Bankruptcy Code.

7.4.    <u>Indebtedness</u>.  Create, incur, assume or be or remain liable with respect to any Indebtedness, other than Permitted Indebtedness.

7.5.    <u>Encumbrances</u>.  Create, incur, assume or suffer to exist any Lien with respect to any of its property, or assign or otherwise convey any right to receive income, including the sale of any Accounts, except for the Carve Out and Permitted Liens, or agree with any Person other than Lender not to grant a security interest in, or otherwise encumber, any of its property.

7.6.    <u>Distributions</u>.  Pay any dividends or make any other Distribution or payment on account of or in redemption, retirement or purchase of any capital stock; provided, that any Subsidiary may pay a dividend or make a distribution to a Credit Party.

7.7.    <u>Acquisitions and Investments</u>.  Directly or indirectly acquire (including by way of merger) any assets of any Person other than in the ordinary course of business; or directly or indirectly acquire, own or make any Investment in or to any Person, other than Permitted Investments.

DOC ID - 26567501.3

7.8.    <u>Transactions with Affiliates</u>.  Except as disclosed in the Schedule, directly or indirectly enter into or permit to exist any material transaction with any Affiliate of any Credit Party except for transactions that are in the ordinary course of such Credit Party's business, upon fair and reasonable terms that are no less favorable to such Credit Party than would be obtained in an arm's-length transaction with a non-affiliated Person.

7.9.    <u>Organizational Documents</u>.  Amend, supplement, or otherwise modify, or permit any amendment, supplement, or modification to, its Organizational Documents that could reasonably be expected to be adverse in any material respect to the interests of Lender.

7.10.    <u>Inventory and Equipment</u>.  Store the Inventory or the Equipment with a bailee, warehouseman, or other third party unless the third party has been notified of Lender's security interest and Lender (a) has received an acknowledgment from the third party that it is holding or will hold the Inventory or Equipment for Lender's benefit or (b) is in pledge possession of the warehouse receipt, where negotiable, covering such Inventory or Equipment. Store or maintain any Equipment or Inventory at a location other than the locations disclosed in the Schedule.

7.11.    <u>Real Property</u>.  Lease any real property (as lessee) except to the extent payments thereunder are provided for in the Budget and following notice to Lender of its intent to do so and delivery of a copy of the proposed lease to Lender at least ten (10) Business Days prior to such Person's execution thereof (or, if later, prior to the Petition Date).  As soon as reasonably practical after any permitted acquisition or lease (as lessee) of real property, if requested by Lender, Borrower will deliver or caused to be delivered, within sixty (60) days a perfected mortgage Lien in favor of Lender on such real property, collateral assignment of lease (if applicable), landlord waiver (if applicable), and such insurance policies, opinions of counsel, and related documents as Lender may reasonably request all in form and substance reasonably satisfactory to Lender. Notwithstanding the foregoing, Borrower shall only be required to use, or cause to be used, commercially reasonable efforts to deliver any applicable landlord waivers with respect to any leased real property.

7.12.    <u>Payments on Indebtedness; Management Fees; Board Fees</u>.  Make any payment:

(a)    of principal, interest or other amount on or with respect to any Indebtedness except Borrower may pay: (i) the Obligations and (ii) cash interest on the Pre-Petition Loan B at the non-default rate of interest set forth in the Pre-Petition Loan B Note as provided in the Budget;

(b)    in respect of any management, structuring, transaction or other similar fee to any Person except as provided in the Budget;

(c)    in respect of any board of director or similar fees or compensation to any of their directors except as provided in the Budget; or

(d)    to any "insider" as defined in Section 101(31) of the Bankruptcy Code other than payment of base salary (not including bonuses).

7.13.    <u>Capital Expenditures</u>.  Make Capital Expenditures except as provided in the Budget.

7.14.    <u>Compliance</u>.  Become an "investment company" or be controlled by an "investment company," within the meaning of the Investment Company Act of 1940, or become principally engaged in, or undertake as one of its important activities, the business of extending credit for the purpose of purchasing or carrying margin stock, or use the proceeds of any Advance for such

DOC ID - 26567501.3

23

purpose. Fail to meet the minimum funding requirements of ERISA, permit a Reportable Event or Prohibited Transaction, as defined in ERISA, to occur, fail to comply with the Federal Fair Labor Standards Act or violate any law or regulation, which violation could have a Material Adverse Effect, or a material adverse effect on the Collateral or the priority of Lender's Lien on the Collateral.

7.15.    <u>DIP Financing</u>.  Incur, or apply to the Bankruptcy Court for authority to incur, or suffer to exist, any (a) Indebtedness having the priority afforded by Section 364(c) or Section 364(d) of the Bankruptcy Code (including any Superpriority Claims) other than the financing provided for under this Agreement and the other DIP Revolving Loan Documents or (b) obligation to make adequate protection payments, or otherwise provide adequate protection, other than as contemplated by <u>Section 7.12(a)(ii)</u>, any Interim DIP Order, any Final DIP Order or the Budget.

7.16.    <u>Alteration of Rights of Lender</u>.  Limit, affect or modify, or apply to the Bankruptcy Court to limit, affect or modify, any of Lender's rights with respect to the Obligations, including rights with respect to the Collateral and the priority thereof.

7.17.    <u>Chapter 11 Claims</u>.  Apply to the Bankruptcy Court for the authority to incur, create, assume, suffer or permit any claim, Lien or encumbrance (other than Permitted Liens and those relating to the Carve Out) against Borrower or any of its assets in the Bankruptcy Case to be *pari passu* with, or senior to, the Liens and claims of Lender granted and arising under the DIP Revolving Loan Documents.

7.18.    <u>No Surcharge on Collateral</u>.  Charge or attempt to charge any costs or expenses of administration or other costs or expenses of Borrower that have been or may be incurred in the Bankruptcy Case against the Collateral, pursuant to Section 506(c) of the Bankruptcy Code or otherwise.

7.19.    <u>Budget Compliance</u>.  Make or commit or agree to make any expenditures in any given week or on a cumulative basis which are not set forth in the Budget.

7.20.    <u>Foreign Cash</u>.  Maintain cash or cash equivalents in the checking, savings or other accounts of the Subsidiaries of the Credit Parties that are not Credit Parties in excess of amounts necessary to pay their operating expenses in the ordinary course of business consistent with past practices.

7.21.    <u>Amendment to Pre-Petition Loan C Credit Agreement</u>.  Consent to any amendment to any provision of the Pre-Petition Loan C Credit Agreement or any other Loan Document (as defined in the Pre-Petition Loan C Credit Agreement) as in effect on the Closing Date (including Section 2.5(b) or Section 2.5(c) thereof) that would alter the pro rata sharing of payments, the priority of payments or the manner in which payments are shared as required by the terms thereof. The Credit Parties' covenant under this Section 7.21 shall survive until all applicable statute of limitations periods with respect to actions that may be brought against each Credit Party have run.

## 8.    **EVENTS OF DEFAULT.**

Any one or more of the following events shall constitute an Event of Default under this Agreement:

8.1.    If Borrower fails to pay, when due, any of the Obligations;

8.2.    If any Credit Party or any Subsidiary (a) fails to perform any obligation under <u>Article 6</u> of this Agreement, any Interim DIP Order or any Final DIP Order; or (b) violates any of the

DOC ID - 26567501.3

covenants contained in Article 7 of this Agreement, any Interim DIP Order or any Final DIP Order; or (c) fails or neglects to perform or observe any other material term, provision, condition, covenant contained in this Agreement, in any of the DIP Revolving Loan Documents, or in any other present or future agreement between such Credit Party or Subsidiary and Lender and as to any default under such other term, provision, condition or covenant described in this subclause (c) that can be cured, has failed to cure such default within ten (10) days after any such Credit Party receives notice thereof or any officer of any such Credit Party becomes aware thereof; provided, however, that, if the default cannot by its nature be cured within the ten (10)-day period or cannot after diligent attempts by such Credit Party or Subsidiary be cured within such ten (10)-day period, and such default is likely to be cured within a reasonable time, then such Credit Party or Subsidiary shall have an additional reasonable period (which shall not in any case exceed thirty (30) days) to attempt to cure such default, and within such reasonable time period the failure to have cured such default shall not be deemed an Event of Default but no Advances will be made;

8.3.     If any circumstance or circumstances occur on or after the Petition Date that have, or could reasonably be expected to have, a Material Adverse Effect;

8.4.     If any material misrepresentation or material misstatement exists now or hereafter in any warranty or representation set forth in any DIP Revolving Loan Document or in any certificate delivered to Lender pursuant to this Agreement or to induce Lender to enter into this Agreement or any other DIP Revolving Loan Document;

8.5.     The Bankruptcy Court shall enter an order with respect to Borrower dismissing the Bankruptcy Case or converting it to a case under Chapter 7 of the Bankruptcy Code, or without the prior written consent of Lender (i) appointing a trustee in its Bankruptcy Case or (ii) appointing a responsible officer or an examiner with enlarged powers relating to the operation of such Person's business (beyond those set forth in Section 1106(a)(3) or (4)) under Bankruptcy Code Section 1106(b) other than under a prior order of the Bankruptcy Court;

8.6.     The Bankruptcy Court shall enter an order granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder of any Lien in any assets of any Credit Party;

8.7.     Any Credit Party or any Subsidiary shall apply for authority to amend, supplement, stay, vacate or otherwise modify any Interim DIP Order or any Final DIP Order, or any order is entered that modifies or vacates any Interim DIP Order or any Final DIP Order, in each case, without the written consent of Lender;

8.8.     From and after the date of entry thereof, any Final DIP Order shall cease to be in full force and effect (or shall have been vacated, stayed, reversed, modified or amended), in each case, without the consent of Lender, or any Final DIP Order shall not have been entered by the Bankruptcy Court on or before the earlier of (x) the expiration of any Interim DIP Order or (y) forty-five (45) days from the entry of any Interim DIP Order;

8.9.     Any Credit Party or any Subsidiary shall fail to comply with the terms of any Interim DIP Order or any Final DIP Order;

8.10.     One or more judgments or decrees shall be entered against any Credit Party or any Unencumbered Foreign Subsidiary involving in the aggregate a post-Petition Date liability (not paid or fully covered by insurance) of Twenty-Five Thousand Dollars ($25,000) or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within

DOC ID - 26567501.3

the time required by the terms of such judgment, or there shall be rendered against any Credit Party or any Unencumbered Foreign Subsidiary a non-monetary judgment with respect to a post-Petition Date event which has or could reasonably be expected to have a Material Adverse Effect on the property, business, condition (financial or otherwise) of any Credit Party or any Unencumbered Foreign Subsidiary or the ability of any Credit Party or any Unencumbered Foreign Subsidiary to perform its obligations under this Agreement and the other DIP Revolving Loan Documents;

8.11.    Any DIP Revolving Loan Document shall cease, for any reason, to be in full force and effect, any Credit Party or any Subsidiary shall so assert in writing, or any DIP Revolving Loan Document shall cease to be effective to grant a perfected Lien on any item of Collateral with the priority purported to be created thereby;

8.12.    The Bankruptcy Court grants any superpriority administrative expense claim or priming Lien or enters any order granting relief from the automatic stay (if not in favor of Lender), except (i) for the Carve Out, (ii) as provided in the Budget, (iii) as otherwise permitted herein or (iv) with the express written consent of Lender;

8.13.    Any Credit Party or any Subsidiary shall fail to be in compliance with the Budget;

8.14.    Borrower shall create, incur or suffer to exist any post-petition Liens other than those granted pursuant to this Agreement, and Permitted Liens, or any other claim which is *pari passu* with or senior to the claims of Lender shall be granted in the Bankruptcy Case;

8.15.    Any Credit Party or any Subsidiary (or any of its successors and assigns) shall file any motion or application or adversary proceeding challenging the validity, enforceability, perfection or priority of the Liens securing pre-petition obligations to Lender under Pre-Petition Loan A or Pre-Petition Loan B or otherwise or any other cause of action against or with respect to such pre-petition obligations or the pre-petition Liens securing such pre-petition obligations of Lender;

8.16.    The payment by any Credit Party or any Unencumbered Foreign Subsidiary, or application by any Credit Party or any Unencumbered Foreign Subsidiary for authority to pay, any pre-petition obligation not expressly provided for in the Budget without the prior written consent of Lender; or

8.17.    Any Credit Party or any Subsidiary shall fail to satisfy any Sale Milestone on or before the date that is seven (7) calendar days following the date set forth opposite such Sale Milestone on Exhibit C attached hereto; or 8.18.    Any Credit Party or any Subsidiary shall fail to receive a qualified bid (meeting the requirements of the Bid Procedures (as defined in Exhibit C attached hereto)) by no later than seven (7) calendar days following the Bid Deadline (as defined in Exhibit C attached hereto) in an amount sufficient to pay, in full, in cash, all Obligations.

9.    **LENDER'S RIGHTS AND REMEDIES.**

9.1.    <u>Rights and Remedies</u>.  Upon the occurrence and during the continuance of an Event of Default, Lender may, at its election:

(a)    Declare all Obligations, whether evidenced by this Agreement, by any of the other DIP Revolving Loan Documents, or otherwise, immediately due and payable without presentment, demand, protest or further notice of any kind, all of which are expressly waived by each Credit Party;

DOC ID - 26567501.3

26

(b)      Terminate or reduce its commitment to make Advances hereunder, and cease or reduce advancing money or extending credit to or for the benefit of any Credit Party under this Agreement or under any other agreement between Borrower and Lender;

(c)      Exercise any and all of its rights and remedies under this Agreement, any Interim DIP Order, any Final DIP Order, any DIP Revolving Loan Document, applicable law, or otherwise; provided, however, notwithstanding anything to the contrary contained herein, Lender shall be permitted to exercise any remedy in the nature of a liquidation of, or foreclosure on, any interest of any Credit Party in the Collateral only upon ten (10) Business Days' prior notice to the Borrower, the office of the United States Trustee for Region 8, and any counsel approved by the Bankruptcy Court for the official committee of unsecured creditors, if any, of Lender's intention to exercise such remedies. Upon the occurrence of an Event of Default and the exercise by Lender of its rights and remedies as provided herein, Lender may make such payments and do such acts as Lender considers necessary or reasonable to protect its security interest in the Collateral. Each Credit Party agrees to assemble the Collateral if Lender so requires, and to make the Collateral available to Lender as Lender may designate. Each Credit Party authorizes Lender to enter the premises where the Collateral is located, to take and maintain possession of the Collateral, or any part of it, and to pay, purchase, contest, or compromise any encumbrance, charge, or lien which in Lender's commercially reasonable determination appears to be prior or superior to its security interest and to pay all expenses incurred in connection therewith. With respect to any of Borrower's owned premises, if any, Borrower hereby grants Lender a license to enter into possession of such premises and to occupy the same, without charge, in order to exercise any of Lender's rights or remedies provided herein, at law, or in equity, or otherwise. Nothing contained herein or otherwise shall be construed to obligate Lender in any way to lend or advance any additional funds to any Credit Party or provide other financial accommodations to any Credit Party upon or after the occurrence of an Event of Default.

9.2.    Power of Attorney. Effective only upon the occurrence and during the continuance of an Event of Default, each Credit Party hereby irrevocably appoints Lender (and any of Lender's designated officers or employees) as such Credit Party's true and lawful attorney to: (a) send requests for verification of Accounts or notify account debtors of Lender's security interest in the Accounts; (b) endorse such Credit Party's name on any checks or other forms of payment or security that may come into Lender's possession; (c) sign such Credit Party's name on any invoice or bill of lading relating to any Account, drafts against account debtors, schedules and assignments of Accounts, verifications of Accounts, and notices to account debtors; (d) dispose of any Collateral; (e) make, settle, and adjust all claims under and decisions with respect to such Credit Party's policies of insurance; (f) settle and adjust disputes and claims respecting the accounts directly with account debtors, for amounts and upon terms which Lender determines to be reasonable; and (g) file, in its sole discretion, one or more financing or continuation statements and amendments thereto, relative to any of the Collateral. The appointment of Lender as each Credit Party's attorney in fact, and each and every one of Lender's rights and powers, being coupled with an interest, is irrevocable until all of the Obligations have been fully repaid and performed and Lender's obligation to provide Advances hereunder is terminated.

9.3.    Accounts Collection. Only after the occurrence and during the continuation of an Event of Default, Lender may notify any Person owing funds to any Credit Party of Lender's security interest in such funds and verify the amount of such Account. Any such Credit Party shall collect all amounts owing to such Credit Party for Lender, receive in trust all payments as Lender's trustee, and immediately deliver such payments to Lender in their original form as received from the account debtor, with proper endorsements for deposit.

9.4.    Lender Expenses. If any Credit Party fails to pay, or to cause any Subsidiary to pay, any amounts or furnish any required proof of payment due to third persons or entities, as required

under the terms of this Agreement, then Lender may do any or all of the following after reasonable notice to such Credit Party: (a) make payment of the same or any part thereof; (b) set up such reserves under the DIP Revolving Facility as Lender deems necessary to protect Lender from the exposure created by such failure; or (c) without limiting the generality of clause (a) above, take any action required with respect to the Intellectual Property Collateral pursuant to <u>Section 6.10</u>, and obtain and maintain insurance policies of the type discussed in <u>Section 6.6</u> of this Agreement, and take any action with respect to such policies as Lender deems prudent. Any amounts so paid or deposited by Lender shall constitute Lender Expenses, shall be immediately due and payable, and shall bear interest at the then applicable rate hereinabove provided, and shall be secured by the Collateral. Any payments made by Lender shall not constitute an agreement by Lender to make similar payments in the future or a waiver by Lender of any Event of Default under this Agreement.

9.5.    <u>Lender's Liability for Collateral</u>.  So long as Lender complies with reasonable banking practices, Lender shall not in any way or manner be liable or responsible for: (a) the safekeeping of the Collateral; (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (c) any diminution in the value thereof; or (d) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other person whomsoever. All risk of loss, damage or destruction of the Collateral shall be borne by Borrower.

9.6.    <u>Remedies Cumulative</u>.  Lender's rights and remedies under this Agreement, any Interim DIP Order, any Final DIP Order, any DIP Revolving Loan Document, or any other agreement shall be cumulative. Lender shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity.  No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Event of Default on Borrower's part shall be deemed a continuing waiver.  No delay by Lender shall constitute a waiver, election, or acquiescence by it. No waiver by Lender shall be effective unless made in a written document signed on behalf of Lender and then shall be effective only in the specific instance and for the specific purpose for which it was given.

9.7.    <u>Demand; Protest</u>.  Each Credit Party waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees at any time held by Lender on which Borrower may in any way be liable.

**10.    NOTICES.**

Unless otherwise provided in this Agreement, all notices or demands by any party relating to this Agreement or any other agreement entered into in connection herewith shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by a recognized overnight delivery service, certified mail, postage prepaid, return receipt requested, or by telefacsimile to Borrower or to Lender, as the case may be, at its addresses set forth below:

DOC ID - 26567501.3

To Borrower or any Credit Party:        CRS Reprocessing, LLC
                                        9780 Ormsby Station Road
                                        Suite 2500
                                        Louisville, KY 40223
                                        Attention:    Chief Executive Officer
                                        Telephone:    502.778.3600
                                        Telecopy:    502.778.3606

                                        With a copy to:

                                        Stoll Keenon Ogden PLLC
                                        300 West Vine Street, Suite 2100
                                        Lexington, KY  40507-1801
                                        Attention:    R. David Lester, Esq.
                                        Telephone:   859.231.3082
                                        E-mail:        David.Lester@skofirm.com

To Lender:                              Triangle Capital Corporation
                                        3700 Glenwood Ave, Suite 530
                                        Raleigh, NC 27612
                                        Attention:  Cary Nordan, Senior Managing Director
                                        Telephone: 919.719.4778
                                        E-mail: cnordan@tcap.com

                                        With a copy to:

                                        Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P.
                                        Wells Fargo Capitol Center
                                        150 Fayetteville Street, Suite 2300
                                        Raleigh, NC 27601
                                        Attention:  Amos U. Priester IV
                                        Telephone: 919.821.6669
                                        E-mail: apriester@smithlaw.com

provided, that any notice, request or demand to or upon Lender shall not be effective until received.

        The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.

        **11.        CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.**

        This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of North Carolina, without regard to principles of conflicts of law, except to the extent governed by the Bankruptcy Code.  Subject to the jurisdiction of the Bankruptcy Court, each Credit Party and Lender hereby submits to the exclusive jurisdiction of the state and Federal courts located in the State of North Carolina.  EACH CREDIT PARTY AND LENDER EACH HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE DIP REVOLVING LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY

DOC ID - 26567501.3

                                        29

CLAIMS. EACH PARTY RECOGNIZES AND AGREES THAT THE FOREGOING WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR IT TO ENTER INTO THIS AGREEMENT. EACH PARTY REPRESENTS AND WARRANTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

### 12.    GENERAL PROVISIONS.

12.1.    <u>Successors and Assigns</u>.  This Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of each of the parties, including any trustee that may be appointed in the Bankruptcy Case or a subsequent Chapter 7 case; <u>provided, however</u>, that neither this Agreement nor any rights hereunder may be assigned by any Credit Party without Lender's prior written consent, which consent may be granted or withheld in Lender's sole discretion.  Lender shall have the right without the consent of or notice to any Credit Party to sell, transfer, negotiate, or grant participation in all or any part of, or any interest in, Lender's obligations, rights and benefits hereunder.  Further, Lender may pledge this Agreement and/or any or all of the DIP Revolving Loan Documents, and Lender's right, title, and interest therein, as security for its currently existing or future senior credit facility to the extent required by such facility.

12.2.    <u>Payment of Expenses; Indemnification</u>.  Each Credit Party shall (a) pay or reimburse Lender on demand for all Lender Expenses incurred, including in connection with an Event of Default, (b) pay, indemnify and hold Lender harmless from any and all recording and filing fees and any and all liabilities with respect to or resulting from any delay in paying stamp, excise and other similar taxes (other than withholding taxes), if any, which may be payable or determined to be payable in connection with the execution and delivery of, or consummation of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, any DIP Revolving Loan Document and any such other documents, and (c) indemnify and hold harmless Lender and its shareholders, directors, agents, officers, subsidiaries and affiliates, successors and assigns, and professional advisors from and against any and all claims, actions, causes of action, and suits, whether groundless or otherwise, and from and against any and all liabilities, losses, damages, settlement payments, obligations, and reasonable costs and expenses of every nature and character arising out of the DIP Revolving Loan Documents or the transactions contemplated thereby and by any Interim DIP Order or any Final DIP Order, except to the extent that such liabilities, losses, damages, or expenses arise out of such person's gross negligence or willful misconduct as finally determined by a final non-appealable order of a court of competent jurisdiction. The indemnity includes indemnification for Lender's exercise of discretionary rights granted under the DIP Revolving Loan Documents. In all such litigation, or the preparation therefor, Lender shall be entitled to select its own counsel and, in addition to the foregoing indemnity, Borrower agrees to pay promptly the reasonable fees and expenses of such counsel.  Lender shall not be required to make any application to the Bankruptcy Court with respect to reimbursement of any Lender Expenses unless otherwise set forth in an order issued by the Bankruptcy Court.

12.3.    <u>Time of Essence</u>.  Time is of the essence for the performance of all obligations set forth in this Agreement.

12.4.    <u>Severability of Provisions</u>. Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

12.5.    <u>Amendments in Writing, Integration</u>.  Neither this Agreement (including the Schedule and exhibits hereto) nor the other DIP Revolving Loan Documents may be amended, supplemented, waived, or otherwise modified without the prior written consent of Lender. All prior

DOC ID - 26567501.3

agreements, understandings, representations, warranties, and negotiations between the parties hereto with respect to the subject matter of this Agreement and the DIP Revolving Loan Documents, if any, are merged into this Agreement and the DIP Revolving Loan Documents.

12.6.    Counterparts.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  Delivery of an executed counterpart of this Agreement by telecopier or electronic mail shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by telecopier or electronic mail also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.  The foregoing shall apply to each other DIP Revolving Loan Document *mutatis mutandis*.

12.7.    Survival.  All covenants, representations and warranties made in this Agreement shall continue in full force and effect so long as any Obligations remain outstanding or Lender has any commitment to make Advances to Borrower.  The obligations of each Credit Party to indemnify Lender with respect to the expenses, damages, losses, costs and liabilities described in Section 12.2 shall survive until all applicable statute of limitations periods with respect to actions that may be brought against Lender have run.

12.8.    Confidentiality.    In handling any confidential information Lender and all employees and agents of Lender, including accountants, shall exercise the same degree of care that it exercises with respect to its own proprietary information of the same types to maintain the confidentiality of any non-public information thereby received or received pursuant to this Agreement except that disclosure of such information may be made (a) to Lender's employees, representatives, directors, managing directors, attorneys, auditors, agents, professional advisors, trustees, members, shareholders, any funding or financing source or Affiliates who are advised of the confidential nature of such information or to any direct or indirect contractual counterparty in swap agreements or such contractual counterparty's professional advisor (so long as such contractual counterparty or professional advisor to such contractual counterparty agrees to be bound by the provisions of this Section 12.8), (b) to assignees or participants or prospective assignees or participants who agree to be bound by the provisions of this Section 12.8, (c) as required by law, regulations, rule or order, subpoena, judicial order or similar order, (d) as may be required in connection with the examination, audit or similar investigation of Lender, (e) in filings with or communications to investors required by the United States Securities and Exchange Commission or applicable foreign counterpart or (f) as Lender may determine in connection with the enforcement of any remedies hereunder.   Confidential information hereunder shall not include information that either: (i) is in the public domain or in the knowledge or possession of Lender when disclosed to Lender, or becomes part of the public domain after disclosure to Lender through no fault of Lender; or (ii) is disclosed to Lender by a third party, provided, that Lender does not have actual knowledge that such third party is prohibited from disclosing such information.

12.9.    Additional Grant of Lien.  All Obligations, contingent or absolute (including the principal thereof, interest thereon and any costs and expenses owing in connection therewith) which may now or from time to time hereafter be owing by any Credit Party to Lender under any of the DIP Revolving Loan Documents shall be secured as set forth in any Interim DIP Order or any Final DIP Order.

12.10.    No Duty.  All attorneys, accountants, appraisers and other professionals and consultants retained by Lender shall have the right to act exclusively in the interest of Lender and shall

DOC ID - 26567501.3

31

have no duty of disclosure, duty of loyalty, duty of care or other duty or obligation of any type or nature whatsoever to any Credit Party or any other Person.

12.11. <u>No Fiduciary Relationship</u>.  The relationship between each Credit Party, on the one hand, and Lender, on the other hand, is solely that of debtor and creditor, and Lender has no fiduciary or other special relationship with any Credit Party, and no term or condition of any of the DIP Revolving Loan Documents shall be construed so as to deem the relationship between an Credit Party and Lender to be other than that of debtor and creditor.

12.12. <u>Equitable Relief</u>.  Each Credit Party recognizes that, in the event it fails to pay, perform, observe or discharge any or all of the Obligations, any remedy at law may prove to be inadequate relief to Lender.  Each Credit Party therefore agrees that Lender, if Lender so requests, shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages.

12.13. <u>BDC Matters; Other Services</u>.  Lender is a Business Development Company under the Investment Company Act of 1940 and routinely provides management advisory services to portfolio companies in which it makes debt and/or equity investments.  Nothing contained herein shall limit or preclude Lender or any of its Affiliates from carrying on any business with, providing financial services to, or participating in any capacity, including as a lender to or an equity investor in, any party whatsoever, including any competitor, supplier, or customer of any Credit Party or its Affiliates, or any other party that may have interests different than or adverse to such parties' interests.  Each Credit Party acknowledges that Lender or its Affiliates may be providing debt financing, equity capital, or other services to other companies in respect of which such Credit Party or its Affiliates may have conflicting interests.  Lender has no obligation in connection with the DIP Revolving Facility to use, or to furnish to any Credit Party or its Affiliates, confidential information obtained from other companies.

12.14. <u>Further Assurances</u>.  Each Credit Party agrees to execute any further documents, and to take any further actions, reasonably requested by Lender to effectuate the rights granted or to be granted to Lender as contemplated by this Agreement.  Without limiting the generality of the foregoing, creation or perfection of security interests in Collateral held by Foreign Credit Parties may require, inter alia, the execution of further documents and the making of additional filings in such countries to be enforceable without the cooperation of the applicable Foreign Credit Parties.

13.    **CO-BORROWER PROVISIONS**

13.1. <u>Primary Obligation</u>.  This Agreement is a primary and original obligation of each Borrower and shall remain in effect notwithstanding future changes in conditions, including any change of law or any invalidity or irregularity in the creation or acquisition of any Obligations or in the execution or delivery of any agreement between Lender and any Borrower.  Each Borrower shall be liable for existing and future Obligations as fully as if all Advances were advanced to such Borrower.  Lender may rely on any certificate or representation made by any Borrower as made on behalf of, and binding on, all Borrowers, including Advance Requests.

13.2. <u>Enforcement of Rights</u>.  Borrowers are jointly and severally liable for the Obligations, and Lender may proceed against one or more of the Borrowers to enforce the Obligations without waiving its right to proceed against any of the other Borrowers.

13.3. <u>Borrowers as Agents</u>.  Each Borrower appoints the other Borrower as its agent with all necessary power and authority to give and receive notices, certificates or demands for and on behalf of all Borrowers, to act as disbursing agent for receipt of any Advances on behalf of each

DOC ID - 26567501.3

Borrower and to apply to Lender on behalf of each Borrower for Advances, any waivers and any consents.  This authorization cannot be revoked, and Lender need not inquire as to each Borrower's authority to act for or on behalf of Borrower.

13.4.  <u>Subrogation and Similar Rights</u>.  Notwithstanding any other provision of this Agreement or any other DIP Revolving Loan Document, each Borrower irrevocably waives all rights that it may have at law or in equity (including any law subrogating any Borrower to the rights of Lender under the DIP Revolving Loan Documents) to seek contribution, indemnification or any other form of reimbursement from any other Borrower, or any other Person now or hereafter primarily or secondarily liable for any of the Obligations, for any payment made by a Borrower with respect to the Obligations in connection with the DIP Revolving Loan Documents or otherwise and all rights that it might have to benefit from, or to participate in, any security for the Obligations as a result of any payment made by Borrower with respect to the Obligations in connection with the DIP Revolving Loan Documents or otherwise.  Any agreement providing for indemnification, reimbursement or any other arrangement prohibited under this Section 13.4 shall be null and void.  If any payment is made to a Borrower in contravention of this Section 13.4, such Borrower shall hold such payment in trust for Lender and such payment shall be promptly delivered to Lender for application to the Obligations, whether matured or unmatured.

13.5.  <u>Waivers of Notice</u>.  Except as otherwise provided in this Agreement, each Borrower waives notice of acceptance hereof; notice of the existence, creation or acquisition of any of the Obligations; notice of an Event of Default; notice of the amount of the Obligations outstanding at any time; notice of intent to accelerate; notice of acceleration; notice of any adverse change in the financial condition of any other Borrower or of any other fact that might increase such Borrower's risk; presentment for payment; demand; protest and notice thereof as to any instrument; default; and all other notices and demands to which such Borrower would otherwise be entitled.  Each Borrower waives any defense arising from any defense of any other Borrower or by reason of the cessation from any cause whatsoever of the liability of any other Borrower.  Lender's failure at any time to require strict performance by any Borrower of any provision of the DIP Revolving Loan Documents shall not waive, alter or diminish any right of Lender thereafter to demand strict compliance and performance therewith.  Nothing contained herein shall prevent Lender from foreclosing on the Lien of any deed of trust, mortgage or other security instrument, or exercising any rights available thereunder, and the exercise of any such rights shall not constitute a legal or equitable discharge of any Borrower.  Each Borrower also waives any defense arising from any act or omission of Lender that changes the scope of such Borrower's risks hereunder.

13.6.  <u>Subrogation Defenses</u>.  Each Borrower hereby waives any defense based on impairment or destruction of its subrogation or other rights against any other Borrower and waives all benefits which might otherwise be available to it under any statutory or common law suretyship defenses or marshalling rights, now and hereafter in effect.

13.7.  <u>Right to Settle, Release</u>.

(a)    The liability of Borrowers hereunder shall not be diminished by (i) any agreement, understanding or representation that any of the Obligations is or was to be guaranteed by another Person or secured by other property, or (ii) any release or unenforceability, whether partial or total, of rights, if any, which Lender may now or hereafter have against any other Person, including another Borrower, or property with respect to any of the Obligations.

(b)    Without affecting the liability of any Borrower hereunder, Lender may (i) compromise, settle, renew, extend the time for payment, change the manner or terms of payment,

DOC ID - 26567501.3

33

discharge the performance of, decline to enforce or release all or any of the Obligations with respect to a Borrower, (ii) grant other indulgences to a Borrower in respect of the Obligations, (iii) modify in any manner any documents relating to the Obligations with respect to a Borrower, (iv) release, surrender or exchange any deposits or other property securing the Obligations, whether pledged by a Borrower or any other Person, or (v) compromise, settle, renew or extend the time for payment, discharge the performance of, decline to enforce or release all or any obligations of any guarantor, endorser or other Person who is now or may hereafter be liable with respect to any of the Obligations.

13.8.    <u>Subordination</u>.  All indebtedness of a Borrower now or hereafter arising held by another Borrower is subordinated to the Obligations, and the Borrower holding the indebtedness shall take all actions reasonably requested by Lender to effect, to enforce and to give notice of such subordination.

## 14.    **GUARANTEE BY GUARANTORS**

14.1    <u>The Guarantee</u>. Each Guarantor hereby guarantees (jointly and severally with the other Credit Parties) to Lender and its respective successors and assigns the prompt payment in full when due (whether at stated maturity, by acceleration or otherwise), and the performance, of the Obligations. The Guarantors hereby further agree that if the Borrower shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Obligations, the Guarantors will promptly pay the same upon demand by Lender, without the requirement of any other demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

14.2    <u>Obligations Unconditional</u>.  The obligations of the Guarantors under <u>Section 14.1</u> are absolute and unconditional irrespective of the value, genuineness, validity, regularity or enforceability of this Agreement, the other DIP Revolving Loan Documents or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Obligations, and, to the fullest extent permitted by applicable law, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent of this <u>Section 14.2</u> that the obligations of the Guarantors hereunder shall be absolute and unconditional under any and all circumstances. Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute and unconditional as described above:

(a)    at any time or from time to time, without notice to such Guarantors, the time for any performance of or compliance with any of the Obligations shall be extended, or such performance or compliance shall be waived;

(b)    any of the acts mentioned in any of the provisions hereof or of the other Loan Documents or any other agreement or instrument referred to herein or therein shall be done or omitted;

(c)    the maturity of any of the Obligations shall be accelerated, or any of the Obligations shall be modified, supplemented or amended in any respect, or any right hereunder or under the other Loan Documents or any other agreement or instrument referred to herein or therein shall be waived or any other guarantee of any of the Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with; or

DOC ID - 26567501.3

34

(d)      any lien or security interest granted to, or in favor of, Lender as security for any of the Obligations shall fail to be perfected.

The Guarantors hereby expressly waive diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that Lender exhaust any right, power or remedy or proceed against the Borrower hereunder or under the other Loan Documents or any other agreement or instrument referred to herein or therein, or against any other Person under any other guarantee of, or security for, any of the Obligations.

14.3      Reinstatement.  The obligations of the Guarantors under this Article 14 shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower in respect of the Obligations is rescinded or must be otherwise restored by any holder of any of the Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, and each Guarantor agrees that it will indemnify Lender on demand for all reasonable costs and expenses (including reasonable fees and expenses of outside counsel) incurred by Lender in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar law.

14.4      Subrogation.      Until all of the Obligations have been paid, in full, in cash, and Lender's commitment to make Advances has terminated, each of the Guarantors hereby waives all rights of subrogation or contribution for each of the Guarantors whether arising by contract or operation of law (including any such right arising under the Bankruptcy Code, as amended) or otherwise by reason of any payment by it pursuant to the provisions of this Article 14 and further agrees with the Borrower for the benefit of each creditor of the Borrower (including Lender) that any such payment by it shall constitute a contribution of capital by such Guarantor to the Borrower.

14.5      Remedies.  The Guarantors agree that, as between the Guarantors and Lender, the Obligations of the Borrower hereunder may be declared to be forthwith due and payable as provided in Section 9.1 (and shall be deemed to have become automatically due and payable in certain circumstances as provided in Section 9.1) for purposes of Section 14.1 notwithstanding any stay, injunction or other prohibition preventing such declaration (or such Obligations from becoming automatically due and payable) as against the Borrower and that, in the event of such declaration (or such Obligations being deemed to have become automatically due and payable), such Obligations (whether or not due and payable by the Borrower) shall forthwith become due and payable by the Guarantors for purposes of Section 14.1.

14.6      Instrument for the Payment of Money.  Each of the Guarantors hereby acknowledges that the guarantee in this Article 14 constitutes an instrument for the payment of money, and consents and agrees that Lender, at its sole option, in the event of a dispute by such Guarantor in the payment of any moneys due hereunder, shall have the right to summary judgment or such other expedited procedure as may be available for a suit on a note or other instrument for the payment of money.

14.7      Continuing Guarantee.  The guarantee in this Article 14 is a continuing guarantee, and shall apply to all Obligations whenever arising.

14.8      General Limitation on Amount of Obligations Guaranteed.  In any action or proceeding involving any state or non-U.S. corporate law, or any state or Federal or non-U.S. bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of the Guarantors under Section 14.1 would otherwise be held or determined to be void, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its

liability under <u>Section 14.1</u>, then, notwithstanding any other provision hereof to the contrary, the amount of such liability shall, without any further action by the Guarantors, Lender or other Person, be automatically limited and reduced to the highest amount that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

*[Signature pages follow]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

**LENDER:**

**TRIANGLE CAPITAL CORPORATION**, a Maryland corporation


By:    _____
Name:  _____
Its:   _____


**BORROWER:**

**CRS REPROCESSING, LLC**, a Delaware limited liability company


By:    _____
Name:  _____
Its:   _____

[Signature Page to DIP Loan and Security Agreement]

**GUARANTORS:**

**CRS SOLIDS SOLUTIONS, LLC,** a Delaware limited liability company

By: _____
Name: _____
Its: _____

**RDC CONSULTING, LLC**, a Delaware limited liability company

By: _____
Name: _____
Its: _____

**CRS ÚJRAFELDOLGOZÁS MAGYARORSZÁG KFT.**, a Hungarian Korlátolt Felelősségű Társaság

By: _____
Name: _____
Its: _____

DOC ID - 26567501.3

[Signature Page to DIP Loan and Security Agreement]

**EXHIBIT A**

**BUDGET**

[attached]

**EXHIBIT B**

**COLLATERAL DESCRIPTION ATTACHMENT**

**TO LOAN AND SECURITY AGREEMENT**

All of the following, whether presently existing or hereafter created or acquired, and wherever located, in each case whether existing, created or acquired prior to the Petition Date or on or after the Petition Date:

(1)    all Accounts;

(2)    all payment rights under contracts directly relating to the creation or collection of Accounts;

(3)    all rights under any existing or future policy of insurance relating to Accounts;

(4)    all letters of credit, guarantees, supporting obligations and other obligations securing or supporting any Accounts, and all claims under such securing or supporting obligations;

(5)    other than any Term Loan Collateral Account (as defined in that certain Amended and Restated Intercreditor Agreement, dated as of May 27, 2015, by and among, inter alia, the Credit Parties, THL Corporate Finance, Inc. and Triangle Capital Corporation, as amended, restated or otherwise modified from time to time), the contents thereof and proceeds therefrom, all cash and cash equivalents, Deposit Accounts, and lockboxes of any Credit Party;

(6)    all credit card receivables;

(7)    [reserved];

(8)    all other collateral of any nature as may be provided as security for the Obligations in any Interim DIP Order, any Final DIP Order or otherwise;

(9)    all books and records directly related to any of the foregoing; and

(10)    any and all proceeds and products of any of the foregoing (including, without limitation, proceeds of insurance described in (3) above but excluding proceeds of business interruption insurance so long as those proceeds are not compensation for a loss with respect to the Collateral, chattel paper, investment property, instruments and letter of credit rights relating to any of the foregoing), all whether now existing or hereafter created, whether purchased or otherwise acquired by such Credit Party.

Terms used in this Exhibit B without definition that are defined in the Code have the meanings given to such terms in the Code.

DOC ID - 26567501.3

**EXHIBIT C**

**SALE MILESTONES**

| Milestone | Specified Deadline |
|---|---|
| 1. Entry by the Bankruptcy Court of an order approving bid procedures in form and substance reasonably acceptable to Lender (the "**Bid Procedures**") with respect to the sale of all or substantially all of Borrower's assets pursuant to a public auction (the "**Auction**") to be consummated in the Bankruptcy Case pursuant to Section 363 of the Bankruptcy Code (the "**Sale**") | No later than September 29, 2017 |
| 2. Last day to submit bid in accordance with the Bid Procedures (the "**Bid Deadline**") | No later than October 13, 2017 |
| 3. Auction in accordance with Bid Procedures | No later than October 20, 2017 |
| 4. Hearing to approve Sale | No later than October 20, 2017 |
| 5. Entry by the Bankruptcy Court of an order approving the Sale | No later than October 27, 2017 |
| 6. Closing of Sale | No later than November 6, 2017 |

**EXHIBIT D**

**ADVANCE REQUEST**

*(To be submitted no later than 2:00 PM to be considered for next Business Day processing)*

To:    <u>TRIANGLE CAPITAL CORPORATION___</u>


Fax:    _____


Date:   _____


From: <u>CRS REPROCESSING, LLC_____</u>

      Borrower's Name


      _____

      Authorized Signature


      _____

      Authorized Signer's Name (please print)


      _____

      Phone Number


To Account #   _____


Borrower hereby requests an Advance, to be made available on _____ __, ____, in the amount of $_____, in accordance with the Debtor-In-Possession Loan and Security Agreement dated as of August 30, 2017 (the "Agreement").  Capitalized terms used herein and not otherwise defined have the meanings set forth in the Agreement.

Borrower hereby authorizes Lender to rely on facsimile stamp signatures and treat them as authorized by Borrower for the purpose of requesting the above advance.

DOC ID - 26567501.3

All conditions precedent to the Advance requested hereby have been satisfied as of the date hereof.

Attached hereto as Annex I is a reconciliation (as of the proposed Advance date) of the requested Advance (together with all other outstanding Advances) to Availability and to the Budget expense(s) to be paid from such Advance.

Check if applicable:

____    The proposed amount of such Advance, together with the aggregate principal amount of all other Advances outstanding, will exceed the result of (a) Availability minus (b) the Availability Block (but will not exceed the DIP Revolving Line), and may be made available or withheld in Lender's sole discretion pursuant to Section 2.1(a)(i) of the Agreement.

**ANNEX I TO ADVANCE REQUEST**

**Reconciliation to Availability and to Budget**

[Borrower to provide]

**EXHIBIT E**

**JOINDER TO DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT**

**THIS JOINDER TO DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT** (this "Joinder"), dated as of [_____], is executed and delivered by [_____], a [_____] ( "Additional Borrower"), pursuant to that certain Debtor-In-Possession Loan and Security Agreement dated as of August 30, 2017 (the "DIP Loan Agreement") by and among CRS Reprocessing, LLC, a Delaware limited liability company ("CRS"), the Guarantors party thereto and Triangle Capital Corporation, a Maryland corporation ("Lender").  Capitalized terms used herein without definition shall have the meanings given to them in the DIP Loan Agreement.

Lender has agreed to provide Advances to any Domestic Subsidiary of CRS that files a petition under the Bankruptcy Code provided such Domestic Subsidiary becomes a "Borrower" under the DIP Loan Agreement and the DIP Revolving Loan Documents.

The Additional Borrower will obtain benefits as a result of being a "Borrower" under the DIP Financing and, accordingly, desires to execute and deliver this Joinder.  The Additional Borrower hereby agrees as follows:

1.      DIP Financing.  By executing and delivering this Joinder, the Additional Borrower hereby becomes a party to the DIP Loan Agreement and a "Borrower" thereunder with the same force and effect as if originally named therein as a Borrower and, without limiting the generality of the foregoing, hereby expressly assumes all obligations and liabilities of a Borrower thereunder.  In furtherance of the foregoing, and without limiting the generality of the terms of this paragraph 1, the Additional Borrower, as security for the Obligations, grants and pledges to Lender:

(a)      Pursuant to Section 364(c)(2) of the Bankruptcy Code, a perfected first-priority lien on the Collateral (but subject to the Carve-Out).

(b)      Pursuant to Section 364(d) of the Bankruptcy Code, a perfected first-priority, priming lien on the Collateral, but subject to the Carve-Out, which lien shall not be subject to being treated *pari passu* with, or subordinated to, any other liens or security interests (whether currently existing or hereafter created).

(c)      These security interests are being granted in all presently existing and hereafter acquired or arising Collateral in order to secure prompt repayment of any and all Obligations and in order to secure prompt performance by each Credit Party of its covenants and duties under the DIP Revolving Loan Documents.  Except for the Carve Out, such security interest constitutes a valid, first priority security interest in the presently existing Collateral, and will constitute a valid, first priority security interest in Collateral acquired after the date hereof.

2.      The Additional Borrower hereby further promises to pay to the order of Lender, in lawful money of the United States of America, the aggregate outstanding principal amount of all Advances made by Lender to Additional Borrower under the DIP Loan Agreement.

3.      The Additional Borrower hereby represents and warrants that each of the representations and warranties contained in the DIP Loan Agreement is true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to "materiality" or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on

DOC ID - 26567501.3

and as of the date hereof (after giving effect to this Joinder) as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct on and as of such earlier date)) as if made on as of such date.

4.    Governing Law.  THIS JOINDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NORTH CAROLINA AND SUBJECT TO THE SAME JURISDICTION AS THAT UNDER THE DIP LOAN AGREEMENT.

5.    This Joinder shall be a DIP Revolving Loan Document (within the meaning of such term under the DIP Loan Agreement), shall be binding upon and enforceable against the Additional Borrower and its successors and assigns, and shall inure to the benefit of and be enforceable by Lender and its successors and assigns.

6.    The address of the Additional Borrower for purposes of all notices and other communication is the address set forth for CRS Reprocessing, LLC in Section 10 of the DIP Loan Agreement.

7.    This Agreement may be executed in two or more counterparts, each of which shall constitute an original but all of which when taken together shall constitute a single contract.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

DOC ID - 26567501.3

**IN WITNESS WHEREOF**, the undersigned have each caused this Joinder to be duly executed and delivered by its authorized officer as a sealed instrument as of the date first above written.

[ADDITIONAL BORROWER]

By: _____
    Name:
    Title:

Acknowledged and accepted:

**TRIANGLE CAPITAL CORPORATION**

By: _____
    Name:
    Title:

DOC ID - 26567501.3

**SCHEDULES**

[attached]

DOC ID - 26567501.3

### Schedule of Permitted Indebtedness – Indebtedness Existing on Petition Date

1.      Pre-Petition Loan A.

2.      Pre-Petition Loan B.

3.      Pre-Petition Loan C.

4.      Pre-Petition Loan D.

5.      Indebtedness in favor of Navitas Credit Corp. relating to Pre-Petition equipment held under capital lease.

<u>Schedule of Permitted Investments – Existing on Petition Date</u>

None, with exception of intercompany investments and transactions as listed below.  Net balance of related parties to CRS Reprocessing, LLC are identified below.

| CRS Reprocessing Subsidiary | Investment in Subsidiary | Intercompany Net Receivable (Payable) | Total Investment and Intercompany Balance |
|---|---|---|---|
| Coöperatief CRS Reprocessing U.A. | 6,020,143.70 | 104,246.80 | 6,124,390.50 |
| CRS (Dongying) Reprocessing, Ltd. | 1,875,132.00 | 6,376,940.91 | 8,252,072.91 |
| CRS (Hohhot) Reprocessing Limited | 100,000.00 | 31,874.96 | 131,874.96 |
| CRS Reprocessing (Philippines), Inc. | 25,033.40 | 7,208,393.76 | 7,233,427.16 |
| CRS Reprocessing France SAS | - | 290,966.73 | 290,966.73 |
| CRS Reprocessing Germany GmbH & Co. KG | - | 243,047.98 | 243,047.98 |
| CRS Reprocessing Germany Verwaltungs GmbH | - | 5,500.00 | 5,500.00 |
| CRS Reprocessing Hungary LLC | 2,240.32 | 1,116,058.89 | 1,118,299.21 |
| CRS Reprocessing Korea Limited YH | 43,533.48 | (15,115,102.97) | (15,071,569.49) |
| CRS Solids Solutions, LLC | 2,744,971.06 | 6,916,893.98 | 9,661,865.04 |
| Full Charter Industries Limited | - | (22,868.91) | (22,868.91) |
| Undisclosed LLC | - | 761.69 | 761.69 |
| RDC Consulting, LLC | - | 9,630.79 | 9,630.79 |
| RDC Consulting, LLC (Japan Branch) | 26,460.00 | 2,225,989.94 | 2,252,449.94 |
| Total | 10,837,513.96 | 9,392,334.56 | 20,229,848.52 |

## <u>Schedule of Permitted Liens– Liens Existing on Petition Date</u>

1.      Liens securing Pre-Petition Loan A.

2.      Liens securing Pre-Petition Loan B.

3.      Liens securing Pre-Petition Loan C.

4.      Liens securing Pre-Petition Loan D.

5.      Liens in favor of Radius Bank relating to Pre-Petition equipment held under operating leases.

6.      Liens in favor of Navitas Credit Corp. relating to Pre-Petition equipment held under capital lease.

**Schedule 5.1 – Credit Parties Organization Jurisdictions**

| Name | Jurisdiction of Organization |
|------|------------------------------|
| CRS Reprocessing, LLC | Delaware, USA |
| RDC Consulting, LLC | Delaware, USA |
| CRS Reprocessing Hungary LLC Korlátolt Felelősségű Társaság (LLC) | Hungary |

**<u>Schedule 5.2</u>**

The Credit Parties will violate the terms of one or more of the Pre-Petition Loan A documents, the Pre-Petition Loan B documents, the Pre-Petition Loan C documents and the Pre-Petition Loan D documents by entering into the Agreement.

The grant of the security interest in favor of Lender by CRS Reprocessing Hungary, LLC has not been authorized under Hungarian law.

**Schedule 5.4**

The security interest granted by CRS Reprocessing Hungary, LLC may not be a legal, valid and binding obligation or enforceable against it.

**<u>Schedule 5.5 – Actual or Imminent Insolvency of Material Account Debtors</u>**

None.

**<u>Schedule 5.6 – Intellectual Property Collateral</u>**

(a)  *Licenses Exceeding 10% of Monthly Gross Revenue.*

None.

(b)  *Security Interest Restrictions.*

      The grant of the liens and security interests by the Credit Parties will violate the terms of the Pre-Petition Loan A documents, the Pre-Petition Loan B documents, the Pre-Petition Loan C documents and the Pre-Petition Loan D documents.

**Schedule 5.7 – Name; Location of Chief Executive Office**

(a)  *Assumed Names.*

CRS Reprocessing Hungary LLC is the English name of CRS Újrafeldolgozás Magyarország Korlátolt Felelősségű Társaság

(b)  *Chief Executive Office.*

| Name | Chief Executive Office |
|---|---|
| CRS Reprocessing, LLC | 9780 Ormsby Station Road<br>Suite 2500<br>Louisville, KY 40223 |
| RDC Consulting, LLC | 9780 Ormsby Station Road<br>Suite 2500<br>Louisville, KY 40223 |
| CRS Solids Solutions, LLC | 9780 Ormsby Station Road<br>Suite 2500<br>Louisville, KY 40223 |
| CRS Reprocessing Hungary LLC CRS Újrafeldolgozás Magyarország Korlátolt Felelősségű Társaság | H-1062 Budapest, Vaci ut 1-3. "A" Building, VI. Floor, Hungary |

(c)  *Location of Inventory and Equipment*

1100 E Hunt Road, NP Central Receiving, Store Stop 142, Alcoa, TN 37701
4879 State Street, Bldg 516T, Bettendorf, IA 52722
569 Industrial Drive, Lewisberry, PA 17339
1372 State Highway 1957, Lewisport, KY 42351
 816B.1 CRS Reprocessing, Hwy 66, Newburgh, IN 47630
859 Century Rd, Ravenswood, WV 26164
1709 Jake Alexander Blvd, Salisbury, NC 28146
15000 E Euclid Ave, Spokane, WA 99215
9780 Ormsby Station Road, Suite 2500, Louisville, KY 40223
7200 NW Front Avenue, Portland, OR 97210
5734 American Legion Road, Tyler, TX 75708
2200 East CR 120, Midland, TX 79706
7646-56 Canton Center Dr. Baltimore, MD 21224
11-2 Kiyohara Industrial Park, Utsunomiya City, Tochigi Perfecture, Japan

DOC ID - 26567501.3

**<u>Schedule 5.8 – Litigation</u>**

None.

**Schedule 5.10 – Environmental Condition**

None.

## Schedule 5.11 – Subsidiary Chart

| Subsidiary of CRS Reprocessing, LLC | Jurisdiction | Entity Type | Formation Date |
|---|---|---|---|
| CRS Solids Solutions, LLC | Delaware | Limited Liability Company | 10/15/2013 |
| RDC Consulting, LLC | Delaware | Limited Liability Company | 1/17/2008 |
| RDC Consulting, LLC (Japan Branch) | Japan | Branch | 4/13/2009 |
| Undisclosed LLC | Pennsylvania | Limited Liability Company | 12/18/2015 |
| Coöperatief CRS Reprocessing U.A. | Netherlands | coöperatie met uitsluiting van aansprakelijkheid | 12/24/2008 |
| CRS Reprocessing Holding B.V. | Netherlands | Besloten vennootschap met beperkte aansprakelijkheid | 1/16/2008 |
| CRS Reprocessing France SAS | France | Société par Actions Simplifiée | 2/1/2008 |
| CRS Reprocessing Germany Verwaltungs GmbH | Germany | Gesellschaft mit beschränkter Haftung | 1/16/2008 |
| CRS Reprocessing Germany GmbH & Co. KG | Germany | Gesellschaft mit beschränkter Haftung & Compagnie Kommanditgesellschaft | 1/16/2008 |
| CRS Reprocessing Hungary LLC | Hungary | Korlátolt Felelősségű Társaság (LLC) | 4/12/2012 |
| CRS (Dongying) Reprocessing, Ltd. | China | Wholly Foreign-Owned Enterprise (Limited Liability Company) | 7/25/2011 |
| CRS Reprocessing Korea Limited YH | South Korea | Yuhan Hoesa (Private Corporation) | 9/10/2010 |
| CRS Reprocessing (Philippines), Inc. | Philippines | Private Corporation | 7/25/2011 |
| Full Charter Industries Limited | Hong Kong | Private Corporation | 3/31/2016 |
| CRS (Hohhot) Reprocessing Limited | China | Wholly Foreign-Owned Enterprise (Limited Liability Company) | 7/6/2016 |

**Schedule 5.13**

CRS Reprocessing Hungary, LLC will need to register the lien on its assets that it pledges in favor of the Lender with the relevant Hungarian registry of liens/pledges.

**Schedule 5.14 – Accounts Not Subject to Control Agreement**

Domestic Credit Party's deposit, operating or investment accounts are maintained or invested with a Person not subject to a control agreement with Lender:

| ACCOUNT OWNER | BANK NAME | ACCOUNT NO. (LAST 4) | DESCRIPTION |
|---|---|---|---|
| UNDISCLOSED LLC | JPMORGAN CHASE BANK, N.A. (KY) | 2297 | Operating Account (USD) |
| FULL CHARTER INDUSTRIES LIMITED | JPMORGAN CHASE BANK, N.A. (KY) | 7626 | Operating Account (USD) |

**Schedule 5.15 – Title to Properties**

None.

## <u>Schedule 5.16 – Real Property</u>

(a)  *List of Leased Property by Each Credit Party.*

CRS Reprocessing, LLC
>        9780 Ormsby Station Rd, Suite 2500 Louisville, KY 40223
>        569 Industrial Drive, Lewisberry, PA 17339

CRS Solids Solutions, LLC
>        5734 American Legion Road, Tyler, TX 75708


(b)  *Leased Property Issues.*

None.

(c)  *Lease Defaults.*

None.

**<u>Schedule 7.8 – Transactions with Affiliates</u>**

Transactions identified and permitted by the Budget.

DOC ID - 26567501.3

**Schedule 7.10 – Inventory and Equipment**

The Credit Parties utilize and store Inventory and Equipment at the following customer locations. These customers have not been notified of any liens relating to such equipment.

1100 E Hunt Road, NP Central Receiving, Store Stop 142, Alcoa, TN 37701
4879 State Street, Bldg 516T, Bettendorf, IA 52722
1372 State Highway 1957, Lewisport, KY 42351
816B.1 CRS Reprocessing, Hwy 66, Newburgh, IN 47630
859 Century Rd, Ravenswood, WV 26164
1709 Jake Alexander Blvd, Salisbury, NC 28146
15000 E Euclid Ave, Spokane, WA 99215
7200 NW Front Avenue, Portland, OR 97210
5734 American Legion Road, Tyler, TX 75708
2200 East CR 120, Midland, TX 79706
11-2 Kiyohara Industrial Park, Utsunomiya City, Tochigi Perfecture, Japan

Document comparison by Workshare Professional on Monday, September 11, 2017 4:06:23 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://SA-DMS.SMITHLAW.COM/RDU/6276985/1 |
| Description | #6276985v1<RDU> - CRS - DIP Loan and Security Agreement (Attachment to First Amendment to LSA) |
| Document 2 ID | interwovenSite://sa-dms.smithlaw.com/RDU/6276985/3 |
| Description | #6276985v3<RDU> - CRS - DIP Loan and Security Agreement (Attachment to First Amendment to LSA) |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 31 |
| Deletions | 24 |
| Moved from | 1 |
| Moved to | 1 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 57 |

**EXHIBIT A**

**BUDGET**

[attached]

CRS Reprocessing, LLC
Final DIP Budget - $3.7MM DIP
September 11, 2017

| | Actual | Actual | Actual | Actual | Actual/Budget | Budget |
|---|---|---|---|---|---|---|
| Week Post-Petition | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 |
| Week Ended | 8/11/2017 | 8/18/2017 | 8/25/2017 | 9/1/2017 | 9/8/2017 | 9/15/2017 |
| **Income** | | | | | | |
| AR Receipts | 381,424 | 12,228 | 155,321 | 37,206 | 98,317 | - |
| Interco Receipts | | | | | | |
| Total Income (Cash Basis) | 381,424 | 12,228 | 155,321 | 37,206 | 98,317 | - |
| **Ordinary Course Expenditures** | | | | | | |
| Site Operations & Engineering AP Expenses | - | (63,050) | (1,345) | 941 | (108,492) | (245,400 |
| SG&A AP Expenses | - | (926) | (448) | 314 | (20,000) | (110,000 |
| Project Capital Expenditures | - | - | - | - | (329,974) | (283,863 |
| All Payroll and Payroll Related | - | (225,277) | - | (189,660) | (49,070) | (190,430 |
| Interco - Korea Employee Commitments | - | - | - | - | - | - |
| Total Ordinary Course Expenditures | - | (289,254) | (1,794) | (188,405) | (507,536) | (829,693 |
| **Bankruptcy/Sale Related Expenditures** | | | | | | |
| Bankers | - | - | - | - | - | - |
| Attorneys - DIP Lender | - | - | - | - | - | - |
| Attorneys - Debtor | - | - | - | - | - | (80,000 |
| Creditors Committee | - | - | - | - | - | - |
| Accountants | - | - | - | - | - | - |
| Trustee, Court, and Other Fees | - | - | - | - | - | - |
| Interest | - | - | - | - | - | (6,709 |
| DIP Interest | - | - | - | - | - | - |
| Total Bankruptcy/Sale Related Expenditures | - | - | - | - | - | (86,709 |
| **Financing** | | | | | | |
| DIP | | - | - | - | 450,000 | 750,000 |
| Beginning Cash | 109,519 | 490,943 | 213,917 | 367,444 | 216,246 | 257,026 |
| Ending Cash | 490,943 | 213,917 | 367,444 | 216,246 | 257,026 | 90,624 |
| Cash Shortfall excluding DIP Borrowing | 381,424 | (277,026) | 153,527 | (151,199) | (409,219) | (916,402 |
| Expected Availability | - | - | - | - | (347,867) | (1,401,729 |
| Cumulative DIP Borrowing | | - | - | - | 450,000 | 1,200,000 |

**Exhibit B**

**Budget**

CRS Reprocessing, LLC
Final DIP Budget - $3.7MM DIP
September 11, 2017

| | Actual | Actual | Actual | Actual | Actual/Budget | Budget |
|---|---|---|---|---|---|---|
| Week Post-Petition | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 |
| Week Ended | 8/11/2017 | 8/18/2017 | 8/25/2017 | 9/1/2017 | 9/8/2017 | 9/15/2017 |
| | | | | | | |
| Income | | | | | | |
| AR Receipts | 381,424 | 12,228 | 155,321 | 37,206 | 98,317 | - |
| Interco Receipts | | | | | | |
| Total Income (Cash Basis) | 381,424 | 12,228 | 155,321 | 37,206 | 98,317 | - |
| | | | | | | |
| Ordinary Course Expenditures | | | | | | |
| Site Operations & Engineering AP Expenses | - | (63,050) | (1,345) | 941 | (108,492) | (245,400 |
| SG&A AP Expenses | - | (926) | (448) | 314 | (20,000) | (110,000 |
| Project Capital Expenditures | - | - | - | - | (329,974) | (283,86 |
| All Payroll and Payroll Related | - | (225,277) | - | (189,660) | (49,070) | (190,43 |
| Interco - Korea Employee Commitments | - | - | - | - | - | - |
| Total Ordinary Course Expenditures | - | (289,254) | (1,794) | (188,405) | (507,536) | (829,693 |
| | | | | | | |
| Bankruptcy/Sale Related Expenditures | | | | | | |
| Bankers | - | - | - | - | - | - |
| Attorneys - DIP Lender | - | - | - | - | - | - |
| Attorneys - Debtor | - | - | - | - | - | (80,000 |
| Creditors Committee | - | - | - | - | - | - |
| Accountants | - | - | - | - | - | - |
| Trustee, Court, and Other Fees | - | - | - | - | - | - |
| Interest | - | - | - | - | - | (6,70 |
| DIP Interest | - | - | - | - | - | - |
| Total Bankruptcy/Sale Related Expenditures | - | - | - | - | - | (86,70 |
| | | | | | | |
| Financing | | | | | | |
| DIP | | - | - | - | 450,000 | 750,00 |
| | | | | | | |
| Beginning Cash | 109,519 | 490,943 | 213,917 | 367,444 | 216,246 | 257,02 |
| Ending Cash | 490,943 | 213,917 | 367,444 | 216,246 | 257,026 | 90,62 |
| | | | | | | |
| | | | | | | |
| Cash Shortfall excluding DIP Borrowing | 381,424 | (277,026) | 153,527 | (151,199) | (409,219) | (916,40 |
| Expected Availability | - | - | - | - | (347,867) | (1,401,729 |
| | | | | | | |
| | | | | | | |
| Cumulative DIP Borrowing | | - | - | - | 450,000 | 1,200,00 |

**Exhibit C**

**SALE MILESTONES**

| Milestone | Specified Deadline |
|---|---|
| 1. Entry by the Bankruptcy Court of an order approving bid procedures in form and substance reasonably acceptable to Lender (the "**Bid Procedures**") with respect to the sale of all or substantially all of Borrower's assets pursuant to a public auction (the "**Auction**") to be consummated in the Bankruptcy Case pursuant to Section 363 of the Bankruptcy Code (the "**Sale**") | No later than September 29, 2017 |
| 2. Last day to submit bid in accordance with the Bid Procedures (the "**Bid Deadline**") | No later than October 13, 2017 |
| 3. Auction in accordance with Bid Procedures | No later than October 20, 2017 |
| 4. Hearing to approve Sale | No later than October 20, 2017 |
| 5. Entry by the Bankruptcy Court of an order approving the Sale | No later than October 27, 2017 |
| 6. Closing of Sale | No later than November 6, 2017 |